# Exhibit A

# SEC Charges Spongetech and Senior Executives in Pump-and-Dump Scheme

**FOR IMMEDIATE RELEASE**
**2010-70**

*Washington, D.C., May 5, 2010* — The Securities and Exchange Commission today charged New York City-based Spongetech Delivery Systems Inc., an affiliate, and five people involved in a massive pump-and-dump scheme that deceived investors into believing they were buying stock in a highly successful company.

The SEC alleges that Spongetech CEO Michael Metter and another senior executive, Steven Moskowitz, hyped fictional customers and grossly exaggerated sales figures through dozens of bogus press releases and fraudulent SEC filings to pump up demand for stock in Spongetech, a company that sells soap-filled sponges. After flooding the market with the false information to fraudulently inflate the stock price, Metter, Moskowitz, and Spongetech dumped approximately 2.5 billion shares by illegally selling them to the public through affiliated entities in unregistered transactions. They spent portions of their illicit profits in highly visible sponsorship deals with professional sports teams to further create the aura that Spongetech was a well-known and prosperous business.

The SEC suspended trading in Spongetech stock on Oct. 5, 2009, due to questions about the accuracy of the company's press releases and SEC filings. In today's enforcement action, Spongetech is accused of obstructing the SEC's investigation by producing phony sales documents in an attempt to legitimize the make-believe customers it hyped to the public. The U.S. Attorney's Office for the Eastern District of New York today announced a parallel criminal action in the matter.

"Spongetech used a menu of manipulative strategies to perpetuate this scheme, including fake sales orders and public statements as well as obstruction of the SEC's investigation," said Robert Khuzami, Director of the SEC's Division of Enforcement. "We will utilize all available means, including referral to criminal authorities, to prosecute those who attempt to thwart our investigations."

Christopher Conte, Associate Director of the SEC's Division of Enforcement, added, "Investors were deceived into believing that Spongetech was a successful business, while Spongetech and its senior executives were illegally dumping shares into the market."

Two of Spongetech's former attorneys — Jack Halperin and Joel Pensley — and stock promoter George Speranza are also charged in the SEC's complaint, which was filed in U.S. District Court for the Eastern District of New York. RM Enterprises International Inc., an affiliate through which Spongetech dumped shares, is also charged.

According to the SEC's complaint, after several years of relatively little business with a single customer comprising the bulk of Spongetech's limited sales, Metter and Moskowitz began to paint a more promising and misleading picture of Spongetech's business. Beginning in approximately April 2007, Spongetech issued dozens of phony press releases touting increasingly larger, yet fictitious, sales orders and revenue. The press releases fraudulently exaggerated the demand for pre-soaped sponges by referencing millions of dollars in sales orders, business, and revenue from five primary customers that purportedly

accounted for 99 percent of Spongetech's business, yet none of those customers actually existed.

The SEC's complaint alleges that Metter, Moskowitz, Spongetech, and RM Enterprises used false and baseless attorney opinion letters by Pensley and Halperin to distribute shares of Spongetech to the public. Metter, Moskowitz, and Spongetech also used false and misleading attorney opinion letters — forged in Pensley's name and in the name of a fictitious lawyer, David Bomart — which were transmitted to Spongetech's transfer agents. The SEC further alleges that Speranza created websites and rented unoccupied office space for the fictional customers in an attempt to legitimize them.

The SEC's complaint alleges that Spongetech violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Securities Exchange Act of 1934 and Exchange Act Rules 10b-5, 12b-20, 13a-13, 15d-1, 15d-11, and 15d-13. The complaint alleges that RM Enterprises violated Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5. The SEC alleges Metter and Moskowitz violated Sections 5(a), 5(c), and 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act, Exchange Act Rules 10b-5, 13b2-1, 13b2-2 (Moskowitz only), and 15d-14, and Section 304 of the Sarbanes-Oxley Act of 2002, and aided and abetted Spongetech's violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act and Exchange Act Rules 12b-20, 13a-13, 15d-1, 15d-11, and 15d-13. The SEC further alleges Speranza violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5, and aided and abetted violations of Sections 10(b) of the Exchange Act and Exchange Act Rule 10b-5. The Commission also alleges Pensley and Halperin violated Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.

The SEC thanks the U.S. Attorney's Office for the Eastern District of New York, the Federal Bureau of Investigation, the Internal Revenue Service, and the Financial Industry Regulatory Authority for their assistance in this matter. The SEC's investigation is continuing.

For more information about this enforcement action, contact:

Christopher Conte
Associate Director, SEC Division of Enforcement
(202) 551-4834

# Exhibit B

# CRAINS New York Business

## The rise and fall of the Spongetech scam

### How sports-stadium ads for soap-filled products helped fuel a penny-stock pump and dump

August 6, 2012

In late 2009, Madison Square Garden executives were getting fed up with one of the most prominent sponsors at New York Knicks and Rangers games. Spongetech Delivery Systems Inc., a small, publicly traded company that had emerged from nowhere months earlier, was chronically late paying for the ads it bought near the arena's basketball hoop and other key locations.

One exasperated MSG sales manager showed up at Spongetech's offices on West 33rd Street on the morning of Dec. 4 to collect in person after his repeated messages went unreturned. Spongetech's chief operating officer, Steven Moskowitz, gave him a check for $360,000 and then quickly left the office, saying he had another obligation.

The MSG executive noticed the check wasn't written from Spongetech's account. He raced to a garage where Mr. Moskowitz was waiting for his car and demanded he pay up, pronto, according to an affidavit filed in New York state court. Mr. Moskowitz told him to come back to the office in a while. A few hours later, the MSG representative watched as the COO wrote another $360,000 check.

In a response filed in court, Mr. Moskowitz acknowledged that his first check contained a "typographical error." But he insisted the check was never intended to pay Spongetech's bill. Rather, it was for an amount owed to MSG by another company he helped run.

Whatever the case, the check failed to clear. The following week, the president of MSG Sports, who was more accustomed to working with blue-chip sponsors like JPMorgan Chase and Coca-Cola, got an apologetic email from Spongetech Chief Executive Michael Metter. The CEO explained that cash flow was "tight" because Spongetech wouldn't get paid by retailers who sold its SpongeBob SquarePants line of sponges until after Christmas.

"We are unlike most of your advertisers," Mr. Metter wrote.

Truer words were never written. MSG executives didn't know it at the time, but theirs was the latest sports operation about to get soaked by a sponge company.

Six months after the email, Mr. Metter and Mr. Moskowitz were arrested and charged by federal prosecutors with faking 99% of Spongetech's sales. Seven people were indicted, and all but Mr. Metter have pleaded guilty to a variety of crimes, from securities fraud to slicing large payments into small amounts to avoid government detection. Mr. Moskowitz and his lawyer wouldn't comment for this article.

Mr. Metter's attorney, Maranda Fritz, said her client "has consistently maintained that he didn't know about or participate in the fraud at Spongetech, which Steve Moskowitz concealed from him and others."

Spongetech was liquidated after filing for bankruptcy, and while collection efforts are ongoing, MSG is unlikely to ever recover the $512,000 it is owed. "They may get a little," said bankruptcy trustee Brett Silverman, "but probably they'll get nothing."

MSG has company. The New York Mets got stiffed out of nearly $3 million by Spongetech. The New York Yankees, New York Giants, Boston Red Sox, Chicago Bears and Chicago Blackhawks also were left in the lurch after carrying ads in their stadiums that were vital in granting an aura of legitimacy to one of the more audacious penny-stock scams to emerge in years.

# Ill-gotten gains

The ads, which usually contained Spongetech's stock-ticker symbol and were typically placed to maximize visibility on television, helped Messrs. Metter and Moskowitz lure new investors to a scheme in which they pocketed $52 million in illegal gains from selling Spongetech shares at inflated prices, according to the feds.

"Either they believed the product was a real product because it was some sort of real product," said Hartley Bernstein, a New York lawyer who used to help unscrupulous market operators cook up penny-stock frauds and now runs a blog explaining how to identify fraudulent companies. "Or they knew they had a phony product and wanted to make it seem real, in which case then you do things that make it look real."

Spongetech marketed itself as "America's cleaning company" and in infomercials touted its unique "high-tech cleaning system." In reality, it was in the humdrum business of selling soap-filled sponges to help clean kitchens, cars or pets. It also sold a SpongeBob SquarePants sponge filled with baby soap. As for the sponges' "tech properties," Mr. Metter explained in TV appearances that the sponges contained a patented polymer "activated by water and mechanical squeezing."

Before getting into the sponge business, Mr. Metter worked for about 20 years as a stockbroker at a number of obscure brokerages with impressive-sounding names that sounded good to people who didn't know any better. One firm, J.J. Morgan, changed its name to First Cambridge Securities after JPMorgan sued.
Along the way, Mr. Metter accumulated a long history of customer complaints, according to records with securities industry regulators. One client who was awarded a $457,000 settlement after suing for fraud told *Crain's* he considered Mr. Metter to be a "mini-Madoff" at the time of his arrest. Ms. Fritz, Mr. Metter's attorney, said her client has never been personally sued by a client, though he was named in several investor complaints in his capacity as principal at First Cambridge. She added that Mr. Metter filed for bankruptcy because of the numerous legal claims he faced

Mr. Moskowitz is a resident of Flushing, Queens, who grew up in Forest Hills and, after graduating from Touro College followed his father into the garment business. He started his own apparel companies, including a maker of women's loungewear and robes called Romantic Moments, but none seem to have taken off. He met Mr. Metter through a headhunter, according to Ms. Fritz, and hired him to develop Spongetech's marketing and relationships with manufacturers.

For several years, Spongetech was little more than a dormant shell company. But in early 2007, its stock suddenly came to life, rising from pennies to 25 cents a share before retreating by year's end to less than a nickel. The launchpad for the action was Congregation Ohel Yitzchok, an orthodox synagogue in Kew Gardens Hills, Queens, attended by Mr. Moskowitz along with about 30 of Spongetech's 40 employees. The synagogue wouldn't comment.

"He never told people, 'Buy the stock,' " recalled a former employee and congregant. "It was always, 'Take a look at this and see what you think.' "

What people at the synagogue and elsewhere thought they saw was a company growing like crazy. Mr. Metter forecast that Spongetech would generate $7 million in profits and sales of $40 million in 2009. Even better, Spongetech executives offered stock to friends at a discount—a virtual guarantee that lucky early investors would make money.

A sale involving a Spongetech investor named Myron Weiner illustrates how things worked. Mr. Weiner, who once worked with Mr. Metter on Wall Street and owns the Italian restaurant John's of 12th Street in Manhattan, in 2009 acquired 10 million Spongetech shares at a nickel each when the stock was quoted at 17 cents a share, according to a lawsuit from the Securities and Exchange Commission. Mr. Weiner reaped a $1.2 million profit when he sold but had to return his windfall to settle with the SEC for violating rules governing restricted stock sales. He didn't return calls seeking comment.

After selling Spongetech stock to friends, the company hired four penny-stock brokers to drum up new audiences overseas for Spongetech and began issuing press releases touting new customers that prosecutors say didn't exist. The hype worked, and the shares started to rally again in the summer of 2009, enabling existing holders to cash out at a big profit. Spongetech even found a one-man accounting firm called Drakeford & Drakeford to sign off on its financial statements so everything looked legit.

The sports ads, a key part of the 2009 hype campaign for the stock, were the brainchild of Mr. Moskowitz, according to former employees and a New York sports executive. They describe Mr. Moskowitz as a big Mets fan who kept a couple of old Shea Stadium seats in his office.

The Mets were the first team to carry Spongetech ads, and the company signed a three-year advertising deal shortly before the team moved into Citi Field in 2009. Spongetech agreed to pay a bit more than $1 million a year for a large sign along the right field wall and ads elsewhere in the ballpark, according to state court documents. The company also rented a luxury suite behind third base for five seasons, starting at $250,000 per year. Because Spongetech was selling so much stock to gullible investors during the summer of 2009, it could afford to pay its bills to the Mets, at least at first.

The ads with the Mets caught the attention of MSG officials, who were impressed that the little-known company had secured a licensing agreement for SpongeBob with the cartoon character's owner, the entertainment giant Viacom. For its part, Viacom's Nickelodeon division terminated its licensing agreement after Mr. Metter and Moskowitz were arrested in 2010 and Nickelodeon was never paid past-due royalties, according to a Spongetech bankruptcy trustee's report. Viacom declined to comment.

At the time MSG was courting Spongetech, a credit check showed it was paying the Mets, according to a person close to the matter, and its product could be found in stores. Yet had MSG executives looked a little deeper they might have found red flags—such as seven letters from the Securities and Exchange Commission over a 13-month stretch, starting in March 2005, demanding that Spongetech provide more information in its financial statements.

Mr. Moskowitz signed a three-year contract with MSG on June 15, 2009, agreeing that Spongetech would pay $3.2 million a year to advertise during Knicks, Rangers and Liberty games, including a prime spot on the Rangers' Zamboni machine that cleans the ice between periods. Included in the sponsorship fee, Spongetech got a suite for six Knicks and Rangers games, two concerts and two other events. Mr. Moskowitz bragged to one employee that Spongetech got its ad space at a 67%

discount because other sponsors, such as Lehman Brothers or Citigroup, were going bust or scaling back dramatically.

# Beginning of the end

A person familiar with MSG's business denies Spongetech got a discount, and an MSG spokeswoman declined to comment.

Things started to come apart a day after Spongetech signed the deal with MSG. The Public Company Accounting Oversight Board revoked the registration of Spongetech's auditor, effectively shutting down the accounting firm. The SEC subpoenaed Spongetech in early September, and weeks later the*New York Post* ran a series of damaging articles. The stock price sank, and share sales dried up. Sensing the walls closing in, Mr. Metter and Mr. Moskowitz twice visited Spongetech's office to look for wiretaps at the end of the workday, climbing into ceilings and searching crevices, according to a former employee. Ms. Fritz denied the searches took place.

The game came to an end on the morning of May 5, 2010, when FBI agents arrested Mr. Metter and Mr. Moskowitz.

Mr. Moskowitz turned government witness and started wearing a wire to record conversations with Mr. Metter and others, according to a letter to the judge presiding over the case filed by Mr. Metter's lawyer. She argues that the evidence shouldn't be heard in court.

Mr. Moskowitz is awaiting sentencing after pleading guilty to securities fraud. According to his LinkedIn page, he has launched a new business: selling tickets to sporting events.

# Exhibit C

From:   Ssharbat <ssharbat@yahoo.com>

SpamShield Pro Actions...

To:     mike CARIDI
        <mcaridi@seahawkcap.com>
Subject: Re see below SAMs friend
Date:    Tue 04/09/13 11:45 AM

**Friday, April 5, 2013**

FBI: 7 Arrested In "Pump And Dump" Penny Stocks Scheme



New York - Preet Bharara, the United States Attorney for the Southern District of New York, and George Venizelos, the Assistant Director-in-Charge of the New York Field Office of the Federal Bureau of Investigation ("FBI"), announced today the unsealing of charges against ALEXANDER GOLDSHMIDT, ALEX PUZAITZER, MICHAEL VAX, PAUL ORENA, YITZ GROSSMAN, EFIM AKSANOV, and STEVE KOIFMAN for their roles in a conspiracy to commit securities fraud and the extortion of a co-conspirator whom they believed owed them money and stock related to the scheme.

Together, the defendants worked to fraudulently inflate the prices and trading volumes of publicly traded stock of small companies, also known as "penny stocks," and then to sell shares of the stock at the fraudulently inflated prices to the investing public for a profit. GOLDSHMIDT, PUZAITZER, VAX, ORENA and GROSSMAN were arrested this morning in connection with today's charges and were presented in Manhattan federal court before Magistrate Judge Kevin Nathaniel Fox this afternoon. EFIM AKSANOV and STEVE KOIFMAN were arrested in Florida and presented in federal court in the Southern District of Florida.

Manhattan U.S. Attorney Preet Bharara said: "As alleged, these defendants preyed on unsuspecting investors by manipulating the share price of a publicly traded stock in a classic 'pump and dump' scheme that they thought would reap big dividends. But when their pot of gold failed to materialize, they allegedly

turned on a co-conspirator with threats and extortion, showing that their greed was strong enough to make them turn to violence."

FBI Assistant Director-in-Charge George Venizelos said: "Pump and dump schemes depend on unwitting investors who are deceived by grossly inflated claims about the stocks they are induced to buy. One group of victims in this case was those defrauded investors. But this was not white collar crime in the traditional sense. Another victim was the co-conspirator who, as alleged, was repeatedly threatened by the defendants with grievous harm to him and his family."

The following allegations are based on the Complaint unsealed today in Manhattan federal court:

From 2012 through March 27, 2013, GOLDSHMIDT, PUZAITZER, VAX, ORENA, GROSSMAN, AKSANOV, and KOIFMAN conspired to commit securities fraud. As part of their "pump and dump" scheme, various defendants acquired control of a large block of shares of Face Up Entertainment Group, Inc. ("FUEG"), and then inflated the stock price and trading volume of FUEG before selling, or "dumping," those shares at inflated prices to unsuspecting traders for a profit.

FUEG was a publicly traded company that was purportedly involved in the reality gaming social network market with its principal place of business located in Valley Stream, New York. As captured through judicially authorized wiretap interceptions, the defendants coordinated control over a significant portion of FUEG shares and then promoted the stock through the dissemination of false press releases sent over the Internet. In addition, the defendants coordinated trading of FUEG shares to create the impression of increased trading volume to make FUEG appear to be an attractive purchase for unsuspecting investors. However, the defendants were unable to reap a profit from trading FUEG stock timed to the promotions, and their scheme ultimately failed.

As a result of the failed promotion of FUEG stock, GOLDSHMIDT, PUZAITZER, VAX, ORENA, GROSSMAN, AKSANOV, and KOIFMAN conspired to extort one of their co-conspirators, referred to as "CC-1" in the Complaint. In the summer of 2012, AKSANOV, KOIFMAN, GOLDSHMIDT and PUZAITZER met with CC-1 in New York, New York, and demanded that CC-1 pay them $350,000 and return shares of FUEG, or AKSANOV would "put slugs into" CC-1's chest.

In several subsequent telephone calls and meetings, various defendants continued to demand that CC-1 repay them for their stake in the failed FUEG scheme, or they would harm CC-1. During a meeting on or about March 5, 2013, GOLDSHMIDT, PUZAITZER, ORENA and VAX met with CC-1 at a hotel in New York City and further threatened CC-1 and CC-1's family if CC-1 did not comply with their demands.

GOLDSHMIDT, PUZAITZER, VAX, ORENA, GROSSMAN, AKSANOV, and KOIFMAN are each charged with one count of conspiracy to commit securities fraud, which carries a maximum penalty of five years in prison, and one count of conspiracy to commit extortion, which carries a maximum penalty of 20 years in prison.

DEFENDANT RESIDENCE - AGE:

ALEXANDER GOLDSHMIDT Morganville, NJ 47

ALEX PUZAITZER Brooklyn, NY 52

MICHAEL VAX West Orange, NJ 54

PAUL ORENA Atlantic Beach, NY 38

YITZ GROSSMAN Valley Stream, NY 58

EFIM AKSANOV Sunny Isles, FL 39

STEVE KOIFMAN Boca Raton, FL 41
Posted by joe levin at 7:38 AM

# Exhibit D

**From**: mcaridi@seahawkcap.com
**Reply-To**: mcaridi@seahawkcap.com
**To**: "Soloman" <ssharbat@yahoo.com>
**Cc**: "Simon Schwarz" <sschwarz@justice.com>
**Subject**: Re: Re Caridi settlement
**Date**: Wed 06/13/12 10:40 AM

I was advanced 25k from ambs stock was 1.40 at the time via a stock purchase agreement . .
Pgog I made sure you got covered . You sold some stock to my brother via a spa also . Stop
trying to squeeze on every transaction . Me as a gentleman offered 20k shares post split and then
after you agreed . Next you pleaded for me to up it to 30k .You also asked that I give you 1k and
I did. I agreed . Now you want to rape me . Very bad .
Michael Caridi
Managing Director
Seahawk Capital Partners
(O) 866-414-2420
(F) 917-210-3110
(C) 917-295-1374

The information transmitted is intended only for the person or entity to which it is addressed and
may contain confidential and/or privileged material. Any review, retransmission or dissemination
or other use of, or taking any action upon this information by persons or entities other than
intended recipient is prohibited. If you receive this in error, please contact the sender and delete
the material from any computer. Sender is not a United Securities Dealer or US Investment
Advisor. Sender is a Consultant and makes no warranties or representations to the buyer or Seller
regarding potential transactions.

**From:** ssharbat@yahoo.com
**Date:** Wed, 13 Jun 2012 20:27:36 +0300
**To:** mcaridi@seahawkcap.com<mcaridi@seahawkcap.com>
**Cc:** Simon Schwarz<sschwarz@justice.com>
**Subject:** Re: Re Caridi settlement

 You own 200,000 shares post split - so we should put 80,000 shares in with me. Any amount
over 300 k we keep that's the lowest amount of shares I will go - you tell us when we should sell
- I'm down over 300 k and I'm closing a 4 year old chapter - I could ask for 10% interest for
monies lent

Sent from my iPhone

On 13 2012 ביון, at 19:37, mcaridi@seahawkcap.com wrote:

Its post split and 30 k you already have 20k post
Michael Caridi
Managing Director
Seahawk Capital Partners
(O) 866-414-2420

(F) 917-210-3110
(C) 917-295-1374

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission or dissemination or other use of, or taking any action upon this information by persons or entities other than intended recipient is prohibited. If you receive this in error, please contact the sender and delete the material from any computer. Sender is not a United Securities Dealer or US Investment Advisor. Sender is a Consultant and makes no warranties or representations to the buyer or Seller regarding potential transactions.

**From:** ssharbat@yahoo.com
**Date:** Wed, 13 Jun 2012 18:06:31 +0300
**To:** mcaridi@seahawkcap.com Caridi<mcaridi@seahawkcap.com>
**Subject:** Fwd: Re Caridi settlement

Mike see below - as soon as you reply confirmed or agreed Simon will draw this up for you to sign and then we will move forward

Sent from my iPhone

Begin forwarded message:

**From:** ssharbat@yahoo.com
**Date:** 13 17:41:13 2012 ביוני GMT+03:00
**To:** Simon Schwarz <sschwarz@justice.com>
**Subject: Re Caridi settlement**

Mike Caridi will sell me 50, 000 shares of - symbol sost or (conte international )pre split shares for .001 cents  share - deal that emanuel arbib is financing any proceeds  over $300,000 will go back to mike Caridi ~ for a settlement on the 200 k pgog purchase to his brother loans And 25 k loan I gave him in oct 2008 -

Sent from my iPhone

**From**:    Shlomo Sharbat <ssharbat@yahoo.com>
**To**:      Mike Caridi <mcaridi@seahawkcap.com>, Seth Fishman <fishman.seth@gmail.com>
**Subject**: Rgin regenicin not wanted by my brokers -
**Date**:    Wed 12/21/11 12:07 PM

None of my brokers want to take the rgin stock - stock they say
worthless not worth the hassle - another 25 k evaporated ? - i was told
this one is going 3-4 dollars - ? add is to the list ? 420 k total
losses
Or is it coming back any time soon?
Sent from my iPad
shlomi sharbat -054 3311416

**From**: ssharbat@yahoo.com
**To**: "mcaridi@seahawkcap.com" <mcaridi@seahawkcap.com>
**Cc**: Mark Beychok <mb@mbaholdings.com>
**Subject**: Re: Re signed both
**Date**: Fri 06/29/12 05:00 AM

Mark see below - we agreed that Caridi will sell me 7704 shares for sost
pre split at .001 cent
Mike will help raise capital in our DR deal with larry  - Caridi shall
receive  first 50 k in fees he can take it in cash
Can you fax over a clean copy of the release I signed over last night -
I will be free in 2 hours the dr said - doing blood test

Sent from my iPhone

On 29 2012 ביונ, at 14:46, mcaridi@seahawkcap.com wrote:

> Done , send me a clean copy now .
> Michael Caridi
> Managing Director
> Seahawk Capital Partners
> (O) 866-414-2420
> (F) 917-210-3110
> (C) 917-295-1374
>
> The information transmitted is intended only for the person or entity
to which it is addressed and may contain confidential and/or privileged
material.  Any review, retransmission or dissemination or other use of,
or taking any action upon this information by persons or entities other
than intended recipient is prohibited.  If you receive this in error,
please contact the sender and delete the material from any computer.
Sender is not a United Securities Dealer or US Investment Advisor.
Sender is a Consultant and makes no warranties or representations to the
buyer or Seller regarding potential transactions.
>
> -----Original Message-----
> From: ssharbat@yahoo.com
> Date: Fri, 29 Jun 2012 14:19:29
> To: mcaridi@seahawkcap.com<mcaridi@seahawkcap.com>
> Subject: Re: Re signed both
>
> Please we do many deals together with pinto and mark - ill even let
you make the first 50 k from fees that we get working together - and you
will love the deal after you meet Larry nusbaum
>
> Sent from my iPhone
>

> On 29 2012 ביוג, at 14:13, mcaridi@seahawkcap.com wrote:
>
>> I will make a copy removing share info for emanuel if ok . Please confirm
>> Michael Caridi
>> Managing Director
>> Seahawk Capital Partners
>> (O) 866-414-2420
>> (F) 917-210-3110
>> (C) 917-295-1374
>>
>> The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material.  Any review, retransmission or dissemination or other use of, or taking any action upon this information by persons or entities other than intended recipient is prohibited.  If you receive this in error, please contact the sender and delete the material from any computer. Sender is not a United Securities Dealer or US Investment Advisor. Sender is a Consultant and makes no warranties or representations to the buyer or Seller regarding potential transactions.
>>
>> -----Original Message-----
>> From: Shlomo Sharbat <ssharbat@yahoo.com>
>> Date: Thu, 28 Jun 2012 23:25:40
>> To: Mike Caridi<mcaridi@seahawkcap.com>; Kyleen Cane<kcane@caneclark.com>; Mark Beychok<mb@mbaholdings.com>
>> Subject: Re signed both
>>
>>
>>
>> Sent from my iPad
>> shlomi sharbat -054 3311416
>>
>> Begin forwarded message:
>>
>>> From: "eFax" <message@inbound.efax.com>
>>> Date: June 28, 2012 23:17:08 GMT+03:00
>>> To: ss@solcapllc.com
>>> Subject: eFax message from "035293519" - 3 page(s), Caller-ID: 000-529-3519
>>>
>>>
>>>
>>> Fax Message [Caller-ID: 000-529-3519]
>>> You have received a 3 page fax at 2012-06-28 20:17:08 GMT.
>>>

>>> * The reference number for this fax is
tel1_did11-1340914461-7617228-29.
>>>
>>> View this fax using your PDF reader.
>>>
>>>
>>>
>>> Please visit www.eFax.com/en/efax/twa/page/help if you have any
questions regarding this message or your service.
>>>
>>> Thank you for using the eFax service!
>>>
>>>
>>> Home    Contact    Login
>>>
>>> © 2011 j2 Global Communications, Inc. All rights reserved.
>>> eFax® is a registered trademark of j2 Global Communications, Inc.
>>>
>>> This account is subject to the terms listed in the eFax® Customer
Agreement.
>>>
>>

**From:** Shlomi <ssharbat@yahoo.com>
**To:** "Cane, Kyleen" <kcane@caneclark.com>
**Cc:** "mcaridi@seahawkcap.com Caridi" <mcaridi@seahawkcap.com>, Seth Fishman <fishman.seth@gmail.com>, "Doney, Scott" <sdoney@caneclark.com>
**Subject:** Re: Re the certs were sent fed ex ??
**Date:** Wed 08/15/12 11:57 AM

Please email me fed ex tracking # - have not recieved any delivery -

Sent from my iPad

On 14 2012 באוג, at 21:35, "Cane, Kyleen" <kcane@caneclark.com> wrote:

> Shlomo:  Just to be clear, you should review the documents you signed which terminate the escrow and the conditions contained therein. Specifically:
>
> 1. You have been sent the 1,775 shares we held for you since the beginning, plus an additional 7,704 shares that were cut from Mr. Caridi's shares, as instructed by Mr. Caridi. This does not equal 65,900 and there is no condition of the escrow or agreement with the company to do a forward split as far as I am aware; and
>
> 2. There is no longer any condition that your shares be sold at $4 before release of the other shares in escrow. You specifically instructed us to delete this condition.  I assume this is the deal you made with Mr. Caridi to get the additional 7,704 shares he has sent you.
>
> The reason we required the fedex number or payment for shipping in advance is that we continue to have no commitment for payment for our escrow services.  Notwithstanding this, as a favor to you and Mr. Caridi, we completed the escrow, preparing the documentation and working with the transfer agent to obtain the share certificate without charge. We, however, asked that the out of pocket costs of the overnight shipping of the certificates and the transfer agent fees be paid so that we would not be put further out of pocket on this venture.  Mr. Caridi, paid these costs and the shares have been shipped to you overnight at the address you specified in your email.
>
> Finally, we now consider the escrow completely closed, and as provided in the closing documents and instructions, we have been released and expect to take no further actions in this regard. I apologize for the force and formality in my language, but in view of your comments below, I feel it necessary to make clear the current status of the escrow transaction.
>
> Good luck with your investment.
>

> Kyleen Cane
>
> Cane*Clark LLP
> 3273 E. Warm Springs Rd.
> Las Vegas, NV 89120
> 702*312*6255
> 702*944*7100 FAX
>
> PERSONAL AND CONFIDENTIAL: This message originates from the law firm
of Cane Clark LLP.  This message and any file(s) or attachment(s)
transmitted with it are confidential, intended only for the named
recipient, and may contain information that is a trade secret,
proprietary, protected by the attorney work product doctrine, subject to
the attorney-client privilege, or is otherwise protected against
unauthorized use or disclosure.  This message and any file(s) or
attachment(s) transmitted with it are transmitted based on a reasonable
expectation of privacy consistent with ABA Formal Opinion No. 99-413.
Any disclosure, distribution, copying, or use of this information by
anyone other than the intended recipient, regardless of address or
routing, is strictly prohibited.  If you receive this message in error,
please advise the sender by immediate reply and delete the original
message.  Personal messages express only the view of the sender and are
not attributable to Cane Clark LLP.
>
>
>
>
> -----Original Message-----
> From: ssharbat@yahoo.com [mailto:ssharbat@yahoo.com]
> Sent: Tuesday, August 14, 2012 9:50 AM
> To: Cane, Kyleen
> Cc: mcaridi@seahawkcap.com Caridi; Simon Schwarz; Seth Fishman
> Subject: Re the certs were sent fed ex ??
>
> Sost shares - Seth I may need you'r fed ex number to get my shares of
sost - all in all around 65,900 shares - should be 4 $ sold when goes
live as per lawyer escrow letter
>
> Sent from my iPhone

**From**:   Shlomo Sharbat <ssharbat@yahoo.com>
**To**:      gal levy <gallevy100@yahoo.com>, Mike Caridi <mcaridi@seahawkcap.com>
**Cc**:      Mark Beychok <mb@mbaholdings.com>
**Subject**: Re sost when will it start to trade
**Date**:    Sun 11/18/12 01:10 PM

Dear mike - gal who is my broker as well needs a few questions answered for his firm on sost -
Also we need to know approximate when the shares are tradable to go live ,sell-  and how the
questioner on file is how many shares I own which I  didn't know what to answer -
9400x6.9=64,000 total shares of SOST which is around 200,000 as in agreement balance in beco
isg security 400,000 shares balance at .25 cents please advise.

Sent from my iPad
shlomi sharbat -054 3311416
----------------------------------------------------------------

**From**:   Shlomi <ssharbat@yahoo.com>
**To**:      "Cane, Kyleen" <kcane@caneclark.com>
**Cc**:      "mcaridi@seahawkcap.com Caridi" <mcaridi@seahawkcap.com>, Simon Schwarz
            <sschwarz@justice.com>, Seth Fishman <fishman.seth@gmail.com>, "Doney, Scott"
            <sdoney@caneclark.com>
**Subject**: **Re: Re the certs were sent fed ex** ??
**Date**:    Wed 08/15/12 11:57 AM

Please email me fed ex tracking # - have not received any delivery

Sent from my iPad

On 14 2012 באוג, at 21:35, "Cane, Kyleen" <kcane@caneclark.com> wrote:

> Shlomo:  Just to be clear, you should review the documents you signed which terminate the
escrow and the conditions contained therein.

Specifically:
>
> 1. You have been sent the 1,775 shares we held for you since the beginning, plus an additional
7,704 shares that were cut from Mr. Caridi's shares, as instructed by Mr. Caridi. This does not
equal 65,900 and there is no condition of the escrow or agreement with the company to do a
forward split as far as I am aware; and
>
> 2. There is no longer any condition that your shares be sold at $4 before release of the other
shares in escrow. You specifically instructed us to delete this condition.  I assume this is the deal
you made with Mr. Caridi to get the additional 7,704 shares he has sent you.
>
> The reason we required the fedex number or payment for shipping in advance is that we
continue to have no commitment for payment for our escrow services.  Notwithstanding this, as a
favor to you and Mr. Caridi, we completed the escrow, preparing the documentation and working

with the transfer agent to obtain the share certificate without charge.

We, however, asked that the out of pocket costs of the overnight shipping of the certificates and the transfer agent fees be paid so that we would not be put further out of pocket on this venture. Mr. Caridi,  paid these costs and the shares have been shipped to you overnight at the address you specified in your email.

> Finally, we now consider the escrow completely closed, and as provided in the closing documents and instructions, we have been released and expect to take no further actions in this regard. I apologize for the force and formality in my language, but in view of your comments below, I feel it necessary to make clear the current status of the escrow transaction.
>
> Good luck with your investment.
>
> Kyleen Cane
>
> Cane*Clark LLP
> 3273 E. Warm Springs Rd.
> Las Vegas, NV 89120
> 702*312*6255
> 702*944*7100 FAX
>
> PERSONAL AND CONFIDENTIAL: This message originates from the law firm of Cane Clark LLP.  This message and any file(s) or attachment(s) transmitted with it are confidential, intended only for the named recipient, and may contain information that is a trade secret, proprietary, protected by the attorney work product doctrine, subject to the attorney-client privilege, or is otherwise protected against unauthorized use or disclosure.  This message and any file(s) or attachment(s) transmitted with it are transmitted based on a reasonable expectation of privacy consistent with ABA Formal Opinion No. 99-413.

Any disclosure, distribution, copying, or use of this information by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited.  If you receive this message in error, please advise the sender by immediate reply and delete the original message. Personal messages express only the view of the sender and are not attributable to Cane Clark LLP.
>
-------------------------------------------------------------------------------------------------------

Case 1:13-cv-08019-RJS   Document 29-1   Filed 12/04/13   Page 24 of 46

08.02 2012 בצהר 11 18

Are you sure Emanuel knows to send me 70,000 shares ? Can he email me that he will

15:11 2012 בדצמ 21

You will make sure I get the shares on sost today please ?

Yes

Thanks

21:15 2012 בדצמ 22

Did u meet Emanuel arbib ? Is my shares being fed exed or dtcd -? This week ?

**From**:     ssharbat@yahoo.com
**To**:       "Auguste, Christopher" <cauguste@KRAMERLEVIN.com>
**Subject**:  Re: Re sost shares
**Date**:     Mon 04/29/13 06:39 PM

Was or Is Caridi a director of sost ? Or he just bought the shell with
part of my money and packaged the deal for both to merge ? I have
several escrow and signed agreements that needs to straighten me out
hopefully so I can receive my proper share account without further due -

Sent from my iPhone

On 30 2013 באפר, at 01:49, "Auguste, Christopher"
<cauguste@KRAMERLEVIN.com> wrote:

> Kyleen,
> Thanks so much.  This is very helpful. You are correct that no forward
split has occurred or been approved by the Company.
> Chris
>
>
>
> Christopher S. Auguste | Partner
> T: 212-715-9265 F: 212-715-8277 E: cauguste@KRAMERLEVIN.com
> Kramer Levin Naftalis & Frankel LLP | 1177 Avenue of the Americas |
New York, New York 10036
> <http://www.kramerlevin.com/>
>
>
> This communication (including any attachments) is intended solely for
the recipient(s) named above and may contain information that is
confidential, privileged or legally protected. Any unauthorized use or
dissemination of this communication is strictly prohibited. If you have
received this communication in error, please immediately notify the
sender by return e-mail message and delete all copies of the original
communication. Thank you for your cooperation.
> -----Original Message-----
> From: Cane, Kyleen [mailto:kcane@caneclark.com]
> Sent: Monday, April 29, 2013 6:43 PM
> To: 'ssharbat@yahoo.com'; Auguste, Christopher
> Subject: RE: Re sost shares
>
> So there is no further confusion, I have attached the signed escrow
agreement and the escrow release signed by you.  These documents have
been sent on three separate occasions and confirm the closing of the
escrow (release of funds and issuance of shares) as agreed in writing by
all the parties.  The two stock certificates issued December 27, 2011
and August 13, 2012  to the Solomon Capital 401K trust were sent to you
and receipt was acknowledged in August of 2012 by Solomon Capital as
follows:
>
> 1.     #135, 1775 shares
> 2.     #140, 7,407 shares
>
> The receipt is attached as well to assist in your recollection of this
matter.  If there was a separate agreement for additional shares between
you and Caridi, we are not aware of it and it was not part of the

escrow. If you are referring to forward split shares, this is a matter
for the company and we are no longer counsel, but I do not believe that
no split has taken place, and thus there would be no additional shares
to be sent.  Please confirm with the company regarding this matter as it
is not part of the escrow.
>
> I hope this assists in your handling of this matter.  In regard to the
escrow, the matter has been closed and you have received all stock as
agreed by its terms.
>
> Thanks, Kyleen
>
> -----Original Message-----
> From: ssharbat@yahoo.com [mailto:ssharbat@yahoo.com]
> Sent: Monday, April 29, 2013 1:51 PM
> To: cauguste@KRAMERLEVIN.com
> Cc: Cane, Kyleen
> Subject: Re sost shares
>
> Hello - I'm a shareholder of sost since 2011 through Kylie cane escrow
-agreement / I'm just wondering if you can help me know when I can pick
up my shares and any update when its going to start to trade - I' was
told I'n 2011 and I'm worried now - hope you understand The shares are
paid and registered under my trust account Solomon. Capital 401 kTrust
any documentation can be emailed to you for verification -
>
>

**From**: ssharbat@yahoo.com
**To**: "Auguste, Christopher" <cauguste@KRAMERLEVIN.com>
**Subject**: Re: Re sost shares
**Date**: Mon 04/29/13 02:41 PM

I was assured this is being process and booked by now ??see below
>
> On 31 2012 בדצמ, at 22:37, Michael Caridi <mcaridi@seahawkcap.com>
wrote:
>
>> Emanuel , please confirm per my conversation Soloman will receive his
additional shares which are 6.75 times his current share count I be
leave its an additional 56k . Thank You and lets make 2013 a big one !
>>
>> Sent by Michael
Sent from my iPhone

On 30 2013 באפר, at 00:29, "Auguste, Christopher"
<cauguste@KRAMERLEVIN.com> wrote:

> Since I am not aware of the share issuance to you, please provide me
with all documentation related to the share issuance, including the
registered name to whom the shares will be issued, the number of shares
involved, whether the shares are to be issued by the Company as a new
issuance or as a sale from a third party.  If it is an issuance in
connection with  a third party sale to you, please provide the
sale/purchase agreement, the name of the seller and the name of the
seller.  Once I have this information, I will be able to respond to your
inquiry about the shares that should be issued to you.
> Regards,
> Chris
>
>
>
> Christopher S. Auguste | Partner
> T: 212-715-9265 F: 212-715-8277 E: cauguste@KRAMERLEVIN.com
> Kramer Levin Naftalis & Frankel LLP | 1177 Avenue of the Americas |
New York, New York 10036
> <http://www.kramerlevin.com/>
>
>
>
> This communication (including any attachments) is intended solely for
the recipient(s) named above and may contain information that is
confidential, privileged or legally protected. Any unauthorized use or
dissemination of this communication is strictly prohibited. If you have
received this communication in error, please immediately notify the

sender by return e-mail message and delete all copies of the original
communication. Thank you for your cooperation.
> -----Original Message-----
> From: ssharbat@yahoo.com [mailto:ssharbat@yahoo.com]
> Sent: Monday, April 29, 2013 4:51 PM
> To: Auguste, Christopher
> Cc: Kyleen E. Cane
> Subject: Re sost shares
>
> Hello - I'm a shareholder of sost since 2011 through Kylie cane escrow
-agreement / I'm just wondering if you can help me know when I can pick
up my shares and any update when its going to start to trade - I' was
told I'n 2011 and I'm worried now - hope you understand
> The shares are paid and registered under my trust account Solomon.
Capital 401 kTrust
> any documentation can be emailed to you for verification -
>
>
> Sent from my iPhone

| **From**: | ssharbat@yahoo.com | | **Attachments** | | | |
|---|---|---|---|---|---|
| | SpamShield Pro Actions... ▼ | | Name | Type | Save | View |
| **To**: | "mcaridi@seahawkcap.com" <mcaridi@seahawkcap.com> | | Part 1 | text/plain | Save | |
| | | | Part 2 | text/html | Save | |
| **Cc**: | "Auguste, Christopher" <cauguste@KRAMERLEVIN.com>,Emanuel Arbib <e.arbib@integratedam.com> | | | | | |
| **Subject**: | Re: Re sost shares conte international | | | | | |
| **Date**: | Tue 05/14/13 07:42 AM | | | | | |

For the record I have documents singed by caridi that is not say 50,000 shares - but differently

Sent from my iPhone

On 14 2013 במאי, at 17:08, "mcaridi@seahawkcap.com" <mcaridi@seahawkcap.com> wrote:

For the record I personally transferred Soloman 50, 000 shares . Anything else is an extortion and he will be held for liable .


Michael Caridi
Seahawk Capital Partners Inc.
917-295-1374 (Cell)
917-210-3110 (Fax)


The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission or dissemination or other use of, or taking any action upon this information by persons or entities other than intended recipient is prohibited. If you receive this in error, please contact the sender and delete the material from any computer. Sender is not a United Securities Dealer or US Investment Advisor. Sender is a Consultant and makes no warranties or representations to the buyer or Seller regarding potential transactions.


On May 14, 2013, at 4:03 PM, ssharbat@yahoo.com wrote:

Caridi just hung up the phone on me and I don't believe they are going to be responsible so I am putting together my lawsuit and it will be filed and sent to the sec within next few weeks including rabbi pinto involvement

Sent from my iPhone

On 8 2013 במאי, at 22:36, "Auguste, Christopher" <cauguste@KRAMERLEVIN.com> wrote:


I was informed by Emanuel that Caridi will transfer the shares to you.


Christopher S. Auguste | Partner
T: 212-715-9265 F: 212-715-8277 E: cauguste@KRAMERLEVIN.com

Kramer Levin Naftalis & Frankel LLP | 1177 Avenue of the Americas | New York, New York 10036
<http://www.kramerlevin.com/>

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

-----Original Message-----
From: Ssharbat [mailto:ssharbat@yahoo.com]
Sent: Wednesday, May 08, 2013 3:24 PM
To: Auguste, Christopher
Subject: Re: Re sost shares conte international

Any update ?

Sent from my iPad

On 7 2013 במאי, at 05:05, "Auguste, Christopher" <cauguste@KRAMERLEVIN.com> wrote:

I was able to do so today but will tomorrow.

Sent from my iPhone

On May 6, 2013, at 9:56 PM, "Ssharbat" <ssharbat@yahoo.com> wrote:

Have you had a chance to speak to the company in Italy yet ?

Sent from my iPad

On 30 2013 באפר, at 21:28, "Auguste, Christopher" <cauguste@KRAMERLEVIN.com> wrote:

Solomon,
I will raise the issue with the Company and will let you know the Company's response.  I do not know if the Company is aware of your discussions and arrangement with Caridi.  Caridi is not and has not been a member of the board.  Tomorrow is a holiday in Italy so I will speak with the client on Thursday.  I will report to you after speaking with the Company.  You can send me your lawyer's name and contact information.
Regards,

Chris

Christopher S. Auguste | Partner
T: 212-715-9265 F: 212-715-8277 E:cauguste@KRAMERLEVIN.com
Kramer Levin Naftalis & Frankel LLP | 1177 Avenue of the Americas | New York, New York 10036
<http://www.kramerlevin.com/>

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

Christopher S. Auguste | Partner
T: 212-715-9265 F: 212-715-8277 E: cauguste@KRAMERLEVIN.com
Kramer Levin Naftalis & Frankel LLP | 1177 Avenue of the Americas | New York, New York 10036
<http://www.kramerlevin.com/>

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

-----Original Message-----
From: ssharbat@yahoo.com[mailto:ssharbat@yahoo.com]
Sent: Tuesday, April 30, 2013 1:38 PM
To: Auguste, Christopher
Subject: Re: Re sost shares conte international

Am I waiting for your email or is it a closed situation on your side ? My lawyers can be reached if you can't speak to me - I can email you his name and number ---

Wasn't Caridi a member director of the shell - does the new entity see him only as a broker ??? If I have claims I would like to make them now before its too late - who can I speak to for my understanding of my rights and consideration for my investment

Sent from my iPhone

On 30 2013 ,באפר, at 01:49, "Auguste, Christopher" <cauguste@KRAMERLEVIN.com> wrote:

Kyleen,

Thanks so much.  This is very helpful. You are correct that no forward split has occurred or been approved by the Company.

Chris

Christopher S. Auguste | Partner

T: 212-715-9265 F: 212-715-8277 E:cauguste@KRAMERLEVIN.com

Kramer Levin Naftalis & Frankel LLP | 1177 Avenue of the Americas | New York, New York 10036

<http://www.kramerlevin.com/>

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

-----Original Message-----

From: Cane, Kyleen [mailto:kcane@caneclark.com]

Sent: Monday, April 29, 2013 6:43 PM

To: 'ssharbat@yahoo.com'; Auguste, Christopher

Subject: RE: Re sost shares

So there is no further confusion, I have attached the signed escrow agreement and the escrow release signed by you.  These documents have been sent on three separate occasions and confirm the closing of the escrow (release of funds and issuance of shares) as agreed in writing by all the parties.  The two stock certificates issued December 27, 2011 and August 13, 2012  to the Solomon Capital 401K trust were sent to you and receipt was acknowledged in August of 2012 by Solomon Capital as follows:

1.    #135, 1775 shares
2.    #140, 7,407 shares

The receipt is attached as well to assist in your recollection of this matter.  If there was a separate agreement for additional shares between you and Caridi, we are not aware of it and it was not part of the escrow. If you are referring to forward split shares, this is a matter for the company and we are no longer counsel, but I do not believe that no split has taken place, and thus there would be no additional shares to be sent.  Please confirm with the company regarding this matter as it is not part of the escrow.

I hope this assists in your handling of this matter.  In regard to the escrow, the matter has been closed and you have received all stock as agreed by its terms.

Thanks, Kyleen

-----Original Message-----
From: ssharbat@yahoo.com[mailto:ssharbat@yahoo.com]
Sent: Monday, April 29, 2013 1:51 PM
To:cauguste@KRAMERLEVIN.com
Cc: Cane, Kyleen
Subject: Re sost shares

Hello - I'm a shareholder of sost since 2011 through Kylie cane escrow -agreement / I'm just wondering if
you can help me know when I can pick up my shares and any update when its going to start to trade - I'
was told I'n 2011 and I'm worried now - hope you understand The shares are paid and registered under
my trust account Solomon. Capital 401 kTrust any documentation can be emailed to you for verification -


Sent from my iPho

>>>>>>
>>>>>>> Solomon,
>>>>>>> I will raise the issue with the Company and will let you know
the Company's response.  I do not know if the Company is aware of your
discussions and arrangement with Caridi.  Caridi is not and has not been
a member of the board.  Tomorrow is a holiday in Italy so I will speak
with the client on Thursday.  I will report to you after speaking with
the Company.  You can send me your lawyer's name and contact
information.
>>>>>>> Regards,
>>>>>>> Chris
>>>>>>>
>>>>>>>
>>>>>>>
>>>>>>> Christopher S. Auguste | Partner
>>>>>>> T: 212-715-9265 F: 212-715-8277 E: cauguste@KRAMERLEVIN.com
>>>>>>> Kramer Levin Naftalis & Frankel LLP | 1177 Avenue of the
Americas | New York, New York 10036
>>>>>>> <http://www.kramerlevin.com/>
>>>>>>>
>>>>>>>
>>>>>>>
>>>>>>> This communication (including any attachments) is intended
solely for the recipient(s) named above and may contain information that
is confidential, privileged or legally protected. Any unauthorized use
or dissemination of this communication is strictly prohibited. If you
have received this communication in error, please immediately notify the
sender by return e-mail message and delete all copies of the original
communication. Thank you for your cooperation.
>>>>>
>>>>> Christopher S. Auguste | Partner
>>>>> T: 212-715-9265 F: 212-715-8277 E: cauguste@KRAMERLEVIN.com
>>>>> Kramer Levin Naftalis & Frankel LLP | 1177 Avenue of the Americas
| New York, New York 10036
>>>>> <http://www.kramerlevin.com/>
>>>>>
>>>>> This communication (including any attachments) is intended solely
for the recipient(s) named above and may contain information that is
confidential, privileged or legally protected. Any unauthorized use or
dissemination of this communication is strictly prohibited. If you have
received this communication in error, please immediately notify the
sender by return e-mail message and delete all copies of the original
communication. Thank you for your cooperation.
>>>>>
>>>>> -----Original Message-----
>>>>>>> From: ssharbat@yahoo.com [mailto:ssharbat@yahoo.com]
>>>>>>> Sent: Tuesday, April 30, 2013 1:38 PM
>>>>>>> To: Auguste, Christopher
>>>>>>> Subject: Re: Re sost shares conte international
>>>>>>>
>>>>>>> Am I waiting for your email or is it a closed situation on your
side ? My lawyers can be reached if you can't speak to me - I can email
you his name and number ---
>>>>>>> Wasn't Caridi a member director of the shell - does the new
entity see him only as a broker ??? If I have claims I would like to
make them now before its too late - who can I speak to for my

>>>>>>
>>>>>> Sent from my iPhone
>>>>>>
>>>>>> On 30 2013 באפר, at 01:49, "Auguste, Christopher"
<cauguste@KRAMERLEVIN.com> wrote:
>>>>>>
>>>>>>> Kyleen,
>>>>>>> Thanks so much.  This is very helpful. You are correct that no
forward split has occurred or been approved by the Company.
>>>>>>> Chris
>>>>>>>
>>>>>>>
>>>>>>>
>>>>>>> Christopher S. Auguste | Partner
>>>>>>> T: 212-715-9265 F: 212-715-8277 E: cauguste@KRAMERLEVIN.com
>>>>>>> Kramer Levin Naftalis & Frankel LLP | 1177 Avenue of the
Americas | New York, New York 10036
>>>>>>> <http://www.kramerlevin.com/>
>>>>>>>
>>>>>>>
>>>>>>> This communication (including any attachments) is intended
solely for the recipient(s) named above and may contain information that
is confidential, privileged or legally protected. Any unauthorized use
or dissemination of this communication is strictly prohibited. If you
have received this communication in error, please immediately notify the
sender by return e-mail message and delete all copies of the original
communication. Thank you for your cooperation.
>>>>>>> -----Original Message-----
>>>>>>> From: Cane, Kyleen [mailto:kcane@caneclark.com]
>>>>>>> Sent: Monday, April 29, 2013 6:43 PM
>>>>>>> To: 'ssharbat@yahoo.com'; Auguste, Christopher
>>>>>>> Subject: RE: Re sost shares
>>>>>>>
>>>>>>> So there is no further confusion, I have attached the signed
escrow agreement and the escrow release signed by you.  These documents
have been sent on three separate occasions and confirm the closing of
the escrow (release of funds and issuance of shares) as agreed in
writing by all the parties.  The two stock certificates issued December
27, 2011 and August 13, 2012  to the Solomon Capital 401K trust were
sent to you and receipt was acknowledged in August of 2012 by Solomon
Capital as follows:
>>>>>>>
>>>>>>> 1.       #135, 1775 shares
>>>>>>> 2.       #140, 7,407 shares
>>>>>>>
>>>>>>> The receipt is attached as well to assist in your recollection
of this matter.  If there was a separate agreement for additional shares
between you and Caridi, we are not aware of it and it was not part of
the escrow. If you are referring to forward split shares, this is a
matter for the company and we are no longer counsel, but I do not
believe that no split has taken place, and thus there would be no
additional shares to be sent.  Please confirm with the company regarding
this matter as it is not part of the escrow.
>>>>>>>
>>>>>>> I hope this assists in your handling of this matter.  In regard
to the escrow, the matter has been closed and you have received all
stock as agreed by its terms.

```
>>>>>>>>
>>>>>>>> Thanks, Kyleen
>>>>>>>>
>>>>>>>> -----Original Message-----
>>>>>>>> From: ssharbat@yahoo.com [mailto:ssharbat@yahoo.com]
>>>>>>>> Sent: Monday, April 29, 2013 1:51 PM
>>>>>>>> To: cauguste@KRAMERLEVIN.com
>>>>>>>> Cc: Cane, Kyleen
>>>>>>>> Subject: Re sost shares
>>>>>>>>
>>>>>>>> Hello - I'm a shareholder of sost since 2011 through Kylie cane
escrow -agreement / I'm just wondering if you can help me know when I
can pick up my shares and any update when its going to start to trade -
I' was told I'n 2011 and I'm worried now - hope you understand The
shares are paid and registered under my trust account Solomon. Capital
401 kTrust any documentation can be emailed to you for verification -
>>>>>>>>
>>>>>>>>
>>>>>>>> Sent from my iPhone
```

From:       Ssharbat <ssharbat@yahoo.com>

| SpamShield Pro Actions... | ▼ |

To:         Benzy Suky <bensuky@aol.com>

Subject:    Fwd: Re for sost - below is or was my
            confirmation from CARIDI that he will
            make up 300 k to me that all I asked for
            plus my loan of 25 k back

Date:       Wed 05/15/13 11:15 AM

It's very clear email maybe You can show Rabbi pinto so he can help settle all this mess - I don't want to
fight or have head aches - it's clear CARIDI confirmed he returns my 300 k - now he is playing games like
many other times -

**From:** mcaridi@seahawkcap.com
**Date:** June 28, 2012 22:08:00 GMT+03:00
**To:** "Soloman" <ssharbat@yahoo.com>
**Subject: Re: Re for sost - so I understand Caridi proposal**
**Reply-To:** mcaridi@seahawkcap.com

Confirmed I will make up the shares , you confirm that if asked to sell and you opt not to I am off the hook
.
Michael Caridi
Managing Director
Seahawk Capital Partners
(O) 866-414-2420
(F) 917-210-3110
(C) 917-295-1374

The information transmitted is intended only for the person or entity to which it is addressed and may
contain confidential and/or privileged material.  Any review, retransmission or dissemination or other use
of, or taking any action upon this information by persons or entities other than intended recipient is
prohibited.  If you receive this in error, please contact the sender and delete the material from any
computer. Sender is not a United Securities Dealer or US Investment Advisor.  Sender is a Consultant
and makes no warranties or representations to the buyer or Seller regarding potential transactions.
----------------------------------------------
-----Original Message-----
From: Shlomi <ssharbat@yahoo.com>
Date: Thu, 28 Jun 2012 22:05:23
To: mcaridi@seahawkcap.com<mcaridi@seahawkcap.com>
Cc: Mark Beychok<mb@mbaholdings.com>
Subject: Re: Re for sost - so I understand Caridi proposal

Ok but you will make sure within the next 12 months you should have total 300 k paid up ? Which will be
probably only 153 k if this goes to 4 - plus I think you can probably raise nice money for the DR deal and
make good fees so you can split that with me also and will credit You - you can do it with the pinto in one
shot -
One last important email confirmation if on this Sost deal it doesn't go over 4 you will transfer enough
shares over within how long to bring me up to the 120 k level ?

Sent from my iPad
--------------------------------------------------------------------------
On 28 2012 ביוג, at 21:56, mcaridi@seahawkcap.com wrote:

On 3 I will get you some stock don't know amounts currently but will be comparable if I'm able
Michael Caridi

Managing Director

Seahawk Capital Partners

(O) 866-414-2420

(F) 917-210-3110

(C) 917-295-1374

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material.  Any review, retransmission or dissemination or other use of, or taking any action upon this information by persons or entities other than intended recipient is prohibited.  If you receive this in error, please contact the sender and delete the material from any computer. Sender is not a United Securities Dealer or US Investment Advisor.  Sender is a Consultant and makes no warranties or representations to the buyer or Seller regarding potential transactions.

--------------------------------------------------------------------------------

-----Original Message-----

From: Shlomo Sharbat <ssharbat@yahoo.com>

Date: Thu, 28 Jun 2012 21:18:56

To: Mike Caridi<mcaridi@seahawkcap.com>

Cc: Mark Beychok<mb@mbaholdings.com>

Subject: Re for sost - so I understand Caridi proposal

#~1 Facts solomon 401 k trust currently own 1775 shares pre split shares of sost which I paid 19,975 say wire for 20 k in fall 2011

#~2Fact -# 2 I will be signing the spa Agreement to be effective to get additional 3704 shares for a total of 5479 pre split shares or total of 6.75 times this equals 36,983 shares of sost

So in effect if I sell at 4 dollars I will have 147 k - which is about a 127 k profit

#~3

On top of this mike Caridi will do the same spa purchase agreement on the homeland security deal that is going to do RTO and audit is complete with Adam gottbetter is the lawyer or found the shell where I get the balance of 153 k dollar value in shares to reach the 300 k goal

#~4 Caridi will help mark get into pinto circle for doing deals like DR deal where Caridi will also, benefit from raising capital in  marks deals

Sent from my iPad

shlomi sharbat -054 3311416

# Exhibit E

# ESCROW AGREEMENT

## SOUTHERN STATES SIGN COMPANY, SHAREHOLDER AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made as of November 22, 2011 by and among Michael Caridi as agent and attorney-in-fact for the holders of certain shares of common stock (the "Sellers") of Southern States Sign Company (the "Company"), Solomon Capital 401k Trust (the "Purchasers") and **Cane Clark LLP**, 3273 E. Warm Springs, Las Vegas, Nevada 89120 (the "Escrow Agent").

WHEREAS, the Sellers hold the right to certain shares of common stock of the Company and are selling to Purchasers, and Purchasers are purchasing from Sellers, 1,775 shares of said common stock (the "Shares Sold") in exchange for $19,972 (the "Purchase Price"); and

WHEREAS, the Company plans to execute a forward split within the next 90 days in which the Shares Sold would be multiplied based on a 6.75 to 1 basis (the "Forward Split"); and

NOW, THEREFORE, in consideration of the covenants and mutual promises contained herein and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the parties agree as follows:

### ARTICLE I

### TERMS OF ESCROW

1.1     The parties hereby agree to establish an escrow account with the Escrow Agent whereby the Escrow Agent shall hold the Purchase Price and the Shares Sold subject to this Agreement.

1.2     Concurrently with the execution of this Agreement, Purchasers shall deposit the Purchase Price which shall be distributed in accordance with the terms of this Agreement by the Escrow Agent. Upon receipt of the Purchase Price, Escrow Agent shall:

(a) Send to the Company's Transfer Agent the Share Certificates representing the Shares Sold along with instructions to the Company's Transfer Agent to place the Shares Sold in the name of Solomon Capital 401k Trust.   The share certificates received following this transfer shall then be delivered to the Purchaser as they may direct.  Escrow Agent shall thereafter hold the remaining shares owned by Sellers undistributed, except for shares of certain concurrent purchasers that together with Purchasers are buying a total of 22,225 shares ("Concurrent Purchasers"), until such time as Purchasers and Concurrent Purchasers have sold all of their shares for a minimum of $4 per share in the market.  Escrow is irrevocably instructed not to release the Sellers shares held in escrow until such time as this condition is met.  In this regard, Solomon agrees to deposit the Shares Sold and attempt to sell them promptly within five days trading following the effective date of the Company's planned Forward Split; and

(b) Transfer the money held in its escrow account as the Purchase Price in the manner

specified by Sellers Agent.  The parties acknowledge that deposit of the full Purchase Price, and sale of the Shares Sold shall occur on or before February 22nd, 2011 (the "Closing Date").

1.3     In the event that the Escrow Agent has not received the full Purchase Price by the Closing Date, the Escrow Agent may return all documents and money to their original source and be discharged of all of its obligations under this Agreement and shall have no liability to any other party to this Agreement, or with the consent of all parties to this escrow may extend the time to act as provided by section 1.2.  In such event, Purchasers acknowledge that all funds distributed pursuant to the terms of this Escrow shall be non-refundable and retained as so distributed.

1.4     The Escrow Agent shall not incur any liability whatsoever for acting upon any notice, direction, waiver, receipt, consent, certificate, authorization, power of attorney or other paper or document purporting and believed by the Escrow Agent to be genuine and to be signed and presented by the proper person or persons.

1.5     The parties acknowledge that, although the Escrow Agent is holding the Shares Sold, Escrow Agent is acting solely as a stakeholder at their request and for their convenience and that Escrow Agent shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrow Agent.

## ARTICLE II

## MISCELLANEOUS

2.1     No waiver of any breach of any covenant or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant or provision herein contained.  No extension of time for performance of any obligation or act shall be deemed an extension of the time for performance of any other obligation or act.

2.2     All notices or other communications required or permitted hereunder shall be in writing, and shall be sent by fax, overnight courier, registered or certified mail, postage prepaid, return receipt requested, and shall be deemed received upon receipt thereof, at the addresses provided by the parties from time to time.

2.3     This Escrow Agreement shall be binding upon and shall inure to the benefit of the permitted successors and permitted assigns of the parties hereto.

2.4     This Escrow Agreement is the final expression of, and contains the entire agreement between, the parties with respect to the subject matter hereof and supersedes all prior understandings with respect thereto.  This Escrow Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the parties to be charged or by their respective agents duly authorized in writing or as otherwise expressly permitted herein.

2.5     Whenever required by the context of this Escrow Agreement, the singular shall include the plural and masculine shall include the feminine.  This Escrow Agreement shall not be construed as if it had been prepared by one of the parties, but rather as if both parties had prepared the same.  Unless otherwise indicated, all references to Articles are to this Escrow Agreement.

2.6     The parties hereto expressly agree that this Escrow Agreement shall be governed by, interpreted under and construed and enforced in accordance with the internal laws of the State of Nevada without reference to principles and conflicts of laws.  The parties hereto submit to the jurisdiction of the state and federal courts sitting in Las Vegas, Nevada with respect to any dispute or controversy arising under this Agreement.

2.7     The Escrow Agent's duties hereunder may be altered, amended, modified or revoked only by a writing signed by each Purchaser Agent, Seller Agent and the Escrow Agent.

2.8     The Escrow Agent shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by the Escrow Agent to be genuine and to have been signed or presented by the proper party or parties.  The Escrow Agent shall not be personally liable for any act the Escrow Agent may do or omit to do hereunder as the Escrow Agent while acting in good faith, excepting only its own willful misconduct, and any act done or omitted by the Escrow Agent pursuant to the advice of the Escrow Agent's attorneys-at-law (other than Escrow Agent itself) shall be conclusive evidence of such good faith.

2.9     The Escrow Agent is hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or corporation, excepting only orders or process of courts of law and is hereby expressly authorized to comply with and obey orders, judgments or decrees of any court.  In case the Escrow Agent obeys or complies with any such order, judgment or decree, the Escrow Agent shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

2.10     The Escrow Agent shall not be liable in any respect on account of the identity, authorization or rights of the parties executing or delivering or purporting to execute or deliver any documents or papers deposited or called for hereunder.

2.11     The Escrow Agent shall be entitled to employ such legal counsel, and other experts as the Escrow Agent may deem necessary properly to advise the Escrow Agent in connection with the Escrow Agent's duties hereunder, may rely upon the advice of such counsel, and may pay such counsel reasonable compensation therefore.  The Escrow Agent has acted as legal counsel for the Company and Purchasers, and may continue to act as legal counsel for the Company and/or Purchasers from time to time, notwithstanding its duties as the Escrow Agent hereunder.  Each Seller and Purchaser consents to the Escrow Agent in such capacity as legal counsel for the Company and Purchasers and waives any claim that such representation represents a conflict of interest on the part of the Escrow Agent.  Purchasers and Sellers understand and acknowledge that the Escrow Agent, Purchasers and the Company are relying explicitly on the foregoing provision in entering into this Escrow Agreement.

2.12    The Escrow Agent's responsibilities as escrow agent hereunder shall terminate if the Escrow Agent shall resign by written notice to Seller Agent and Purchasers.  In the event of any such resignation, Seller Agent and Purchaser Agent shall appoint a successor Escrow Agent.

2.13    If the Escrow Agent reasonably requires other or further instruments in connection with this Escrow Agreement or obligations in respect hereto, the necessary parties hereto shall join in furnishing such instruments.

2.14    It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the Shares Sold held by the Escrow Agent hereunder, the Escrow Agent is authorized and directed in the Escrow Agent's sole discretion (i) to retain in the Escrow Agent's possession without liability to anyone all or any part of the Shares Sold until such disputes shall have been settled either by mutual written agreement of the parties concerned by a final order, decree or judgment of a board of arbitration or a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but the Escrow Agent shall be under no duty whatsoever to institute or defend any such proceedings, or (ii) to deliver the Shares Sold and any other property and documents held by the Escrow Agent hereunder to a state or Federal court having competent subject matter jurisdiction and located in the State of Nevada in accordance with the applicable procedure therefore.

2.15    The Sellers and the Purchasers agree jointly and severally to indemnify and hold harmless the Escrow Agent and its partners, employees, agents and representatives from any and all claims, liabilities, costs or expenses (including reasonable attorneys' fees) in any way arising from or relating to the duties or performance of the Escrow Agent hereunder or the transactions contemplated hereby, other than any such claim, liability, cost or expense to the extent the same shall have been determined by final, nonappealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Escrow Agent.

2.17    In the event any vote is submitted to the holders of Common Stock at any time while the Shares Sold are held by Escrow Agent, Sellers, Purchasers and the Company acknowledge that for purposes of such vote, such Shares Sold shall be deemed to be held beneficially and of record by the Sellers and the vote of the Sellers with respect to Shares Sold deposited in escrow under this Agreement shall be deemed to be counted as if such Shares Sold were not the subject of this Agreement.

2.18    Time is of the essence of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of this 22 day of November 2011.

ESCROW AGENT:
CANE CLARK, LLP

By: _____

Name: Kyleen E. Cane
Title: Agent

**SELLER/SELLER AGENT:**

_____

Michael Caridi
As agent and attorney in fact for those sellers listed
on Schedule A hereto[1]

**PURCHASERS:**

_____

Solomon Capital 401k Trust
By:
Its:

---

[1] Seller Agent represents and warrants to Escrow Agent and Purchasers, that Seller Agent has been duly appointed as agent and attorney-in-fact for each of the Sellers listed on Schedule A hereto, and such appointment is in full force and effect with respect to each Seller and such appointment has not been revoked nor has any action been taken by any Seller to revoke such appointment.

To:     Cane Clark LLP, Escrow Agent

From: Solomon Capital 401K Trust

Re:     Southern States Sign Company, Selling Shareholders Escrow

In regard to the $19,975 US wired into the above escrow account by Solomon Capital 401K Trust on November 4th, 2011 you are hereby directed to release and distribute $19,975 as provided under the terms of the Escrow Agreement upon closing.

Upon completion of the funds releases described above, Cane Clark, LLP, as Escrow Agent, having fully administered its duties and having lawfully performed all acts required of it, is hereby discharged as Escrow Agent and released and discharged by us from any and all liability, duties, or further responsibilities with regard to these instructions, the released funds, and otherwise.

We further agree to defend and indemnify you as Escrow Agent, and all of your officers, partners, agents, and employees, against all costs, expenses, and losses (including reasonable attorney fees and costs) asserted by or awarded to any third parties against you relating in any way to the release of the funds or to the execution of these instructions.

Sincerely,


Solomon Capital 401K Trust

To:      Cane Clark LLP, Escrow Agent

From:    Solomon Capital 401k Trust and Michael Caridi

Re:    Southern States Sign Company, Escrow and Shareholder Agreement

In regard to the Escrow Agreement dated November 29, 2011 by and between Michael Caridi, Solomon Capital 401k Trust ("Solomon") and you as the Escrow Agent (the "Agreement"), please consider this instruction as a modification and closing instruction of the Agreement, as follows:

1. It is acknowledged that the Purchase Price has been released and distributed as provided in the earlier documentation provided to Escrow and that the 1,775 Shares Sold have been received by Solomon.

2. We have agreed to delete the condition and language provided in paragraph 1.2 (a) regarding the sale of the Shares Sold for $4; as such all of the language that follows should be considered deleted from the document and you are no longer to be restricted from the distribution of the other shares of Southern States Sign Company held in your escrow account:

"Escrow Agent shall thereafter hold the remaining shares owned by Sellers undistributed, except for shares of certain concurrent purchasers that together with Purchasers are buying a total of 22,225 shares ("Concurrent Purchasers"), until such time as Purchasers and Concurrent Purchasers have sold all of their shares for a minimum of $4 per share in the market. Escrow is irrevocably instructed not to release the Sellers shares held in escrow until such time as this condition is met. In this regard, Solomon agrees to deposit the Shares Sold and attempt to sell them promptly within five days trading following the effective date of the Company's planned Forward Split;"

3. The Agreement and Escrow should be considered complete, and you are hereby released and discharged as the Escrow Agent from any further responsibilities under the Agreement.

Sincerely,

Solomon Capital 401k Trust

Michael Caridi