**Exhibit A**



August 14, 2012

Genesis BioPharma, Inc
1500 Olympic Blvd, Suite #400
Los Angeles, CA 90064

Attention:      Anthony Cotaldo, President and Chief Executive Officer

Sir:

  1. We are pleased to set forth the terms of the retention of New World Merchant Partners LLC ("*NWMP*") by Genesis BioPharma, Inc. (collectively with its affiliates, the "*Company*") to act as a non-exclusive financial and strategic advisor to the Company in connection with the some or all of the following, with all efforts on a commercially reasonable basis, provided that NWMP completes its due diligence review of the Company and is satisfied therewith:

    (a) assistance with the evaluation of strategic growth and financial alternatives, which could include refinancing of existing debt, expansion of available credit, and infusions of equity, any of which may be private or public in nature;

    (b) identification of appropriate professionals to assist the Company in connection with an international public awareness campaign;

    (c) assistance in the preparation of any needed presentation materials;

    (d) assistance with any Transaction as defined below.

  As used in this Agreement, the term "*Transaction*" shall mean (a) any corporate development, merger, consolidation, reorganization, capitalization, business combination, or other transaction pursuant to which the Company is capitalized, developed, acquired by, or combined with, any Introduced Entity (as hereinafter defined) during the term of this Agreement (any such entity, a "*Target*") or (b) the acquisition, directly or indirectly, by the Company (or by one or more persons acting together with the Company pursuant to a written agreement or otherwise), in a single transaction or a series of transactions, of (i) all or substantially all of the assets of the Target or (ii) shares of the Target's capital stock. NWMP's services may include advice with respect to valuation and structuring of any Transaction, assisting the Company in the Company's efforts for introductions to sources of

700 White Plains Road, Suite 317
Scarsdale, New York 10583
(914) 723-7400 Telephone
(914) 723-7470 Fax

1C Bowens Landing
Newport, Rhode Island 02840
(401) 619-5908 Telephone
(914) 723-7470 Fax

 ew World
Merchant Partners

capital required for any Transaction, and assisting the Company in negotiations relating to any Transaction.

The Company understands that NWMP intends to introduce the Company to entities ("*Introduced Entities*") in connection with the matters referenced in this paragraph 1.  In order to do so, NWMP shall present the name of prospective Introduced Entities ("*Prospective Introduced Entities*") to the Company in writing (an "*Introduction Preclearance Notice*").  The Company may inform NWMP within five business days following the receipt of such notice of any Prospective Introduced Entities to which it does not desire (for any reason, in the Company's sole discretion) an introduction.  Any Prospective Introduced Entity so identified shall not be an Introduced Entity and NWMP shall not contact them regarding any transaction with the Company.  In the event that the Company shall not inform NWMP within five business days following the receipt that such Introduction Preclearance Notice of the identities of the Prospective Introduced Entities named therein to which it shall not desire an introduction, all Prospective Introduced Entities identified therein shall be deemed to be Introduced Entities.  For the period commencing on the date hereof and terminating on the second anniversary of the date of the termination of this Agreement, the Company shall not consummate any transactions with any Introduced Entities without the prior written consent of NWMP.

2.      In connection with NWMP's activities on the Company's behalf, NWMP will familiarize itself with the proposed business, operations, properties, financial condition, and prospects of the Company.  In connection with its role as the Company's advisor, NWMP would expect its services to include such additional financial and strategic advisory and related services as may be mutually agreed upon by you and NWMP.  Services supplemental to those contemplated hereby shall be rendered on a basis mutually agreeable to you and NWMP.  The retention by you of NWMP as advisory as heretofore described shall be for a period of three months from the date hereof.

3.      In connection with NWMP's activities on the Company's behalf, the Company will cooperate with NWMP and will furnish NWMP with all information and data concerning the Company (the "*Information*") that NWMP deems appropriate and will provide NWMP with access to the proposed officers, directors, employees, independent accountants, and legal counsel of the Company.  The Company represents and warrants that all Information made available to NWMP by, or on behalf of, the Company will, at all times during the period of engagement of NWMP hereunder, be complete and correct in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading in the light of the circumstances under which such statements are made.  The Company further represents and warrants that any projections provided by, or on behalf of, the Company to NWMP will have been prepared in good faith and will be based upon assumptions which, in light of the circumstances under which they are made, are reasonable.  The Company acknowledges and agrees that, in rendering its services hereunder, NWMP will be using and relying on the Information without independent verification thereof by NWMP or independent appraisal by NWMP of any of the Company or the business, prospects, financial condition, or results of operations thereof.  NWMP does not assume responsibility for any Information.  Any advice rendered by NWMP pursuant to this Agreement may not be disclosed publicly without NWMP's prior written consent.


ew World
Merchant Partners

4.    In consideration of its services pursuant to this Agreement, NWMP shall be entitled to receive, at or prior to the closing of the Transaction:

> (a)    $35,000.00 USD due diligence advance fee payable by wire transfer upon the execution and delivery of this agreement hereof.  This sum is deductible at the Company's option, at the closing of the transaction.

> (b)    mutually agreeable consulting fees determined prior to the consummation of any particular transaction between the Company and any Introduced Entity, or in connection with any other Transaction.  Such fees shall be negotiated with reference to, among other things, the nature of the transaction, the amount of work and effort required by NWMP, the source of the Introduced Entity or other party to a Transaction, and such other factors as shall be mutually agreeable.

5.    In addition to the fees described in Paragraph 4 above, the Company agrees to promptly reimburse NWMP for expenses incurred in connection with its retention hereunder when incurred or promptly thereafter, provided, however, that no expense shall exceed $500 without the prior consent of the Company, not to be unreasonably withheld.

6.    The Company agrees to indemnify NWMP in accordance with the indemnification provisions (the "*Indemnification Provisions*") attached to this Agreement as Annex A, which Indemnification Provisions are incorporated herein and made a part hereof.

7.    NWMP may terminate this Agreement at any time upon 30 days' prior written notice, without liability or continuing obligation, except as set forth in the following sentence.  Neither termination of this Agreement nor completion of the assignment contemplated hereby shall affect: (i) any compensation earned by NWMP up to the date of termination or completion, as the case may be, including the entirety of the fees referenced in Paragraph 4 hereof; (ii) the reimbursement of expenses incurred by NWMP up to the date of termination or completion, as the case may be, (iii) the provisions of the last paragraph of Paragraph 1 of this Agreement and Paragraphs 4 through 7 of this Agreement and (iv) the Indemnification Provisions attached as Annex A hereto which are incorporated herein, all of which shall remain operative and in full force and effect.

8.    The validity and interpretation of this Agreement shall be governed by the law of the State of New York applicable to agreements made and to be fully performed therein. The Company irrevocably submits to the jurisdiction of any court of the State of New York or the United States District Court for the Southern District of the State of New York for the purpose of any suit, action, or other proceeding arising out of this Agreement, or any of the agreements or transactions contemplated hereby, which is brought by or against the Company and (i) hereby irrevocably agrees that all claims in respect of any such suit, action, or proceeding may be heard and determined in any such court and (ii) to the extent that the Company has acquired, or hereafter may acquire, any immunity from jurisdiction of any such court or from any legal process therein, the Company hereby waives, to the fullest extent permitted by law, such immunity.  The Company hereby waives, and agrees not to assert in any such suit, action, or proceeding, in each case, to the fullest extent permitted by applicable law, any claim that (a) the Company is not personally subject to the jurisdiction of any such court, (b) the Company is immune from any legal process

 ew World
Merchant Partners

(whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution, or otherwise) with respect to the Company's property or (c) any such suit, action, or proceeding is brought in an inconvenient forum.

9.      The benefits of this Agreement shall inure to the respective successors and assigns of the parties hereto and of the indemnified parties hereunder and their successors and assigns and representatives, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.

10.      For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto.  Each such counterpart shall be, and shall be deemed to be, an original instrument, but all such counterparts taken together shall constitute one and the same Agreement.  This Agreement may not be modified or amended except in writing signed by the parties hereto.

11.      NWMP shall be permitted to announce the retention thereof by the Company on the website of NWMP, including the use of the logo and any other trademark or service mark of the Company, provided that such announcement does no more than advise the public of such retention as a financial and strategic consultant.  Such announcement on the website of NWMP may be modified to provide additional specificity at such time as any transaction involving the Company with respect to which NWMP rendered financial and strategic advisory services becomes a matter of public record or otherwise with the consent of the Company.

12.      **Although one or more employees and/or members of NWMP are or were members of the bar, neither NWMP nor any employee or member thereof is acting as an attorney on behalf of any party.  Any documentation and any advice provided by NWMP or any employee or member of NWMP is intended to be used for informational purposes only and, in the case of documentation, is to be used solely as a guide to suggested topics for inclusion in final documentation.  No advice provided by NWMP or any employee or member thereof is intended to be, or should be construed to be, legal advice.  No representation is made by NWMP or any employee or member thereof as to the sufficiency or legality of any documentation provided thereby, as to its legality in any jurisdiction, or as to its appropriateness for use.  All advice and documentation should be reviewed by the attorneys to the parties thereto prior to use.**

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]**



If the foregoing correctly sets forth our Agreement, please sign the enclosed copy of this letter in the space provided and return it to us.

Very truly yours,

**NEW WORLD MERCHANT PARTNERS LLC**

By:_____

    **Name:**      **Jason Gold**

    **Title:**       **Director**

**Confirmed and Agreed to:**
**this _____ day of August, 2012**

**Genesis BioPharma, Inc.**

**By:_____**

    **Name:**

    **Title:**



Annex A

## INDEMNIFICATION PROVISIONS

Genesis BioPharma, Inc (the "*Company*"), agrees to indemnify and hold harmless New World Merchant Partners LLC ("*NWMP*") against any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses, and disbursements (and any and all actions, suits, proceedings, and investigations in respect thereof and any and all legal and other costs, expenses, and disbursements in giving testimony or furnishing documents in response to a subpoena or otherwise), including, without limitation the costs, expenses, and disbursements, as and when incurred, of investigating, preparing, or defending any such action, suit, proceeding, or investigation (whether or not in connection with litigation in which NWMP is a party), directly or indirectly, caused by, relating to, based upon, arising out of, or in connection with NWMP's acting for the Company, including, without limitation, any act or omission by NWMP in connection with its acceptance of or the performance or non-performance of its obligations under the letter agreement dated August 14, 2012, between NWMP and the Company, as it may be amended from time to time (the "*Agreement*"); <u>provided</u>, <u>however</u>, such indemnity agreement shall not apply to any portion of any such loss, claim, damage, obligation, penalty, judgment, award, liability, cost, expense, or disbursement to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence or willful misconduct of NWMP. The Company also agrees that NWMP shall not have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the engagement of NWMP, except to the extent that any such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from NWMP's gross negligence or willful misconduct.

These Indemnification Provisions shall be in addition to any liability which the Company may otherwise have to NWMP or the persons indemnified below in this sentence and shall extend to the following: NWMP, its affiliated entities, directors, officers, employees, legal counsel, agents, and controlling persons (within the meaning of the federal securities laws). All references to NWMP in these Indemnification Provisions shall be understood to include any and all of the foregoing.

If any action, suit, proceeding, or investigation is commenced, as to which NWMP proposes to demand indemnification, it shall notify the Company with reasonable promptness; <u>provided</u>, <u>however</u>, that any failure by NWMP to notify the Company shall not relieve the Company from its obligations hereunder. NWMP shall have the right to retain counsel of its own choice to represent it, and the Company shall pay the fees, expenses, and disbursements of such counsel; and such counsel shall, to extent consistent with its professional responsibilities, cooperate with the Company and any counsel designated by the Company. The Company shall be liable for any settlement of any claim against NWMP made with the Company's written consent, which consent shall not be unreasonably withheld. The Company shall not, without the prior written consent of NWMP, settle or compromise any claim, or permit a default or consent to the entry of any judgment in respect thereof, unless such settlement, compromise, or consent includes, as an



unconditional term thereof, the giving by the claimant to NWMP of an unconditional release from all liability in respect of such claim.

In order to provide for just and equitable contribution, if a claim for indemnification pursuant to these Indemnification Provisions is made, but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification in such case, then the Company, on the one hand, and NWMP, on the other hand, shall contribute to the losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses, and disbursements to which the indemnified persons may be subject in accordance with the relative benefits received by the Company, on the one hand, and NWMP, on the other hand, and also the relative fault of the Company, on the one hand, and NWMP on the other hand, in connection with the statements, acts, or omissions which resulted in such losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses, or disbursements and the relevant equitable considerations shall also be considered.   No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation.  Notwithstanding the foregoing, NWMP shall not be obligated to contribute any amount hereunder that exceeds the amount of fees previously received by NWMP pursuant to the Agreement.

Neither termination nor completion of the engagement of NWMP referred to above shall affect these Indemnification Provisions which shall then remain operative and in full force and effect.

**Exhibit B**

**Proposed Termsheet**

*Draft 20130315*

**RESTRUCTURING AND RECAPITALIZATION**

**OF**

**GENESIS BIOPHARMA, INC.**

*Except as otherwise expressly stated herein, the proposed terms set forth below are set forth herein for discussion purposes only and are subject to, among other things, the completion of due diligence review and execution and delivery of definitive documentation.  References to the proposed or anticipated terms of any offering of securities is subject to additional comment by the provider thereof and may be superceded by written documentation therewith.*

| | |
|---|---|
| Parties | Genesis BioPharma, Inc., a Nevada corporation ("*Genesis*")<br><br>New World Merchant Partners LLC, transactional advisor to Genesis ("*NWMP*")<br><br>Sharon Jakoby (together with his affiliates, "*Jakoby*")<br><br>Alon Cohen (together with his affiliates, "*Cohen*")<br><br>Highline Research Advisors ("*Highline*") |
| Transaction Summary | Genesis, with the assistance of NWMP and Highline, shall:<br><br>i.    reverse split (the "*Reverse Split*") the outstanding common stock, par value $0.001 per share (the "*Genesis Common Stock*"), of Genesis;<br>ii.    restructure and convert certain existing indebtedness of Genesis (the "*Debt Restructuring*");<br>iii.    raise additional capital in the form of convertible secured notes (the "*New Notes*") and shares of Genesis Common Stock (the |

| | |
|---|---|
| | "*Capital Transactions*"); and<br><br>iv.    replace the management and board of directors of Genesis with a team designated by the Restructuring Group and reasonably acceptable to the existing board of directors of Genesis (the "*New Management*"). |
| Preliminary Matters | *Equity Capitalization.* At September 30, 2012, Genesis had outstanding 78,293,095 shares of Genesis Common Stock (excluding shares of Genesis Common Stock to be issued) and no shares of preferred stock outstanding.<br><br>*Options and Warrants.* At September 30, 2012, Genesis had outstanding options and warrants exercisable for an aggregate of 20,448,418 shares of Genesis Common Stock at a weighted average exercise price of $_____ per share.<br><br>*Existing Secured Notes.* At September 30, 2012, Genesis had outstanding 12% secured notes in the amount of $5,416,111 of principal and accrued and unpaid interest (the "*Existing Notes*"). The Existing Notes Notes have "Most Favored Nations" protection.<br><br>*Existing Secured Notes.* At September 30, 2012, Genesis had outstanding unsecured convertible promissory notes in the amount of $1,216,250 of principal and accrued and unpaid interest (the "*Existing Secured Notes*"). The Existing Secured Notes are convertible at $1.25 per share currently. |
| Reverse Split | Prior to the consummation of the Capital Transaction, Genesis shall approve and effect a 1-for-ten reverse split of the Genesis Common Stock. The Reverse Split may be conditioned upon the execution and delivery of final documentation relating to the Capital Transaction by the parties thereto. |

| | | |
|---|---|---|
| Debt Restructuring | | |
| | Exiting Secured Notes | The holders of the Existing Secured Notesshall be repaid in full at the closing. |
| | Existing Notes | The holders of the Existing Notes shall have the right to exchange their Existing Notes at the same terms as Jakoby and Cohen. |
| Capital Transactions | | |
| | Structure | The offering  shall be structured as a transaction exempt from Section 5 of the Securities Act of 1933, as amended (the "*Securities Act*"), and shall comply with Section 4(2) of the Securities Act and Regulation D thereunder and state securities law. |
| | Securities Offered | Up to $30.0 million of 8% Secured Convertible Notes due five years after the date of issuance 20% coverage in the form of shares of Genesis Common Stock (e.g., 25% of the number of shares into which the New Notes shall be initially convertible).  Investors will also be afforded "*Most Favored Nations Treatment*" while their New Notes are outstanding. |
| | New Notes | |
| | | Priority | The New Notes shall constitute senior secured indebtedness of the Company, secured by all of the assets of Genesis, including a pledge of the shares of the subsidiaries thereof. |
| | | Interest | Interest shall accrue at the rate of 8% per annum and shall be payable quarterly and on the Maturity Date (as hereinafter defined) or the earlier prepayment of the Notes. |
| | | Maturity | Four years from date of issuance |
| | | Prepayment | Provided that the closing price of the Genesis Common Stock is at least 200% of the then effective conversion price of the New Notes, the New Notes may be prepaid at any time upon 30 days prior written notice to the Holders, in whole or in part, without premium or |

| | | | |
|---|---|---|---|
| | | | penalty. |
| | | Covenants | Restrictions on liens, prohibition on indebtedness senior to, or pari passu with, the New Notes (subject to customary carve-outs), restrictions on dividends, related party transactions, certain notice requirements, no change in control, etc.<br><br>The holders of the Notes shall be entitled to designate a member to serve on the Board of Directors of the Company until such time as the Notes are repaid in full. |
| | | Events of Default | Failure to pay principal and interest when due; breach of covenants after notice; false or misleading representations, warranties, or certifications; final judgments in excess of $500,000 not discharged or stayed after applicable periods; certain events of bankruptcy or insolvency, limitations on debt incurrence, total leverage covenants, limitations on capital expenditures, and limitations on dividends. |
| | | Waivers and Amendments | Waivers of covenants and defaults and amendments to the Notes shall require the written consent of the holders of a majority in principal amount of the Notes (other than the Company). |
| | | Conversion | The New Notes shall be convertible at $2.50 per post-Reverse Split share of Genesis Common Stock, subject to adjustment for stock splits, stock dividends, etc., recapitalizations, as well as on a weighted average ratchet basis for "down rounds". |
| | Timing | | Sharon: Sharon shall invest no less than $500,000 at the closing of the Capital Transaction and shall invest no less than $10.0 million within nine months following the date of such closing.<br><br>Alon: Alon shall invest no less than $10.0 at the closing of the Capital Transaction. |
| New Management | | | The names and biographies of the proposed New Management shall be supplied prior to the execution and delivery of the definitive documentation relating to the Capital Transaction. |

| | |
|---|---|
| Additional Financing | Genesis shall enter into a letter of intent with Highline pursuant to which Highline shall engage in a private placement or PIPE transaction in connection with which Genesis shall receive gross proceeds of no less than $4.0 million and not more than $10.0 million. |

# Exhibit C

**To**:    "Jason E. Gold"
                <jgold@newworldmp.com>

**Cc**:    "Robert S. Brown"
                <rbrown@newworldmp.com>,Mark
                Beychok
                <mb@mbaholdings.com>,"David E.
                Price, Esq." <David@TopTier.eu>

| Attachments | | |
|---|---|---|
| **Name** | **Type** | **Save View** |
| Message | text/plain | Save |

**Subject**: Re lets try to nail this down ASAP

**Date**:    Mon 03/25/13 06:03 AM

```
There 10% cash & 10% stock on capital raise on an exclusive bases (once
we control first raise )from dollar one to dollar 85 million-where the
exclusive agent is MBA and Solomon capital evenly 50% each
And new world partners on the other 50%~ exclusive raise as agent
Any fee raises issues like high land which is 6~6% is coming off our
10-10%
And Alon Strauss group who also wants 6-6% ( we will negotiate him down
after we have a signed agreement between the 4 of us where MBA Solomon
capital will split down the middle all fees with new world equally ~~~
Once this part is signed and sealed we should get high lined signed up
with there fee agreement in place as so With Alon -- Alon may have a
point to be entitled to a greater fee since his first but we should only
start negotiating after all our fees are agreed upon between ourselves
and moving forward/
Lets get this and highland fee agreement in place so there's no more
loose ends ~ there's no more room
To make mistakes or to be sloppy and careless - I had enough already on
this deal of such feelings not going to have this again right before the
Close

Sent from my iPhone
```

---

Sent: Monday, March 18, 2013 12:56 PM

To: Mark Beychok

Cc: david@toptier.eu

Subject: Alon Strauss and Nechemia


What are the fees splits with new world in regards to Nechemia and Strauss are we just do every thing 50-50'% Is there a exclusive arrangement for entire 85 million moving forward as we spoke - ? I

spoke to robert brown and jason gold


Sent from my iPad

---


On 18 2013 במרץ, at 23:11, "David E. Price, Esq." <David@TopTier.eu> wrote:

Shlomo -

Just relax with Mark for right now. These messages are really not helpful for anything. The company will pay back all approved expenses. I don't believe Mark has any interest in screwing you. Just don't let your anxieties overwhelm you, all will come out ok on this, trust me.

- David

-David E. Price, Esq.

Washington, DC

1 202 536-5191

--------------------------------------------------------------------------------------

**From:** Ssharbat <ssharbat@yahoo.com>
**Date:** 18 23:10:49 2013 במרץ GMT+02:00
**To:** "David@TopTier.eu" <David@TopTier.eu>
**Subject: Re: Alon Strauss and Nechemia**
Ok thanks - it' just pisses me of all his fuckin lies even on the deal I ,eat him on 4 years ago I lost 100 k and I had a chance to,not lose it but he tricked me on that one also - it turned out that it was lie after lie after just one big fat liar loser

Sent from my iPad

# Exhibit D

NON-DISCLOSURE AGREEMENT

THIS AGREEMENT, entered into this 8th day of April, 2013, by and between Solomon Sharbat/Alon Cohen ("Sharbat/Cohen" or "Disclosing Party") and New World Merchant Partners ("Receiving Party") (each a "Party" and collectively, the "Parties").

1.  In connection with the Parties mutual evaluation of their potential funding of Genesis Biophrama the Parties may from time to time disclose to each other certain confidential or proprietary information. As used herein, "Confidential Information" shall mean written or oral confidential information of any Party disclosed to the other Party after the date hereof relating to the Project. The Party disclosing Confidential Information is referred to herein as the "Disclosing Party" and the Party receiving such Confidential Information is referred to herein as the "Receiving Party".

2.  The Receiving Party agrees that the Confidential Information shall be kept strictly confidential and shall not be sold, traded, published or otherwise disclosed to anyone in any manner whatsoever, including by means of photocopy or reproduction, without the Disclosing Party's prior written consent, except as provided in Paragraphs 4 and 5 below. The Receiving Party further agrees that it will only use the Confidential Information in connection with the joint evaluation of the Project with the Disclosing Party and shall not use the Confidential Information to participate in the development of the Project without the Disclosing Party.

3.  The parties mutually agree that, while they are jointly conducting any negotiations, pursuant to this Agreement or any subsequent definitive agreements that the Parties may mutually agree upon, not to circumvent each other's contacts with local agents or affiliated partners, directly or indirectly, by contacting, dealing or transacting any agreements and business with them without the knowledge and consent of the other Party.

4.  The Receiving Party may disclose the Confidential Information without the Disclosing Party's prior written consent only to the extent such information is:

    (a)  already known to the Receiving Party as of the date of disclosure hereunder;

    (b)  already in possession of the public or becomes available to the public other than through the act or omission of the Receiving Party in breach hereof;

    (c)  required to be disclosed under applicable law or by a governmental order, decree, regulation or rule (provided that the Receiving Party shall give written notice to the Disclosing Party prior to such disclosure); or

    (d)  is acquired independently from a third party that, to the knowledge of the Receiving Party, has the right to disseminate such information at the time it is acquired by the Receiving Party; or

    (e)  independently developed by the Receiving Party without reliance on the Confidential Information disclosed by the Disclosing Party.

5.  The Receiving Party shall be entitled to disclose the Confidential Information without the Disclosing Party's prior written consent to the following persons (the "Representatives"), to the extent the Representatives need to know such Confidential Information for the

purpose of assisting with the evaluation of the Project, are informed of the confidential nature of the Confidential Information and agree to be bound by the terms of this Agreement:

(a)     employees, officers and directors of the Receiving Party;

(b)     its affiliates and the employees, officers and directors of such affiliates; or

(c)     any professional consultant or agent retained by the Receiving Party for the purpose of evaluating the Project.

6.     The Receiving Party shall be responsible for ensuring that all of its Representatives to whom the Confidential Information is disclosed under this Agreement shall keep such information confidential in accordance with the terms of this Agreement and shall not disclose, divulge or use such Confidential Information in violation of this Agreement. The Receiving Party shall be responsible to the Disclosing Party for any breach of this Agreement by the Representatives of the Receiving Party.

7.     Neither Party shall be liable in any action initiated by one against the other for special, indirect or consequential damages resulting from or arising out of this Agreement, including, without limitation, loss of profit or business interruptions, however same may be caused.

8.     The Confidential Information shall remain the property of the Disclosing Party, and the Disclosing Party may demand the return thereof at any time upon giving written notice to the Receiving Party.  Within 30 days of receipt of such notice, the Receiving Party shall return all of the original Confidential Information and shall destroy all copies, reproductions or extracts (both written and electronic) in its possession and in the possession of Representatives to whom it was disclosed pursuant to Paragraph 4 hereof, including notes and work papers containing Confidential Information. The destruction of such Confidential Information shall be certified by the Receiving Party to the Disclosing Party promptly following completion of the destruction of such Confidential Information.

9.     If either Party becomes legally compelled to disclose any of the Confidential Information, such Party will provide the other Party with prompt notice so that the other Party may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, such Party will furnish only that portion of the Confidential Information, which is legally required, and such Party will cooperate with the other Party's counsel to enable such Party to obtain a protective order or other reliable assurance that confidential treatment will be accorded the same.

10.     The confidentiality obligation set forth in this Agreement shall terminate two years after the date of this Agreement.

11.     The Disclosing Party hereby represents and warrants that it has the right and authority to disclose the Confidential Information to the Receiving Party. The Disclosing Party, however, makes no representations or warranties, express or implied, as to the quality, accuracy and completeness of the Confidential Information disclosed hereunder.  The Disclosing Party, its affiliates, and their officers, directors and employees shall have no liability whatsoever with respect to the use of or reliance upon the Confidential Information by the Receiving Party.

12.   This Agreement shall be governed by and interpreted in accordance with the laws of the state of New York.  Each Party hereby submits to the jurisdiction and venue of the courts in New York for purposes of any litigation related to the Agreement.

13.   Nothing contained herein is intended to create a joint venture, partnership or other type of business entity between the Parties, to require either Party to provide any information with regard to the Project, or to confer upon either Party the right to participate in the Project.

14.   No amendments, changes or modifications to this Agreement shall be valid except if the same are in writing and signed by a duly authorized representative of each of the Parties.

15.   This Agreement comprises the full and complete agreement of the Parties hereto with respect to the disclosure of the Confidential Information and supersedes and cancels all prior communications, understandings and agreements between the Parties hereto, whether written or oral, expressed or implied with respect thereto.

16.   All provisions of this Agreement are severable, and the unenforceability or invalidity of any of the provisions of this Agreement shall not affect the validity or enforceability of the remaining provisions of this Agreement.

17.   In the event of any breach or threatened breach by either Party of the terms hereof, the other Party shall be entitled to injunctive and other equitable relief, and such breaching Party shall not plead in defense thereto that there would be an adequate remedy at law. Any such relief shall be in addition to, and not in lieu of, money damages or any other legal or equitable remedy available to the Party seeking relief.

18.   This Agreement may be executed in counterparts, each of which when executed and delivered shall be an original, but all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the duly authorized representatives of the Parties have caused this Agreement to be executed on the date first written above.

For and on behalf of New World Merchant Partners

By:_____
Name: Jason Gold

For and on behalf of Sharbat/Cohen

By: _____
Name: