# Exhibit A

## CONFIDENTIALITY, NON-DISCLOSURE
## and NON-CIRCUMVENTION AGREEMENT

This Confidentiality, Non-Disclosure and Non-Circumvention Agreement ("Agreement") is entered into as of June 13, 2012 (the "Effective Date"), by and between MBA HOLDINGS, LLC, a California limited liability company ("MBA"), and GENESIS BIOPHARMA, INC., a Nevada corporation ("GNBP").

### R E C I T A L S

MBA is a consulting firm in the business of advising companies on capital formation; structuring and negotiating mergers and acquisitions with complex financing arrangements, including debt and equity transactions; and making introductions to companies to assist with developing promising business opportunities.

GNBP is developing autologous cell therapies for the treatment of cancer.

MBA and GNBP desire to enter into discussions regarding the possibility of establishing a mutually beneficial business relationship between the parties (the "Opportunity").

For purposes of exploring the Opportunity, GNBP and MBA desire from one another certain information, data, terms, concepts, ideas, strategies, contacts, introductions and relationships that each party deems confidential.

GNBP and MBA are willing to disclose and/or cause to be disclosed to each other certain information, data, terms, concepts, ideas, strategies, contacts, introductions and relationships that each party deems confidential; provided, however, that such disclosure is subject to the terms and conditions hereof.

### A G R E E M E N T

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, the parties hereto agree as follows:

1.      The term "Confidential Information" as used herein shall mean (a) any and all information received by one party hereto (the "Recipient Party") from the other party hereto (the "Disclosing Party") regarding the Opportunity, and (b) any and all information gathered by either in the course of discussing and/or implementing the Opportunity, whether written or oral, and if written, however produced, that would logically be considered confidential and the subject matter of this Agreement, and which information shall include, without limitation, (i) all ideas, concepts, strategies, corporate and financing structures, data, summaries, reports, drawings, charts, specifications, forms, materials, term sheets, agreements and contracts (including this Agreement) relating in any way to the Opportunity, and (ii) all information of any nature concerning either party's financial contacts and resources, distribution contacts and resources, technical information and know-how, business dealings and negotiations with third parties, potential mergers and acquisitions, shareholders, members, clients, employees, consultants and affiliates.

—1—

2.     The term "Confidential Information" does not include information which (a) is publicly available or becomes generally available to the public other than as a result of a disclosure by the Recipient Party, (b) becomes available to the Recipient Party on a non-confidential basis from a source other than the Disclosing Party, provided that such source is not bound by a confidentiality agreement or other obligation of secrecy with the Disclosing Party, or (c) is independently developed by the Recipient Party.

3.     The provisions of this Agreement prohibiting disclosure of Confidential Information shall not apply to Confidential Information that the Recipient Party is lawfully required to disclose pursuant to an order of a court of competent jurisdiction, provided that before making such disclosure the Recipient Party shall promptly notify the Disclosing Party of such disclosure order and upon request of the Disclosing Party shall fully cooperate in contesting such disclosure.  If after such contest disclosure is still required, then the Recipient Party shall seek confidentiality treatment from the entity requiring disclosure to the extent that the same is available.

4.     Each party hereto agrees that it shall not, at any time, disclose, in whole or in part, the Confidential Information to any third party, without first obtaining express written permission from the Disclosing Party.  Each party further and specifically agrees not to disclose, in whole or in part, the Confidential Information (including without limitation, the provisions of any term sheets or letters of intent) to any third parties with whom GNBP may be in negotiations regarding the Opportunity.   Neither party may reveal Confidential Information to any affiliates except those who are deemed by the Recipient Party to be necessary for the purpose of discussing or evaluating the Opportunity, and provided that the Confidential Information will be used by such affiliates solely in connection with the Opportunity.  The Recipient Party shall take all necessary and appropriate precautions to avoid the unauthorized disclosure of Confidential Information.  All references to GNBP and MBA in this Agreement shall include all affiliates of GNBP and MBA, respectively.  As used in this agreement, "affiliates" shall include but shall not be limited to (a) any entities of which either respective party is an employee, officer, director, partner, member, ten percent or greater shareholder, and any subsidiaries, partnerships or any other entities controlled by such entities, (b) all officers, directors, agents, employees, partners, ten percent or greater shareholders, consultants and advisors of each respective party, and (c) any entity newly formed by either party subsequent hereto under the same or a similar name.

5.     If at any time the Disclosing Party requests in writing, the Recipient Party shall immediately return to the Disclosing Party all written and tangible Confidential Information originating with the Disclosing Party (including without limitation, all documents, business plans, booklets, proposals, confidential memoranda, term sheets, letters, memos, drawings, charts, specifications, discs, magnetic tapes, electronic files and data bases) and any and all copies thereof.

6.     Confidential Information shall remain the sole and exclusive property of the Disclosing Party.  The Recipient Party shall make no commercial use whatsoever, in whole or in part, of the Confidential Information, shall not use the Confidential Information to establish or operate or assist anyone in the establishment or operation of a business, product or service similar or in competition, directly or indirectly, with the business of the Disclosing Party anywhere in the world.   Further, the Recipient Party shall not mechanically copy or otherwise reproduce the Confidential Information, except as may be necessary to evaluate and/or implement the Opportunity.  Nothing herein shall be construed as to grant the Recipient Party any right or license under any patent, copyright, trademark or any other right relating to the Confidential Information.  Each party understands and agrees that any and all contracts prepared by the other party hereto (not including the form of this Agreement) are protected by copyright and/or

— 2 —

by this Agreement and the Recipient Party may not copy or use in any manner, all or any portion of, such contracts for any purpose other than in connection with the Opportunity.

7.     The parties hereto acknowledge that the Confidential Information protected hereunder is of an extraordinary nature and value and cannot, in the event of any unauthorized disclosure or use by the Recipient Party, be adequately or reasonably compensated for in damages awarded in an action at law.  Each party therefore agrees that in the event of such unauthorized disclosure or use by the Recipient Party, the Disclosing Party shall be entitled to require of the Recipient Party specific performance of all acts and undertakings so required hereunder and to obtain injunctive and other equitable relief to prevent any further violation of any provisions herein.  In any action taken by the Disclosing Party to enforce its rights under this Agreement, the Disclosing Party shall be entitled to recover its costs of enforcement, including reasonable attorney's fees.

8.     The Recipient Party will not, in any manner, circumvent, or attempt to circumvent, the Disclosing Party by entering into any direct or indirect negotiations, communications, or transactions, or solicit or accept any business or financing from or for, any parties, contacts or sources introduced ("Introduced Party") to the Recipient Party by the Disclosing Party, without the express prior written consent of the Disclosing Party.

9.     The Recipient Party will not disclose to any third parties any names, addresses, telephone numbers, fax numbers, or email addresses of any Introduced Party, and the Recipient Party recognizes that such information about any Introduced Party is the exclusive and valuable property of the Disclosing Party.

10.     Each party hereby warrants, represents and covenants to the other that (a) each respective party has the right to enter into this Agreement and to perform fully all of its obligations herein, and (b) each respective party is not a party to any other agreement or under any other obligation to any third party which would prevent it from entering into this Agreement and complying with the terms and conditions set forth herein.

11.     The obligations of each party set forth in this Agreement shall remain in full force and effect for a period of three (3) consecutive calendar years following the Effective Date.

12.     This Agreement shall not be assigned by any of the parties hereto.

13.     This Agreement contains the full and complete understanding between the parties with regard to the subject matter hereof and cannot be modified or amended except by a written instrument signed by each party.  This Agreement supersedes all prior agreements, whether written or oral, between the parties with regard to the subject matter hereof.  Each party hereto acknowledges that no representation or promise not expressly contained in this Agreement has been made by the other party.

14.     This Agreement may be executed in several counterparts, each of which shall be an original as against any party who signed it.  This Agreement shall not be binding on any party until each party hereto has executed this Agreement or a counterpart hereof and delivered such executed Agreement or counterpart, whether by facsimile or otherwise, to the other parties hereto or to their respective representatives.  In the event that any provision contained in this Agreement shall be (i) held by any court or arbitration tribunal to be unenforceable, illegal, void or contrary to public policy, or (ii) in conflict with any applicable statute, law, regulation or applicable collective bargaining agreement, then such provision shall be of no force or effect;

— 3 —

provided, however, that in such event the provision of this Agreement so affected shall be curtailed and limited only to the minimum extent necessary to permit compliance with the minimum required, and no other provisions of this Agreement shall be affected thereby and all such other provisions shall continue in full force and effect. No waiver by either party of any rights hereunder nor the failure of either party to enforce against the other any provision, covenant or condition of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision, covenant or condition. All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative. If more than one person or entity executes this Agreement on behalf of any party hereto, all obligations and benefits hereunder shall apply jointly and severally. This Agreement shall inure to the benefit of the parties hereto and to their respective successors, heirs and assigns, subject to any restrictions on assignment contained elsewhere herein. Any rules of interpretation that ambiguities are to be construed against the drafting party shall not apply. Time is of the essence of every obligation under this Agreement that involves a time deadline for performance. In the event of any dispute, arbitration or litigation arising in any manner with respect to this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs. This Agreement shall be governed by and construed under the laws of the State of California. Any controversy or claim arising out of, or relating to, this Agreement and/or the execution or breach thereof, shall be subject to the jurisdiction of the appropriate court in the city and/or county of Los Angeles, California.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the Effective Date.

"MBA"
MBA HOLDINGS, LLC
a California limited liability company

"GNBP"
GENESIS BIOPHARMA, INC.
a Nevada corporation

By: _____
      Mark Beychok
      Managing Member & CEO

By: _____
Name: _____
Title: _____

# Exhibit B

**From**:    Shlomo Sharbat <ssharbat@yahoo.com>
**To**:      Mark Beychok <mb@mbaholdings.com>
**Subject**: Re. Confirmation on genesis - please confirm
**Date**:    Tue 07/17/12 09:22 AM

Our deal in regards to genesis gnbp - we are 50-50 equal partners
sharing all fees 10-% cash and 10% stock in regards to yorkville or any
other investors or contacts thru me -(Solomon )

2- in regards to mike Caridi and joe moscato any financing from them
whether it comes from gnbt generex or antigen or any one of there group
of contacts that invest in genesis - mark & Solomon
Will split evenly 5-% &5 % cash and stock which is what is left over
from the 50% cut of fees that Caridi and joe moscato get(  -10% + 10%
)they also want consulting shares for a few months which you need to
work out with them ) plus mark will split any fees I get in regards to
jala yogurt

If genesis gets financing from any of marks contacts mark can give
Solomon from his 10&10 agreement any portion he feels that is fair for
solomon hard work - whatever is fine I appreciate the block of shares
s8 we get now also is good  Enough -
Lets confirm above and move on to other confirmation deals like
polygreen etc fisher and Larry's DR deal

Sent from my iPad
shlomi sharbat -054 3311416

# Exhibit C



NUMBER

23-2

**GENESIS BIOPHARMA, INC.**

INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

AUTHORIZED - 1,800,000,000 COMMON SHARES,
$0.00004166666 PAR VALUE PER SHARE

SEE RESTRICTIVE LEGEND ON REVERSE

SHARES

728,750

CUSIP 37182R 10 2
SEE REVERSE FOR
CERTAIN DEFINITIONS

This Certifies That

—MBA HOLDINGS LLC—

is the owner of

***SEVEN HUNDRED TWENTY EIGHT THOUSAND SEVEN HUNDRED FIFTY***

Fully Paid and Non-Assessable Common Stock, $0.00004166666 Par Value of

**GENESIS BIOPHARMA, INC.**

transferable on the books of this Corporation in person or by attorney upon surrender of this Certificate duly endorsed
or assigned. This Certificate and the shares represented hereby are subject to the laws of the State of Nevada, and to
the Articles of Incorporation and the Bylaws of the Corporation, as now or hereafter amended. This Certificate is not
valid until countersigned by the Transfer Agent.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by the facsimile
signatures of its duly authorized officers and to be sealed with the facsimile seal of the Corporation.

Dated:      10/2/12

PRESIDENT

SECRETARY

Countersigned:
CORPORATE STOCK TRANSFER, INC.
3200 Cherry Creek South Drive, Suite 430
Denver, CO 80209
By
Transfer Agent and Registrar Authorized Officer

235



SEE RESTRICTIVE LEGEND ON REVERSE

**NUMBER**

234

**GENESIS BIOPHARMA, INC.**

INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

AUTHORIZED: 1,800,000,000 COMMON SHARES,
$0.0000416666 PAR VALUE PER SHARE

**SHARES**

−728,750−

CUSIP 37182R 10 2
SEE REVERSE FOR
CERTAIN DEFINITIONS

This Certifies That

−SOLOMON CAPITAL 401K TRUST−

is the owner of

***SEVEN HUNDRED TWENTY EIGHT THOUSAND SEVEN HUNDRED FIFTY***

Fully Paid and Non-Assessable Common Stock, $0.0000416666 Par Value of

**GENESIS BIOPHARMA, INC.**

transferable on the books of this Corporation in person or by attorney upon surrender of this Certificate duly endorsed
or assigned. This Certificate and the shares represented hereby are subject to the laws of the State of Nevada, and to
the Articles of Incorporation and the Bylaws of the Corporation, as now or hereafter amended. This Certificate is not
valid until countersigned by the Transfer Agent.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by the facsimile
signatures of its duly authorized officers and to be sealed with the facsimile seal of the Corporation.

Dated:      10/2/12

PRESIDENT

SECRETARY

SEAL

Countersigned:
CORPORATE STOCK TRANSFER, INC.
3200 Cherry Creek South Drive, Suite 430
Denver, CO 80209
BY
Transfer Agent and Registrar Authorized Officer



NUMBER
236-0

GENESIS BIOPHARMA, INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

AUTHORIZED: 1,800,000,000 COMMON SHARES,
$0.0000416666 PAR VALUE PER SHARE

SEE RESTRICTIVE LEGEND ON REVERSE

CUSIP 37182R 10 2

SHARES
42,500

SEE REVERSE FOR
CERTAIN DEFINITIONS

This Certifies That

—MAXINE MANDEL—

is the owner of

***FORTY TWO THOUSAND FIVE HUNDRED***

Fully Paid and Non-Assessable Common Stock, $0.0000416666 Par Value of

GENESIS BIOPHARMA, INC.

transferable on the books of this Corporation in person or by attorney upon surrender of this Certificate duly endorsed
or assigned. This Certificate and the shares represented hereby are subject to the laws of the State of Nevada, and to
the Articles of Incorporation and the Bylaws of the Corporation, as now or hereafter amended. This Certificate is not
valid until countersigned by the Transfer Agent.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by the facsimile
signatures of its duly authorized officers and to be sealed with the facsimile seal of the Corporation.

Dated:        10/2/12

PRESIDENT

SECRETARY

Countersigned:
CORPORATE STOCK TRANSFER, INC.
3200 Cherry Creek South Drive, Suite 430
Denver, CO 80209
By
Transfer Agent and Registrar Authorized Officer

236

# Exhibit D

**From**:   Shlomo Sharbat <ssharbat@yahoo.com>
**To**:   Mark Beychok <mb@mbaholdings.com>
**Cc**:   שלומי שרבט<ssharbat@yahoo.com>,Shlomo Sharbat <ssharbat@gmail.com>
**Subject**:   Re please review - too make you feel good I added many deals that I will be bringing to table -
you can add some on your side also
**Date**:   Mon 11/19/12 06:13 AM

Non-Disclosure Non-Circumvention and Fee
Agreement

This Agreement Is Entered Into By And Between **SOLOMON SHARBAT Solomon Capital LLC
and Second party  Mark Beychok personally and thru MBA holdings**

(_____

for and in consideration of their mutual promises, benefits and covenants as set forth herein:

**First**

The signatories, as First, Second and Third Party, hereby agree to keep completely confidential the
names of any contacts, corporations, individuals or group of individuals, introduced by any of the names,
signatories or associates. Such identity shall remain confidential during the applicable Project/Business
transaction(s) and duration of this Agreement, and shall include any names, addresses, telephone / fax
numbers, E-mail addresses, as well as Project names, projects and locations and/or other such
information considered the property of the introducing signatory, that the parties hereto agree to discuss
among themselves for disclosure and procedural determination purposes, any claim or controversy
arising to any part of this provision or the breach thereof, and which is not settled between the signatories
themselves shall be settled in arbitration in accordance with the rules of the STATE of New York or Israel
.up to Solomon Capital to decide Judgment upon award rendered by the Arbitrator(s) may be entered in
any court having competent jurisdiction thereof including the award to the aggrieving signatory, receive a
remuneration in addition to all court costs, attorney fees, and other charges deemed fair by Arbitrator(s).

**Second**

This is to confirm that each of the named signatories, separately and individually, and their associates
hereby agree that their respective corporation, divisions, subsidiaries, employees, agents or consultants
will not make independent contact with, deal with, or otherwise involve in any transaction of
Projects/Business, within the scope of either parties business, either corporately or individually, clients
introduced by the other signatory, either corporately or individually, and their associates without
permission provided in writing by the other party to this Agreement. This Agreement is also effective for
the signatories, their heirs and assignees or designees.

**Third**

By signatures below and the execution of this Agreement, each of the named signatories and their
associates, separately and individually, confirm that any corporation, firm, company or individual of which
each signatory is a party to, member, principal, agent for, or parties who otherwise would benefit
financially from and association, is bound by this Agreement.

**Fourth**

By signatures below, the signatories confirm their agreement to the payment of the_____50% of ___ fees
- stock -options -equity warrants as follows to the First Party in the event of any transaction or

intermediation being carried out by the signatories second party or any party that they will do business with including to first party business idea and or contacts----including deals such as

    1- so delecious cafe and so delecious distribution
    2-genesis bio pharma
    3- Tony deal in Philly for torts pay outs to law suit cases
    4- jay adoni shoe biz
    5-Lge - 2 million shares minimum of lge only
    if no investment raise from my side
    6- regenenera pharma
    7- expermind
    8--

and any other deals for next 48 months that either of us introduce ( .except in regards to liyah events company where it's 33% to Solomon capital LLC providing a 50,000 investment in 6-8 months for signing today date -)

**Fifth**

This Agreement is a perpetuation guarantee for the terms of the Project/Business arrangements between the parties for three years beginning with the date affixed below, and is to be applied to any and all transactions entertained by the signatories, including subsequent, follow up, repeat, extended or negotiated transactions, as well as to the initial transaction, regardless of the success of the cooperating partners, lending institutions, corporations, individuals and are the property of the introducing signatory and shall remain so for the duration of this Agreement. Any controversy arising out of any part of this provision or the breach thereof, and which is not settled between the signatories themselves, shall be settled in arbitration in accordance with the rules of the STATE OF NEW YORK or israel as out lined in section one of this Agreement.whichever Solomon chooses

**Sixth**

It is understood that this Agreement is a reciprocal one between the undersigned concerning their privileged information and contact.

**Seventh**

The signatories hereto agree to hold harmless one another from and against all claims, lawsuits, actions, responsibilities / liabilities, losses, damages and expenses arising from their individual efforts taken under the terms of this Agreement, including without limitation attorney's and accountant's fees arising under this Agreement, or any in any way connected with the performance of this Agreement, or any resultant services unless jointly agreed to in writing pursuant to this Agreement.

**Eighth**

It is understood that all information is intended for the use of the beneficiary to which it is addressed and contains information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution, copying fully or partial is strictly prohibited and all and every communication shall remain in the hands of the beneficiary, the partners, the company and is not allowed either to leave the hands of the beneficiary, partners and company nor to be made public.

*EFFECTIVE THIS*

**(FIRST PARTY)**

_____

NAME: SOLOMON SHARBAT
TITLE: Director
COMPANY: SOLOMON CAPITAL LLC
Gush Halav #~ 10 tel aviv Israel 64581
TEL.: +
Fax:-212-214-0432
Mobile:-212-738-0469

E-Mail: ssharbat@yahoo.com


**(SECOND PARTY)**

_____  _____
NAME:mark Beychok
TITLE:CEO
COMPANY:MBA holdings
ADDRESS:


Sent from my iPad
shlomi sharbat -054 3311416

# Exhibit E

**From:** ssharbat@yahoo.com [mailto:ssharbat@yahoo.com]
**Sent:** Wednesday, January 30, 2013 12:59 PM
**To:** Michael Handelman
**Cc:** ssharbat@gmail.com; Shalev
**Subject:** Re: call times to discuss senior secured note for our investment and expenses

Ok thanks

For now to make it easier we have below confirmed

$28500

Wire from Solomon capital 401 k - aug 2012

Wire 15 k Solomon capital 401 k nov 28

Wire Solomon capital 401 k 1,800

Hotel Hilton sent itemized bill 56 k

Flights sent can send again 15 k

Gidon taxi sent bill 42,000

Wires Mark  Beychok 55 k

Proff Schachter 7500

Will send over shortly


Shalav raff 35 k to new world in sept 2012

8,000 to genesis  dec 5

25 k hotel Hilton - sent in past can send again

Visa 2 k will send bill

Sent from my iPhone

**Exhibit F**

**From:** "Irving Einhorn" <ime@einhornlaw.com>
**Date:** June 26, 2012 21:04:25 GMT+03:00
**To:** <jonathan.golomb@finra.org>
**Subject: Solomon Sharbat**
**Reply-To:** <ime@einhornlaw.com>

Jon – this is to advise you that I have been retained by Solomon Sharbat in connection with FINRA's Rule 8210 request for his on the record testimony.  Mr. Sharbat will be unable to appear for his scheduled testimony session on June 27th.  He is undergoing medical treatment and I have asked him to provide me with a letter from his physician describing his present medical condition.

I have not had an opportunity to fully de-brief Mr. Sharbat and do not presently know whether he will be in a position to cooperate with you in the future.  Please feel free to contact me if you have any questions or comments regarding this matter.

Irving M. Einhorn
Law Offices of Irving M. Einhorn
1710 10th Street
Manhattan Beach, CA  90266

Telephone: (310) 798-7216
Facsimile: (310) 798-5910

PLEASE NOTE:  The information contained in this email message is privileged and confidential, and is intended only for the use of the individual named above and others who have been specifically authorized to receive such.  If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by return email or telephone and destroy and delete the original email.  Thank you.

**Exhibit G**



Financial Industry Regulatory Authority

June 13, 2012

**Sent via Regular and Certified Mail #7011 1150 0000 0740 4340 and**
**Sent via E-mail to (ssharbat@yahoo.com)**
Mr. Shlomo Sharbat
67-34 Kessel St.
Forest Hills, NY  11375

**Federal Express Tracking No. 7985 0653 5616 and**
**U.S. Postal Service**
Mr. Shlomo Sharbat
165 Hayarkon St.
Tel Aviv, Israel  64581

RE:   vFinance Investments, Inc. (CRD No. 44962)
      Examination No. 20090161600
      Request for Testimony

Dear Mr. Sharbat:

In a letter dated February 23, 2012 (see attached), FINRA staff requested that you appear for on-the-record testimony in connection with the matter referenced above pursuant to FINRA Rule 8210.  The testimony was scheduled to occur by videoconference on March 6, 2012, at 3:00 p.m. (Tel Aviv Time[1]).  One day before the scheduled testimony, on March 5, 2012, you provided the staff with a signed declaration affirming that your testimony would be truthful.  However, you failed to appear for the scheduled testimony, notifying the staff (through counsel) only ten minutes before the testimony was scheduled to begin that you would not appear for the testimony.  On March 7, 2012, FINRA staff sent you a letter notifying you that your failure to appear for the scheduled testimony is a violation of FINRA Rule 8210 (see attached).

Your counsel, Mr. Logan, has represented that you have again agreed to provide on-the-record testimony to FINRA staff.  We request, pursuant to FINRA Rule 8210 that you appear for on-the-record testimony on **June 27, 2012 at 3:00 p.m. (Eastern Standard Time)** so that we may take your testimony under oath at FINRA's Florida District Office, located at 2500 N. Military Trail, Suite 302, Boca Raton, Florida, 33431.  If you are unable to appear for testimony in FINRA's Florida District Office, please inform us immediately so that alternate arrangements can be made for the same date and time.

Please note the following:

- Under FINRA Rule 8210, you are obligated to appear as requested and to answer our questions fully, accurately, and truthfully.

---

[1] The testimony was scheduled to begin at 8:00 a.m. Eastern Standard Time.

Investor protection. Market integrity.

Crystal Corporate Center      t 561 443 8000
2500 N. Military Trail, Suite 302   f 561 443 7995
Boca Raton, Florida            www.finra.org
33431-6324

Mr. Shlomo Sharbat
Examination No. 20090161600
June 13, 2012
Page 2 of 3

If after testifying you become aware that any of your testimony was incomplete or inaccurate, you or your counsel should contact us promptly to supplement or correct it. A failure to satisfy these obligations could expose you to sanctions, including a permanent bar from the securities industry.

- You may be accompanied and represented by counsel when we take your testimony.

- FINRA staff will consider assertions of common law testimonial privileges such as attorney-client privilege. Because FINRA is not a governmental agency, however, the Fifth Amendment privilege against self-incrimination does not apply in its investigations and proceedings. Refusing to answer a question based on an assertion of that privilege constitutes a violation of FINRA Rule 8210 and may expose you to sanctions, including a permanent bar from the securities industry.

- Your testimony will be transcribed by a court reporter. FINRA staff will control the record and the reporter will not go off the record unless directed to do so by FINRA staff. You or your counsel may ask to go off the record, and the FINRA employees taking the testimony will determine whether or not to grant the request.

- Pursuant to FINRA Rule 8210(f), the court reporter will not release the transcript of your testimony without FINRA authorization. If you or your counsel wish to obtain the transcript, you or counsel may seek such authorization by sending a written request to the FINRA employee who took the testimony. FINRA Rule 8210(f) provides that for good cause the staff may deny the request to purchase a copy of the transcript. If the request is granted, you or your counsel may then purchase the transcript from the court reporter. If the request is denied, you or your counsel may still review the transcript at FINRA's offices. FINRA staff does not release copies of exhibits to testimony but they are available for review at FINRA's offices.

- As a matter of policy, FINRA conducts its investigations on a non-public basis. Nonetheless FINRA may sometimes provide access to its investigative files to other regulatory and law enforcement authorities, and, if subpoenaed, to litigants in civil actions. In addition, pursuant to FINRA's Code of Procedure, FINRA is required to produce certain documents and transcripts to respondents during discovery. We will not entertain requests for confidential treatment of the record of your testimony or give you or your counsel notice of any subpoena or access request we receive that encompasses it.

*   *   *

Finally, this request should not be construed as an indication that FINRA staff has determined that any violations of federal securities laws or FINRA, NASD, NYSE, or MSRB rules have occurred.

Mr. Shlomo Sharbat
Examination No. 20090161600
June 13, 2012
Page 3 of 3

Please call me at 561-443-8051 if you have any questions.

Sincerely,

Blake F. Snyder
Surveillance Director

BFS:mb

cc:   **Sent via E-mail to (logan@loganlf.com) and**
      **Federal Express Tracking No. 7936 7604 6032**
      Ronald J. Logan, Esq.
      Logan Law Firm PLC
      2999 North 44th Street, Suite 303
      Phoenix, AZ  85018-7250

Enclosures:    1) FINRA's February 23, 2012 OTR Request Letter
               2) FINRA's March 7, 2012 Rule 8210 Notification Letter

vFinance Investments OTR Req Ltr Sharbat 6-13-12 BFS

# Exhibit H

FINANCIAL INDUSTRY REGULATORY AUTHORITY
OFFICE OF HEARING OFFICERS

| | |
|---|---|
| DEPARTMENT OF ENFORCEMENT,<br><br>    Complainant,<br><br>v.<br><br>SHLOMO SHARBAT (CRD 2399408),<br><br>    Respondent. | DISCIPLINARY PROCEEDING<br>No. 2009016160001<br><br>Hearing Officer-- RLP |

ENFORCEMENT'S SUPPLEMENTAL FILING IN
SUPPORT OF MOTION FOR ENTRY OF DEFAULT DECISION

In an Order dated September 28, 2012, the Hearing Officer asked the Department of
Enforcement to supplement the record in this matter regarding the First Cause of Action, which
alleges that Respondent Sharbat violated Regulation M under the Securities Exchange Act of
1934, and NASD Rule 2110. Specifically, Sharbat solicited customers to purchase the common
stock of PERF Go-Green Holdings, Inc. (PGOG) while his firm, vFinance Investments, Inc., was
participating in a distribution of its securities. The Department respectfully submits this
supplemental filing, along with the attached Affidavit of Kathleen Harwood, in support of its
Motion for Entry of Default Decision.

   Regulation M applies to distributions of covered securities during the restricted period. A
"covered security" is defined in Rule 100 as the security that is the subject of the distribution, or
any reference security. A "reference security" is defined as "a security into which a security that
is the subject of a distribution may be converted, exchanged, or exercised...." The PGOG
offering involved debentures that could be converted into PGOG common stock.[1] Accordingly,

---

[1] Complaint, ¶ 11.

PGOG common stock was a reference security subject to the provisions of Regulation M during the applicable restricted period.[2]

Rule 100 of Regulation M defines a distribution as "an offering of securities... that is distinguished from ordinary trading transactions by the magnitude of the offering and the presence of special selling efforts and selling methods." The following SEC guidance explains the nature of the inquiry:

> A "distribution" must have two elements: "Magnitude" and "special selling efforts and selling methods." Factors relevant to the magnitude element are: the number of shares to be registered for sale by the issuer, and the percentage of the outstanding shares, public float, and trading volume that those shares represent. The Commission has indicated that providing greater than normal sales compensation arrangements pertaining to the distribution of a security, delivering a sales document, such as a prospectus or market letters, and conducting "road shows" are generally indicative of "special selling efforts and selling methods." Based upon an analysis of their individual characteristics, the following transactions, among others, have been viewed as involving distributions under this definition: registered public offerings, private placements, Rule 144A transactions, rights offerings, warrant exercise solicitations, dividend reinvestment and stock purchase plans, the issuance of securities in connection with a merger or exchange offer, "major sales campaigns" by a broker-dealer, and sales made pursuant to a shelf registration statement.[3]

The PGOG offering was sold pursuant to a private placement memorandum dated April 4, 2008.[4] The SEC has indicated, in the release quoted above, that using a private placement memorandum is indicative of special selling efforts and selling methods.

The magnitude of the offering is established by the attached Affidavit, which states that PGOG intended to offer up to $5 million in convertible notes in connection with the offering,

---

[2] SEC Rel. No. 33-7375, 1996 SEC LEXIS 3482, *30 (December 20, 1996) ("Regulation M does apply to reference securities, such as common stock underlying an exercisable, exchangeable, or convertible security that is being distributed.").
[3] SEC Rel. No. 34-33924, 59 F.R. 21681, 21684-5 (April 26, 1994) (footnotes omitted).
[4] Affidavit of Kathleen Harwood, ¶ 5.

with an option to offer an additional $1 million.[5] The notes were convertible into 3,333,333 shares (minimum sold) or 8,000,000 shares (maximum sold, including the additional $1 million issuer option) of common stock.[6] The offering was expected to sell a sufficient "magnitude" of shares representing between 10.3% (minimum sold) and 24.83% (maximum sold) of the outstanding shares.[7] In addition, the private placement memorandum indicates that investors will receive warrants convertible into PGOG common stock at a conversion price at $1.00 per share. Based on these facts, it is abundantly clear that the PGOG offering qualifies as a distribution under Regulation M.

Rule 100 of Regulation M also defines distribution participant as an "underwriter, prospective underwriter, broker, dealer, or other person who has agreed to participate or is participating in a distribution." Although the Department was unable to ask Sharbat about these matters because he refused to appear for testimony, two of his former colleagues provided testimony that ties Sharbat to the PGOG offering. Jeffrey Auerbach, a representative who shared customer accounts with Sharbat, testified that Sharbat was involved in raising funds for PGOG by introducing Auerbach to clients who might be interested in the offering.[8] In addition, as described more fully in the Affidavit of Kathleen Harwood submitted herewith, and in paragraph 16 of the Complaint, Sharbat was sending emails to customers or potential customers soliciting them to invest an imminent private placement of PGOG being conducted by his firm.[9]

Moreover, the term "distribution participant" should be construed to include registered representatives of the firm, since a broker-dealer can only act through its registered

---

[5] *Id.* at ¶ 7.
[6] *Id.* at ¶ 8.
[7] *Id.*
[8] Harwood Affidavit at ¶¶ 16-17.
[9] Harwood Affidavit at ¶ 14. It is not clear which PGOG security Sharbat was soliciting. He told clients that the company's stock was about to be offered publicly, when the actual offering was for convertible debentures.

representatives.  vFinance clearly viewed it this way, prohibiting its registered representatives from soliciting purchases of PGOG while the offering was on-going.  According to vFinance's CEO/President, Richard Campanella, the firm's representatives cannot solicit open market purchases of a stock while the firm is conducting an offering.[10]

By soliciting sales of PGOG common stock – a reference security – during the restricted period, in part through the emails quoted in Paragraph 16 of the Complaint, Sharbat clearly facilitated and participated in a prohibited distribution of securities.  Twenty-two of Sharbat's customers purchased 253,800 shares of PGOG through vFinance between May 16 and May 21, 2008.[11]  PGOG was on the firm's restricted list from March 14 to June 13, 2008.[12]

Date:   October 12, 2012

Jonathan Golomb, Senior Special Counsel
Gary Lisker, Senior Counsel
FINRA Department of Enforcement
15200 Omega Drive
Rockville, MD  20850
(301) 258-8532
Facsimile (202) 721-8320
Email: jonathan.golomb@finra.org
          gary.lisker@finra.org

---

[10] Harwood Affidavit at ¶ 18.
[11] Id. at ¶ 15; Complaint ¶ 13.
[12] Harwood Affidavit at ¶ 12; Complaint ¶ 13.

4

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2012, I caused the foregoing Supplemental Filing in

Support of Motion for Entry of Default Decision and accompanying Affidavit of Kathleen

Harwood to be served on Respondent by regular mail and email, as follows:

> Mr. Shlomo Sharbat
> 67-34 Kessel St.
> Forest Hills, NY 11375
>
> Mr. Shlomo Sharbat
> 165 Hayarkon St.
> Tel Aviv, Israel 64581
>
> ssharbat@gmail.com

and to Respondent's counsel by regular mail and e-mail as follows:

> Irving M. Einhorn, Esq.
> Law Offices of Irving M. Einhorn
> 1710 10th Street
> Manhattan Beach, CA  90266
> ime@einhornlaw.com

> Jonathan Golomb
> Senior Special Counsel

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## OFFICE OF HEARING OFFICERS

| | |
|---|---|
| DEPARTMENT OF ENFORCEMENT,<br><br>                Complainant,<br><br>v.<br><br>SHLOMO SHARBAT (CRD 2399408),<br><br>                Respondent. | DISCIPLINARY PROCEEDING<br>No. 2009016160001<br><br><br>Hearing Officer-- RLP |

### AFFIDAVIT OF KATHLEEN HARWOOD IN
### SUPPORT OF ENFORCEMENT'S SUPPLEMENTAL FILING

1. My name is Kathleen Harwood, and I am a Principal Regulatory Coordinator in the FINRA District Office in Boca Raton, Florida.

2. I was an Associate Principal Examiner in the Boca Raton office during the investigation that led to the filing of the Complaint in this matter.  I was one of two examiners who conducted that investigation.

3. The matters set forth in this affidavit are within my personal knowledge and belief, and based upon documents and information collected by FINRA during its investigation of this matter.  This includes sworn on-the-record testimony, exhibits to that testimony, and other documents obtained in the course of the investigation.

4. ESYS Holdings ("ESYS") is the predecessor entity to PERF Go-Green ("PGOG").

5. On April 4, 2008, vFinance Investments, Inc., acting as lead placement agent, began offering convertible notes issued by ESYS.  vFinance was the only broker/dealer selected to sell the offering, which was the subject of a private placement memorandum dated April 4, 2008.

6. On May 9, 2008, while the offering was ongoing, ESYS engaged in a reverse merger with a privately-held company, PERF Go-Green, Inc.  The surviving entity changed its name to PERF Go-Green Holdings, Inc., and was quoted on the Bulletin Board as PGOG.

7. In the offering, PGOG sought to raise a minimum of $2.5 million and a maximum of $5 million, with the right to sell up to an additional $1 million in notes and associated warrants.

8. The notes were convertible into common stock of PGOG in the range of 3,333,333 (the minimum offering amount) to 8,000,000 common shares (the maximum offering amount).  Based upon the PPM and other publicly available information, I calculated that, the offering was expected to sell shares representing between 10.3% (minimum sold) and 24.83% (maximum sold) of the outstanding shares.  Upon conversion of each note, investors would receive one common share of stock and one warrant to purchase common stock of PGOG at $1.00 per share.

9. As part of its role as placement agent, registered representatives of vFinance solicited investors to invest in the PGOG offering.

10. vFinance, through its registered representatives, raised $5.91 million in the PGOG offering.

11. Shlomo Sharbat was associated with vFinance from February 2, 2008, through June 12, 2008.

12. PGOG was on vFinance's restricted list from March 14 to June 13, 2008.

13. Sharbat was aware that vFinance was participating in an offering for PGOG, and erroneously claimed via email to several customers that he or his firm was taking the stock public in the near future.

14. During the restricted period, Sharbat solicited customers to purchase PGOG common

stock.  He sent emails indicating that the stock was being offered by his firm at the time

of the offering of the convertible debentures underlying this matter, including the

following:

- In an e-mail dated May 13, 2008 at 12:41 p.m. to todd1965@gmail.com and copied to a customer, Sharbat wrote: *www.perfgogreen.com going public tomm let me know if u want in ps they have purchase orders from Amazon.com Walmart to name a few...*" Camper responded:  "*I want in.  How do I get it at $1.50,*" to which Sharbat responded on May 13, 2008 at 17:47:05: *"call me now I will open you an account with me."*  Later that evening, Camper sent an email asking to add another 2,000 shares to his order.  The next afternoon, at 2:30, Camper wrote to Sharbat: *"What time is the IPO,"* and Sharbat responded: *"Waiting for clearance any moment."* Camper bought 4,000 shares on May 19[th].  Sharbat forwarded Auerbach the e-mail chain for execution.

- On May 19, 2008, at 5:02 p.m. Sharbat sent an e-mail to torihome@aol.com with the subject "PERF GO GREEN" which states:  *"It went public Friday Buy with me pgog's the symbol 1.67 call me tomm"*

- Sharbat sent an e-mail to three individuals at four separate email addresses on May 15, 2008 at 3:47 pm that states:  "*...On another note I am bringing my first company public www.perfgogreen.com.  Danny Devito is the spokesman and former Gov Pataki is the head of the board.  Would love to catch up and if you want some shares you can call me or buy on your own symbol PGOG going live tomm at $1.65 and will be on Oprah show on Tuesday next week."*

- On May 13, 2008, at 12:28 p.m. Sharbat sent an email to a customer or potential customer stating:  *"www.perfgogreen.com going public tomm  let me know if you want in ps they have purchase orders from Amazon.com Walmart to name a few..."*[1]

15. Between May 16 and May 21, 2008, 22 of Sharbat's customers bought a total of 253,800

shares of common stock of PGOG through vFinance.  One other Sharbat customer

purchased the stock on June 4, 2008.

---

[1] These e-mails appear to be confusing PGOG's stock with the debentures being offered by his firm.

16. Jonathan Rich, who was the Director of Investment Banking at vFinance at the time of the PGOG offering, testified on the record that Jeffrey Auerbach, a vFinance representative with whom Sharbat shared a rep number, placed securities during the PGOG offering.

17. Auerbach, in turn, testified under oath that Sharbat was involved in raising funds for PGOG. Specifically, Auerbach testified that Sharbat had a large client base and introduced Auerbach to clients who might be interested in the offering.

18. According to vFinance's CEO/President, Richard Campanella, the firm's representatives cannot solicit open market purchases of a stock while the firm is conducting an offering.

Kathleen Harwood

STATE OF FLORIDA

COUNTY OF *Palm Beach*

Sworn to and subscribed before me, this *11th* day of October, 2012.

My commission expires: *17 JUL 2015*

RAYNARD DANTE PALACIOS
Notary Public - State of Florida
My Comm. Expires Jul 17, 2015
Commission # EE 77894
Bonded Through National Notary Assn.

# Exhibit I



NUMBER

4437

COMMON STOCK

PAR VALUE $ 0.001

THIS CERTIFIES THAT

SOLOMON CAPITAL 401K TRUST

INCORPORATED UNDER THE LAWS OF THE STATE OF FLORIDA

Is the owner of

*** Five Hundred Thousand ***

**Fully Paid and Non-Assessable Shares of Common Stock** of Novo Energies Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid unless countersigned and registered by the Transfer Agent and Registrar.

**Witness** the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:    December 1, 2011

President

Chief Executive Officer

novo
ENERGIES

SEE RESTRICTIVE LEGEND
ON REVERSE SIDE

SEE REVERSE FOR CERTAIN DEFINITIONS

CUSIP# 67009Q 102

SHARES

***500,000***

NOVO ENERGIES CORPORATION
SEAL
FLORIDA

BY:
Authorized Signature

COUNTERSIGNED:
PACIFIC STOCK TRANSFER COMPANY
4045 South Spencer Street, #403
Las Vegas, NV 89119

CS1-4437

SOLOM 1271

# NOVO ENERGIES CORPORATION
# IMMUNOVATIVE THERAPIES LTD
# EXCLUSIVE COMMERCIAL LICENSE AGREEEMENT

t-cell
Cryostim
AlloStim

**<u>CONFIDENTIAL</u>**

# PRIVATE PLACEMENT MEMORANDUM

**$5,000,000**

50,000,000 Shares of Common Stock

$0.10 per share

DATE OF THIS MEMORANDUM: January 2012

Copy Number _____          Offeree_____

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## NOVO ENERGIES CORPORATION

# $5,000,000

### 50,000,000 Shares of Common Stock
### $0.10 per share

This Confidential Memorandum (the "Memorandum") relates to the offer and sale of shares of common stock (the "Shares") of Novo Energies Corporation (the "Company"), a Florida corporation with headquarters in Montreal, Quebec, Canada. We are placing up to 50,000,000 shares of our Stock at a price of $0.10 per share (the "Placement"). There is no public market for the offered Shares at the current time, but currently outstanding common shares of the Company do trade under the symbol NVNC on the over-the-counter bulletin board market ("OTCBB"). The Company may register the Shares placed hereby with the U.S. Securities and Exchange Commission to become eligible to trade freely at a later date solely at the option of the Company.

The Company reserves the right to close the Placement early, extend the Placement or increase the maximum Placement amount. Sales are restricted to "accredited" investors, who meet the investor suitability requirements set forth herein (See **INVESTOR SUITABILITY STANDARDS**" below).

THE SHARES OFFERED HEREBY ARE HIGHLY SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK (See **RISK FACTORS**"). INVESTORS MUST BE ABLE TO WITHSTAND A TOTAL LOSS OF THEIR INVESTMENT. IN ADDITION, THE SHARES WILL HAVE AN IMMEDIATE AND SUBSTANTIAL DILUTION.

THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY OTHER GOVERNMENTAL AGENCY, NOR HAS THE SEC OR ANY OTHER GOVERNMENTAL AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM OR ENDORSED THE MERITS OF THIS PLACEMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE SHARES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (the "ACT"), OR QUALIFIED UNDER ANY STATE SECURITIES LAWS. THE SHARES MAY NOT BE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL IN FORM AND SUBSTANCE ACCEPTABLE TO THE COMPANY AND ITS COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED.

|  | Number of Shares Placed[1] | Placement Price | Selling Commissions [2] | Proceeds to Company[2][3] |
|---|---|---|---|---|
| Per Share | ------ | $0.10 | $0.005 | $0.095 |
| Total Placement | 50,000,000 | $5,000,000 | $250,000 | $4,750,000 |

(1) We are placing up to 50,000,000 Common Shares at the price indicated. See "Terms of Placement"

(2) There currently are no agreements with any placement agent to sell the shares on commission. However, should placement agent(s) be retained, estimated total commissions may be 5% of the Placement price of the Shares sold by any placement agent. The current officers and directors and promoters will not receive any commissions on the sales of Shares in this Placement. In connection with the Placement and the License Agreement, a member of Management and a consultant will receive a total of 10,000,000 options to purchase shares of the Company's common stock at $0.10 per share.

(3) The Shares are offered on a "best efforts" basis. Funds paid by investors will be held in an escrow account and will be returned promptly if the Placement is terminated.

THE PLACEMENT PRICE PER SHARE WAS DETERMINED ARBITRARILY BY THE COMPANY AND DOES NOT BEAR ANY RELATIONSHIP TO THE ASSETS, RESULTS OF OPERATIONS OR BOOK VALUE

OF THE COMPANY.   THE COMPANY IS PLACING THE SHARES THROUGH CERTAIN OF ITS DIRECTORS AND OFFICERS AND SHAREHOLDERS WHO WILL RECEIVE NO COMMISSIONS, FEES, OR OTHER REMUNERATION IN CONNECTION WITH THE SELLING EFFORT.   THE COMPANY RESERVES THE RIGHT, AT ITS SOLE DISCRETION, TO ENGAGE A SALES AGENT OR AGENTS (WHO ARE NOT DIRECTORS, OFFICERS, OR EMPLOYEES OF THE COMPANY) WITH RESPECT TO THIS PLACEMENT WHO MAY RECEIVE UP TO FIVE PERCENT (5%) OF THE PROCEEDS OF SUCH AGENT'S SALES IN CASH AND/OR SHARES. IN CONNECTION WITH THE PLACEMENT AND THE LICENSE AGREEMENT, A MEMBER OF MANAGEMENT AND A CONSULTANT WILL RECEIVE A TOTAL OF 10,000,000 OPTIONS TO PURCHASE SHARES OF THE COMPANY'S COMMON STOCK AT $010 PER SHARE.

THIS MEMORANDUM HAS BEEN PREPARED BY THE COMPANY AND CONSTITUTES AN OFFER TO A PROSPECTIVE INVESTOR WHOSE NAME APPEARS ON THE FRONT COVER.   THIS MEMORANDUM SHALL NOT CONSTITUTE AN OFFER IN ANY JURISDICTION WHERE SUCH OFFER WOULD NOT BE PERMITTED BY LAW.

BY ACCEPTING THIS MEMORANDUM, THE RECIPIENT AGREES TO: (A) KEEP CONFIDENTIAL THE CONTENTS HEREOF; (B) NOT USE THIS MEMORANDUM FOR ANY PURPOSE OTHER THAN AN EVALUATION BY THE RECIPIENT OF A POTENTIAL INVESTMENT IN THE COMPANY; AND (C) NOT COPY THE MEMORANDUM, DISCLOSE OR DELIVER THE SAME TO, OR PERMIT DISCLOSURE OR DELIVERY OF THE SAME TO, ANY THIRD PARTY OTHER THAN PERSONS WHO PROVIDE ASSISTANCE AND ADVICE TO THE PROSPECTIVE INVESTOR IN EVALUATING THE RISKS AND MERITS OF AN INVESTMENT IN THE SHARES.

THE SHARES ARE OFFERED BY THE COMPANY SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION OF THE OFFER, WITHOUT NOTICE.   THE COMPANY RESERVES THE RIGHT TO REJECT ANY SUBSCRIPTION OR ORDER, IN WHOLE OR IN PART, FOR THE PURCHASE OF ANY SHARES.

**INVESTOR SUITABILITY STANDARDS**

SALES OF SECURITIES WILL ONLY BE MADE TO PERSONS THE COMPANY REASONABLY BELIEVES TO BE ACCREDITED INVESTORS AS DEFINED UNDER THE ACT.  Accredited Investors generally include the following: (a) a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of this purchase exceeds $1,000,000; (b) a natural person who had an individual income in excess of $200,000 in each of the two most recent calendar years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current calendar year; (c) an organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the Shares, with total assets in excess of $5,000,000; or (d) an entity in which all of the equity owners are persons who meet the qualifications set forth in (A) and (B) above.

**PLAN OF PLACEMENT**

Investors in this Placement will execute and deliver a Subscription Agreement to purchase any of the 50,000,000 newly issued common shares in the Company and transfer funds to the Company's Bank Account. The Company will issue common shares to the Investors.  The Shares are subject to immediate dilution by existing shareholders and future dilution as the Company raises additional funds through the sale of equity to meet its obligations under the License Agreement and to fund operations and if there is an issuance of additional common shares to IMMUNOVATIVE THERAPIES LTD. ("ITL") as part of a planned merger.

**METHOD OF SUBSCRIPTION**

Each person desiring to purchase Shares of the Company pursuant to this Memorandum must: (i) execute and deliver to a copy of the Subscription Agreement provided with this Memorandum, together with (ii) a check in the amount of $0.10 for each Share to which the subscription relates.  Checks should be payable to Novo Energies

Corporation.  The words: " Novo Private Placement" should be written in the memo line.  The check along with the Subscription Agreement should be sent by fax or mail to:

<div align="center">

Novo Energies Corporation
417, rue St-Pierre Suite 804
Montreal, QC H2Y 2M3
Tel: 514-840-3698

</div>

Alternatively, the documents may be mailed as above or fax to **+1-514- 221-3336** and the funds wired to:

| | |
|---|---|
| Bank Name: | BMO Bank of Montreal |
| | 119, rue St-Jacques |
| | Montréal, Québec, H2Y 1L6 |
| | |
| Account Name: | WTL Renewable Energy Inc. |
| Account Number: | 4703-793 |
| ABA: | 021001088 |
| SWIFT Code: | BOFMCAM2 |
| Message: | Novo Energies/Immunovative PPM $0.10 Shares |

## ADDITIONAL INFORMATION

THE INFORMATION CONTAINED IN THIS MEMORANDUM IS ONLY A SUMMARY OF THE PROPOSED BUSINESS AND TECHNICAL ASPECTS RELATING TO THE COMPANY. You should review the Company's filings with the US Securities and Exchange Commission for further information, including financial information, about the Company.  For additional information about the Company or the terms and conditions of this Placement, contact Mr. Antonio Treminio, Novo Energies Corporation CEO & Chairman at 1-514-840-3697 or email: **atreminio@mac.com** or Dr. Michael Har-Noy, IMMUNOVATIVE THERAPIES LTD. founder and acting Chief Executive Officer, at +972-54-232-7077 or 1-619-822-2646 or email: harnoy@immunovative.co.il.

No person is authorized to give any information or make any representation other than as contained in this Memorandum, except for information which may be requested from and given by the Company or IMMUNOVATIVE THERAPIES LTD.

EVERY PROSPECTIVE INVESTOR HAS THE OPPORTUNITY TO ASK QUESTIONS OF, AND TO RECEIVE ANSWERS FROM, DR. HAR-NOY AND MR. TREMINIO CONCERNING THE COMPANY, ITS PROPOSED BUSINESS AND THE TERMS AND CONDITIONS OF THIS PLACEMENT AND TO OBTAIN ANY ADDITIONAL RELEVANT INFORMATION TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN OBTAIN IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

# FORWARD-LOOKING STATEMENTS

This Memorandum (the "Memorandum") contains forward-looking statements.  All statements other than statements of historical fact included in this Memorandum are forward-looking statements.  These forward-looking statements include, without limitation, statements regarding the Company's estimate of the sufficiency of its existing capital resources and the Company's ability to raise additional capital to fund cash requirements for future operations and statements regarding the uncertainties involved in development and commercialization process.  Although the Company believes that the expectations reflected in these forward-looking statements are reasonable, the Company cannot assure you that such expectations reflected in these forward-looking statements will prove to have been correct.

When used in this Memorandum, the words "expect", "anticipate", "intend", "plan", "believe", "seek", "estimate" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these identifying words.  Because these forward-looking statements involve risk and uncertainties, actual results could differ materially from those expressed or implied by these forward-looking statements for a number of important reasons, including those discussed under "Risk Factors" in this Memorandum. Among other things, the forward-looking statements should be read in the context of Novo's stage of development and the fact that the Company's assets will require significant additional development and substantial additional investment in order to achieve significant market acceptance.

You should read these statements carefully because they discuss the Company's expectations about the Company's future performance, contain projections of the Company's future operating results and of the Company's future financial condition, or state other "forward-looking" information.  Before you invest in the Units, you should be aware that the occurrence of any of the contingent factors described under "Risk Factors" in this Memorandum could substantially harm the Company's business, results of operations and financial condition.  Upon the occurrence of any of these events you could lose all of your investment.

Under no circumstances should the inclusion of the forward-looking statements be regarded as a representation or prediction that Novo will achieve or is likely to achieve any particular results.  The Company cannot guarantee any future results, levels of activity, performance or achievements.  The Company does not intend to update any of the forward-looking statements in this Memorandum after the date of this Memorandum.  Each prospective purchaser must make his/her own evaluation of the merits and risks of the purchase of the Units.

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## EXECUTIVE SUMMARY

The following is only a summary of the business of Novo Energies Corporation (the "Company"). Information in this Memorandum regarding Immunovative Therapies LTD. ("ITL") has been provided by ITL and has not been verified by the Company. See **"RISK FACTORS"** for information to be considered by prospective investors. Prior to purchasing any Shares, all potential investors will be given the opportunity to ask questions, in order to obtain a clearer understanding of the Company's business. The Company also invites you to review its annual, quarterly and other reports filed with the SEC, all of which are available on the SEC's website (www.sec.gov) to understand elements of the Company's business not described herein such as its audited financial statements and a description of its management. *You should carefully review the risk factors and other information set forth herein.*

**Novo Energies Corporation (the "Company")**

The Company trades on the OTCBB exchange under the symbol "NVNC". The Company was previously involved in the business of developing new technologies for the clean production of energy. Upon the completion of the License Agreement with ITL, the Company adopted the business of commercializing the technologies of ITL and intends to undergo a name change to Immunovative Inc. and symbol change to reflect this new business focus. The Company plans to perform investor relations, public relations and business development activities with the aim to increase the awareness of the ITL technology and to seek to raise sufficient capital from private and public markets and also through grants or loan programs in order to advance the ITL technology toward commercialization.

**Immunovative Therapies, Ltd. ("ITL")**

ITL is a clinical stage biopharmaceutical company developing a new class of immunotherapy drugs designed to harness the power of the immune system to treat cancer and infectious disease. ITL has clean room manufacturing, QC laboratories and research laboratories located in Jerusalem, Israel. In Jerusalem, ITL currently has 12 full-time employees, 4 with doctoral degrees, 6 with technical/engineering advanced degrees and 2 administrative employees. ITL has a wholly owned subsidiary called Immunovative Clinical Research, Inc. located in Carlsbad, California. This subsidiary has administrative office and laboratory facilities and is responsible for coordinating worldwide clinical research activities. To perform these duties, the subsidiary currently has a full-time clinical coordinator, a part-time research nurse and a contract radiologist (MD) and contract pathologist (MD). ITL also conducts operations in Bangkok, Thailand through an affiliated company called Immunovative (Thailand) Co., Ltd. This affiliate coordinates and manages clinical trials conducted in partnership with the National Cancer Institute of Thailand and will also support clinical trials that may be conducted elsewhere in Southeast Asia. The Thai operation currently employs a full-time business administrator and two contract research nurses. This affiliate is expanding and plans to hire a full-time nurse coordinator and 5 to 7 full time clinical data management personnel during 2012. The Thai facility is expected to begin operations in the second quarter of 2012.

**Product Candidates**

ITL has two products in early and mid/late stage clinical testing called " AlloVax$^{TM}$" and  "AlloStim$^{TM}$", respectively.

AlloStim$^{TM}$ is designed to provide the same anti-tumor effects of allogeneic bone marrow/stem cell transplant procedures without the life-threatening toxicity and without the need for a tissue matched donor. Although AlloStim$^{TM}$ has completed an FDA-cleared Phase I/II clinical trial that has demonstrated systemic, immune-mediated tumor killing in heavily pre-treated metastatic cancer patients, the US Food and Drug Administration has subsequently placed a clinical hold on this product candidate. The clinical hold is related to an FDA request for ITL to present validation data demonstrating efficiency in conducting a QC test for endotoxin. ITL has complied with this request and is currently discussing with FDA the requirements which enable clinical studies to continue in the United States. The results of the completed clinical trial are being prepared for submission for peer-review for publication in a medical journal. AlloVax$^{TM}$ is a personalized anti-tumor vaccine made from a sample of a patient's own tumor and is used in combination with AlloStim$^{TM}$ both to treat existing tumors and to prevent tumor reoccurrence after surgery.



NOVO ENERGIES CORPORATION