# Exhibit A

SUPREME COURT OF STATE OF NEWYORK
COUNTY OF NEW YORK
--------------------------------------------------------------X
SOLOMON SHARBAT AND QUALIFIED
SETTLEMENT MANAGEMENT, LLC,                     **Index No.  600151-2008**

                           Plaintiff,           Hon. Paul George Feinman

          -against-


LAW OFFICES OF MICHAEL B. WOLK, P.C.            **AFFIDAVIT OF SOLOMON**
 AND MICHAEL B. WOLK,                           **SHARBAT IN SUPPORT**
                                                **OF MOTION TO VACATE**
                           Defendants.
--------------------------------------------------------------X

**SOLOMON SHARBAT**, being duly affirmed deposes and says:

1       I am the individual plaintiff in this action, and I make this affidavit in

support of the plaintiff's motion for an order vacating (1) a Judgment entered by the Clerk

of New York County on October 4, 2011 in favor of the Nimkopf Law Firm and against

plaintiffs Solomon Sharbat and Qualified Settlement Management, LLC, jointly and

severally, in the amount of $338, 248.78 and the underlying decision and order of the

Honorable Lancelot B. Hewitt, Special Referee,  dated September 21, 2011 awarding the

Nimkopf Law Firm the amount of $336,784.22 as legal fees earned in *quantum meruit*

against plaintiffs Solomon Sharbat and Qualified Settlement Management, LLC, jointly

and severally, together with interest and costs taxed thereon,  and (2) the prior orders of

this Court dated March 9, 2011, granting by default the Motion of The Nimkoff Firm,

*inter alia*, for in effect a *quantum meruit* entitlement to fees and disbursements in this

matter which was referred for assignment to a Special Referee to hear and determine,

pursuant to CPLR 5015(a)(5) [as to (1) above-vacatur of a prior order ((2) above) upon which it

is based] and CPLR 5015(a)(4) [as to both (1) and (2) above- lack of jurisdiction]) on the

following grounds:  (a) this Court lacked subject matter jurisdiction of the plaintiff Sharbat

to enter any general orders or judgments in *quantum meruit* adverse to him and in favor

of Attorney Nimkoff, in this action, without the service of a summons and complaint in a

new action, other than to conduct a special summary proceeding brought by a

withdrawing attorney to fix an attorney's charging lien pursuant to Judiciary Law § 475

and to enter an appropriate order therewith; (b) this Court lacks personal jurisdiction of

Sharbat in that  the order to show cause dated February 16,2011 and supporting papers

constituting the Motion of the Nimkopf Law Firm  were not properly served by "personal

service as defined in the CPLR" prior to February 18, 2011, but rather by a method other

than personal delivery as defined in CPLR § 308CPLR rendering the judgment and orders

referred to above a nullity which should be vacated unconditionally.

2.    In this affidavit, I shall deal only with the second prong (b) of the instant

Motion to Vacate.

### A.   <u>Vacatur Under CPLR 5015(a)(4) and (a)(5)</u>

3.    I am advised by counsel that a court is without power to render an order or

judgment (i) where is has no subject matter jurisdiction., or (ii) against a party as to

whom it has no personal jurisdiction due to a lack of proper service of process, and that

any order or judgment so issued without jurisdiction is void and a nullity and must be

vacated by the court on motion pursuant to CPLR 5010(a)(4).  Moreover, I am advised by

counsel that pursuant to CPLR 5015(a)(5), a judgment or order must also be vacated if it is

based on a prior order which must be vacated for lack of personal jurisdiction or otherwise.

4.    I am further advised by counsel that the Motion filed by The Nimkopf law

Firm, commenced by way of order to show cause dated February 16, 2011, sought, *inter*

*alia*, a general judgment for quantum meruit fees. As a result, the order of this Court dated March 9, 2011, granted in effect by default the Motion of The Nimkoff Firm, *inter alia*, for a *quantum meruit* entitlement to fees and disbursements in this matter which was referred for assignment to a Special Referee to hear and determine.

5.   Following such a reference and hearing, of which I had barely received notice and  instructed an attorney, Mr. Scott Stone, to raise this jurisdictional objection as well as others, a decision and order of the Honorable Lancelot B. Hewitt, Special Referee,  dated September 21, 2011 was entered that nevertheless awarded the Nimkopf Law Firm the amount of $336,784.22 as legal fees earned in *quantum meruit* against plaintiffs Solomon Sharbat and Qualified Settlement Management, LLC, jointly and severally, together with interest and costs taxed thereon, and (d) a Judgment was thereafter entered by the Clerk of New York County on October 4, 2011, in favor of the Nimkopf Law Firm and against plaintiffs Solomon Sharbat and Qualified Settlement Management, LLC, jointly and severally, in the amount of $338, 248.78.

6.   I am further advised by counsel that since both the judgment entered October 4, 2011 and the underlying order dated September 21, 2011, were predicated on the prior order dated March 9, 2011 which is void for lack of jurisdiction (pars. 7-13, *infra*) and warrants its vacatur, such resulting order and judgment are void as well pursuant to CPLR 5015(a)(5) and must be vacated. This is true even if I had actual notice and did not have a meritorious defense, as actual notice alone can not subject me to the court's jurisdiction absent compliance with the prescribed conditions of service set forth in the underlying order to show cause.

**(i)    Lack of Personal Jurisdiction of March 9, 2011 Order Directing Reference and Hearing to Determine Quantum Meruit Fees**

7.    As indicated in the Affidavit of Service of Matthew Dreyer annexed to the Nimkoff Law Firm's original motion for, inter alia, legal fees in quantum meruit (the "Dreyer Affidavit")(Exhibit__ to Motion), service of the order to show cause dated February 16, 2011 and supporting motion papers were purportedly effectuated upon me on February 17, 2011 by the nail and mail method allowed by CPLR § 308(4) in lieu of personal delivery, purportedly because he, as the   process server,   had exercised due diligence and was unable to find me upon several attempts at 67-34 Kessel Street, Forest Hills, NY 11375 on Feb. 16 and 17, 2011. See Dreyer Affidavit, ¶¶ 2-6.

8.    Therefore, Mr. Dreyer states that he affixed the order to show cause and supporting motion papers to the door at 67-34 Kessel Street, Forest Hills, NY 11375 and then mailed copies of such papers to addressed to me, Solomon Sharbat, at the same address, 67-34 Kessel Street, in an envelope bearing the legend "personal and confidential" and not indicating on the outside, by return address or otherwise, that the communication is from an attorney.

9.    In point of fact, as Mr. Nimkopf well knew for some time,  I have reside in Tel Aviv, Israel for at least two years and did not reside at the Kessel St. address at any time since. That address is for a house owned by my parents, who also moved to Israel well over two years ago, but have had difficulties in selling it due to a poor sellers' market in the area. No one lives at that house, and it would be obvious to anyone who exercised due diligence in serving legal papers there. Indeed, my mail is reviewed and picked up by a friend, Mr. Michelle, once a month or so, based on his availability.

4

10.     Regardless of the due diligence issue, the Kessel St. house is without question not my present "dwelling place," Because Mr. Michelle was in California for an extended period of time starting in January 2011, I did not receive any mail for several months.

11.   I am advised by counsel that even assuming the <u>mailing</u> aspect of the nail and mail method of service under CPLR § 308(4) had been properly effectuated by Mr. Dreyer to my "last known residence" at 67-34 Kessel Street, Forest Hills, NY 11375, the <u>nailing</u> part was not properly done at that address because the statute requires that such nailing be done at my "dwelling place" which it clearly was not.  Therefore, no "personal service as defined in the CPLR," was ever made upon me pursuant to CPLR § 308, as the method of service specifically directed by the order to show cause.

**(ii)     Lack of Subject Matter Jurisdiction**

12.     I am further advised by counsel that this Court lacks subject matter jurisdiction to enter any general order or judgment in *quantum meruit* against Solomon Sharbat and in favor of Attorney Nimkoff, in this action, without the service of a summons and complaint in a new action, other than to conduct a special summary proceeding brought by a withdrawing attorney pursuant to Judiciary Law § 475,  for which it has jurisdiction to fix the amount of Attorney Nimkoff's quantum meruit fee as a charging lien against any proceeds of this action. Moreover, even if this were simply a summary proceeding under Judiciary Law § 475, I am advised that I would first be entitled to a hearing to determine where Attorney Nimkopf's withdrawal was "for cause"; otherwise he is not entitled to any quantum meruit fee in this contingency fee matter.

general assets, and it is void for lack of subject matter jurisdiction.

WHEREFORE your affiant respectfully prays that this honorable court grant all the relief requested by plaintiff in his motion to vacate.

Dated: Tel Aviv, Israel

February 2, 2012
FEB

_____
**SOLOMON SHARBAT**

ALSO      SHLomo SHARBAT
KNOWN
as

State of Israel
Municipality of Tel Aviv-Yafo
Embassy of the                          **ss:**
United States of America

SUBSCRIBED AND SWORN (AFFIRMED) TO BEFORE
ME THIS *February 02, 2012*

*Julia Forrest*

**Julia Forrest**
Consular Associate

Embassy of the United States of America
Consular Section - ACS/PPT
71 Hayarkon Street
Tel Aviv, Israel 63903

INDEFINITE

**Exhibit B**

SUPREME COURT OF STATE OF NEWYORK
COUNTY OF NEW YORK
------------------------------------------------------------X
SOLOMON SHARBAT AND QUALIFIED
SETTLEMENT MANAGEMENT, LLC,

                        Plaintiff,

             -against-

LAW OFFICES OF MICHAEL B. WOLK, P.C.
AND MICHAEL B. WOLK,

                    Defendants.
------------------------------------------------------------X

Index No.  600151-2008

Hon. Paul George Feinman

**AFFIDAVIT IN SUPPORT
OF MOTION TO VACATE**

**MICHAEL MICHEL**, being duly affirmed deposes and says:

1      I have been a friend of Solomon Sharbat, the individual plaintiff in the above captioned action, and I know him personally for more than ten years. I am fully aware of his personal and business affairs.  I reside in Forest Hills, New York, about 10 blocks half mile from Mr. Sharbat's former residence for several years at 67-34 Kessel Street, Forest Hills, NY 11375. As such,  I have personal knowledge of the facts set forth herein.

2      I make this affidavit in support of the plaintiff's motion for an order vacating (1) a Judgment entered by the Clerk of New York County on October 4, 2011 in favor of the Nimkopf Law Firm and against plaintiffs Solomon Sharbat and Qualified Settlement Management, LLC, jointly and severally, in the amount of $338, 248.78 and the underlying decision and order of the Honorable Lancelot B. Hewitt, Special Referee,  dated September 21, 2011 awarding the Nimkopf Law Firm the amount of $336,784.22 as legal fees earned in *quantum meruit* against plaintiffs Solomon Sharbat and Qualified Settlement

Management, LLC, jointly and severally, together with interest and costs taxed thereon, and (2) the prior orders of this Court dated March 9, 2011, that granted by default the Motion of The Nimkoff Firm, *inter alia*, for a *quantum meruit* entitlement to fees and disbursements in this matter which was referred for assignment to a Special Referee to hear on the grounds, among others, that this Court lacks personal jurisdiction of Sharbat in that the order to show cause dated February 16,2011 and supporting papers constituting the Motion of the Nimkopf Law Firm were not properly served by "personal service as defined in the CPLR" prior to February 18, 2011, but rather by a method other than personal delivery as defined in CPLR § 308, rendering the judgment and orders referred to above a nullity which should be vacated.

3       At some time more than two years ago, Solomon Sharbat ("Solomon") and his retired parents made *aliyah*, or moved from their home at 67-34 Kessel Street, Forest Hills, NY 11375 to Tel Aviv, Israel to live there on a permanent basis.  I have visited him there when I vacationed in Israel. I can categorically state of personal knowledge that since that date, neither Mr. Sharbat, nor his parents have resided or even visited the Forest Hills home, which has been "for sale" on the real estate market ever since that move, and Solomon has not conducted any business in the United States nor maintained any offices here.  Neither Solomon, nor his parents, left any belongings at the Kessel St. house that would suffice to live there, and they have no working telephone number there. Solomon's parents, too, have not been there once since their permanent relocation to Israel to live their retirement years there.

4       Before Mr. Sharbat moved, he asked me at the airport to pick up his mail as often as I could because he had forgotten to notify the post office, and mail or federal

express to him in Israel anything that looks interesting and not "junk mail." Accordingly, I have checked his mail on a regular basis since his move and I have sent mail or federal express packages to Mr. Sharbat several times for more than two years.

5       Generally, I would try to check Solomon's mail every 1-2 months. Almost all the mail was no important. However, because of my work as an artist manager in the entertainment business, I do a lot of traveling to Los Angeles, California and overseas. When I am on the road, the mail would not be checked for a more extended period of time. Thus, from about mid-February 2011 to early May 2011, I could not pick up Mr. Sharbat's mail because of my travel itinerary.

6       When I returned from a tour in early May last year, I immediately checked Mr. Sharbat's mail on Sunday, May 8, 2011. I discovered mail from the Nimkopf Law Firm with some partially handwritten court paper that indicated there was a conference which Mr. Sharbat needed to attend on May 11, 2011. I also found a stack of papers from them and several certified notices. I immediately notified Mr. Sharbat over the phone and, subsequently, he informed me that he had hired Mr. Scott Stone to attend the conference on his behalf.  The following day I went to the post office to pick up the certified mail but they would not release them to anyone but the named recipient, Solomon Sharbat.

7. Finally, it is clear to me that any serious process server exercising "due diligence" and trying to serve of papers on Mr. Sharbat at his former, vacated residence at Kessel St., in February or March 2011, would have immediately  realized that no one lives there from

the appearance of the windows and shades, the garbage cans, the mail box (which notes that all mail be dropped in a mail slot on the door) and the lighting at the house.

WHEREFORE your affiant respectfully prays that this honorable court grant the relief requested by plaintiff in his motion to vacate in its entirety.

Dated: New York, New York
January 30, 2012

MICHAEL MICHEL

sworn to before me this
~~30th day of January 2012~~
8th dAy OF FEBRUARY 2012

NOTARY PUBLIC

GLORIA VARGAS
Notary Public, State of New York
No. 41-4616577
Qualified in Queens County
Commission Expires July 31, ~~2005~~
2013

4

# Exhibit C

Ronald A. Nimkoff
The Nimkoff Firm
Non-Party *Pro Se*
28 Robert Circle
Syosset, New York 11791
(516) 921-3460

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| SOLOMON SHARBAT and QUALIFIED SETTLEMENT MANAGEMENT, LLC. | Index No. 600151/08 |
| Plaintiffs, | IAS Part 12 Hon. Paul G. Feinman |
| -against- | |
| LAW OFFICES OF MICHAEL B. WOLK, P.C. and MICHAEL B. WOLK, | **AFFIDAVIT OF RONALD A. NIMKOFF** |
| Defendants. | |

STATE OF NEW YORK    )
                          ) ss.:
COUNTY OF NASSAU    )

RONALD A. NIMKOFF, being duly sworn, deposes and says:

1. I am a member of The Nimkoff Firm, former counsel to plaintiffs Solomon Sharbat ("Sharbat") and Qualified Settlement Management, LLC (collectively, the "Sharbat Plaintiffs") in this action. I submit this affirmation on personal knowledge in opposition to the Sharbat Plaintiffs' application for an order vacating, among other things, the judgment that this Court has entered against them and in favor of The Nimkoff Firm.

2. First and foremost, this Court should know that all it needs to understand in connection with Sharbat's application is that it is misdirected. Where, as here, the order of reference to the referee is "to hear and determine" rather than "to hear and report," the

"referee to *determine* an issue . . . shall have all the powers of a court." CPLR 4301 (emphasis added). Thus, as set forth in greater depth in The Nimkoff Firm's accompanying memorandum of law dated May 30, 2012 ("The Nimkoff Firm's Brief") at Point I, the presiding justice who issued the order of reference to the referee, Hon. Paul G. Feinman, does not have the authority to vacate the judgment that the referee awarded to The Nimkoff Firm. Accordingly, if Sharbat is to seek to such relief, he must do so through an application to the referee who awarded the judgment or through an appeal to the Appellate Division.

3. But, even if this Court were to address the merits of the Sharbat Plaintiffs' application and not leave it for the referee or the Appellate Division as it must (see *id.*), the Sharbat Plaintiffs' contentions that this Court had neither the subject matter jurisdiction, nor personal jurisdiction over Sharbat, to enter the judgment that was entered, are downright silly.

4. As set forth in The Nimkoff Firm's Brief at Point II, this Court, the Supreme Court of the State of New York, is a court of general jurisdiction and, accordingly, unless another court is given exclusive subject-matter jurisdiction over a particular claim (such as the federal court for an exclusively federal claim or the Court of Claims for a claim against The State of New York), this Court had, notwithstanding the Sharbat Plaintiffs' contrived assertions to the contrary, the subject matter jurisdiction for it to award the judgment at issue. Moreover, in referring the question of The Nimkoff Firm's fee to a

2

referee to determine in *quantum meruit*, the Court did exactly the right thing. *Id.* at Point III.  In fact, there is no question that this Court is empowered to refer to a referee the question of attorneys' entitlements to fees in *quantum meruit*. *See Id.*

5.  Moreover, as discussed in greater detail in The Nimkoff Firm's Brief at Point IV, just as misguided is the Sharbat Plaintiffs' claim that this Court lacked personal jurisdiction over them and, therefore, was not empowered to award a judgment against them.  Simply stated, the Sharbat Plaintiffs commenced this action in this Court and by doing so subjected themselves to the Court's personal jurisdiction.  In addition, though any mention of it is, tellingly, completely absent from the papers that the Sharbat Plaintiffs' submitted in support of their application, the Sharbat Plaintiffs' **appeared** through counsel during the entirety of the hearing before the referee, raised objections, proffered arguments and cross-examined me, the only witness called to testify at the referee hearing, thoroughly without ever mentioning anything about, never mind asserting any defense predicated on the absence of, personal jurisdiction.  Nevertheless, the Sharbat Plaintiffs now, for the first time very nearly a year after the hearing before the referee was conducted, claim that this Court did not have personal jurisdiction over them.  The Sharbat Plaintiffs evidently contend that they are entitled to appear at the referee hearing through counsel, have that hearing conducted on the merits *with their participation*, hope for a favorable determination, and then, when they receive a determination that they deem to be adverse, claim that the Court did not have personal jurisdiction over them and that

3

the hearing must, therefore, be deemed to be a nullity.  Not surprisingly, our legal system does not work that way.  The Sharbat Plaintiffs' argument that it does is simply unavailing.

Background

6.  By agreement dated October 24, 2006 (the "Retainer Agreement"), a copy of which is attached as Exhibit A, the Sharbat Plaintiffs retained The Nimkoff Firm[1] to represent them in this action.

7.  The Retainer Agreement required the Sharbat Plaintiffs to reimburse The Nimkoff Firm for the disbursements that The Nimkoff Firm incurred during the course of its representation of them in this action.  Indeed, the Retainer Agreement provides:

> You [*i.e.*, the Sharbat Plaintiffs] will also be responsible for the payment of any and all disbursements related to our representation. Such disbursements may include usual and customary charges for duplicating, facsimile transmission, long distance telephone service, computerized legal research, travel, court reporter fees, local counsel fees, expert witness fees, secretarial overtime and other charges incidental to overtime, postage, overnight courier and messenger services, as well as other charges necessary to reimburse us for payments made to third party providers of these and other services. At our option, we reserve the right to require advance payment of specifically anticipated disbursements (*e.g.*, the cost of deposition transcripts) so that our firm does not advance such disbursements.

---

[1] The Wolk Retainer Agreement was initially entered into by the Sharbat Plaintiffs and Nimkoff Rosenfeld & Schechter, LLP, a law firm in which I was then a partner.  However, by execution of a substitution of counsel dated December 22, 2009, a copy of which is attached as Exhibit B, The Nimkoff Firm was substituted for Nimkoff Rosenfeld & Schechter, LLP as the Sharbat Plaintiffs' counsel.  As I was the attorney who at all times was responsible for, and entitled to derive the pecuniary benefit from, the representation of the Sharbat Plaintiffs in this action, no distinction is drawn in this affirmation between Nimkoff Rosenfeld & Schechter, LLP and The Nimkoff Firm.

4

Ex. A at 3.

8.  The Retainer Agreement further provides:

> This Agreement shall be construed in accordance with the substantive laws of the State of New York without regard to New York's choice of law rules.  Moreover, except to the extent that New York State's provision for the compulsory arbitration of attorney-client fee disputes as set forth in the preceding paragraph is applicable, you agree that all litigation arising from, or relating to, this Agreement shall be commenced and maintained in the United States District Court for the Southern District of New York, the Supreme Court of the State of New York, County of New York, or the Civil Court of the City of New York, County of New York, as appropriate.  Accordingly, subject to the preceding paragraph, you expressly consent to the personal jurisdiction of those courts and waive any challenge to the venue of those courts.

*Id.* at 3-4.

9.  In accordance with the Retainer Agreement, The Nimkoff Firm diligently, faithfully and competently represented the Sharbat Plaintiffs in this action.

10.  In connection with its representation of the Sharbat Plaintiffs in this action, The Nimkoff Firm incurred disbursements for which the Sharbat Plaintiffs were responsible to pay under the Retainer Agreement.  Such disbursements included, among other things, filing fees, duplicating, electronic legal research, process server fees and travel.

11.  The Nimkoff Firm sent the Sharbat Plaintiffs invoices for disbursements in this action as they accrued along with numerous letters requesting payment. The letters (with accompanying invoices) dated April 18, 2008, June 10, 2008, July 22, 2008, December 23, 2009, February 2, 2010, March 16, 2010, April 21, 2010, November 2,

2010, December 8, 2010, and February 14, 2011, are attached, collectively, within Exhibit C.[2]

12. Notwithstanding The Nimkoff Firm's numerous invoices and correspondence, as well as numerous requests for payment transmitted orally, the Sharbat Plaintiffs failed and refused to forward payment to The Nimkoff Firm. This was so even though the Sharbat Plaintiffs had never rejected, or even taken issue with, any invoice from The Nimkoff Firm.

13. In fact, as the statements submitted to the Sharbat Plaintiffs reflect, Sharbat made certain payments for fees and disbursements due and owing to The Nimkoff Firm in both this action and the *Hartstein* Action, but, without any excuse, cause or justification, ceased rendering payments for outstanding disbursements and fees, even though he had repeatedly acknowledged their obligation to pay. *See, e.g.*, the e-mail from Sharbat to me on April 29, 2010 at 12:24 p.m., replying to an e-mail about a bill by stating, "[I] have Alon Hoshmods tel # for you- he must give you 30k – [I] will email him tomm[.]" Copies of relevant e-mails are attached collectively within Exhibit D.

14. Thereafter, Sharbat again affirmatively acknowledged his debt to The Nimkoff Firm and that payment was "overdue." See the e-mail from Solomon Sharbat to Alon

---

[2] Some invoices contain separate entries reflecting sums that Sharbat and his companies also owed to The Nimkoff Firm for legal services rendered, and disbursements incurred, in connection with two other actions in which The Nimkoff Firm represented Sharbat and his companies: *Hartstein v. Sharbat*, et al. 09 Civ. 9799 (RMB) (the "*Hartstein* Action) and *Advantage Premium Financing, LLC v. Broadstreet Group LLC and Positive Financial Services LLC.*, New York County, Index No. 602303/07.

6

Hoshmand on June 17, 2010 at 3:26 p.m., a copy of which is included within Exhibit D, stating, "Alon - please call Ron Nimkoff and give him the 30 k his tel # 212-868-8100 - at least call him and let him know when you can bring it or arrange it *it's overdue* and I'm still overseas." (Emphasis added).

15. No payment, from any source, followed Mr. Sharbat's April 29, 2010 or June 17, 2010 e-mails. The last payment towards the invoices submitted to Plaintiffs was for $5,000.00 – and that payment was received on or about March 12, 2010, as reflected in the billing statement dated March 16, 2010[3], a copy of which is included within Ex. C.

16. In addition, The Nimkoff Firm repeatedly and promptly complied with Sharbat's requests for additional copies of bills and retainers.

17. On May 9, 2010, in response to Sharbat's e-mail to me on May 5, 2010 at 9:24 a.m., a copy of which is included within Ex. D, The Nimkoff Firm faxed duplicate copies of all prior bills and the retainer agreement in the *Hartstein* Action. A copy of my May 9, 2010 fax is attached as Exhibit E.

18. On November 9, 2010, in response to yet another request by telephone, I e-mailed yet another copy of the Hartstein Retainer Agreement to Mr. Sharbat. See my e-mail to Sharbat on November 9, 2010 at 11:56 a.m., a copy of which is included within Exhibit D.

---

[3] That $5,000 payment was not received from the Sharbat Plaintiffs, but was received, on the Sharbat Plaintiffs' behalf, from Michael Hartstein in accordance with the terms of the agreement settling the *Hartstein* Action.

7

19.  The Sharbat Plaintiffs were fully aware of the ramifications of their failure to pay The Nimkoff Firm for outstanding fees and disbursements.  The Retainer Agreement explicitly provides:

> In the event that a statement shall remain outstanding and unpaid for more than thirty (30) consecutive calendar days, you each agree that, at our option, we may then and there be discharged from all further responsibilities under this engagement."

*See* the Retainer Agreement (Ex. A) at 3.

20.  There was no doubt that the Sharbat Plaintiffs' failure to pay was knowing and deliberate.  The Nimkoff Firm has sent the Sharbat Plaintiffs numerous letters requesting payment (*see* Exhibit C) and had repeatedly written to the Sharbat Plaintiffs about their failure to make the required payments.  See, *e.g.*, my e-mail to Sharbat dated March 1, 2010 at 8:08 p.m., a copy of which is attached within Exhibit D ("Also, we have not yet received the anticipated wire transfer of funds from you.  Please let me know where that stands").  Despite the Sharbat Plaintiffs' awareness of their financial obligation to The Nimkoff Firm, they chose to ignore it.

21.  Indeed, as early as July 25, 2009, The Nimkoff Firm expressed concerns about unpaid disbursements in this action.  See my e-mail to Solomon Sharbat on July 25, 2009 at 10:05 a.m., a copy of which is included within Exhibit D ("Solomon, we need to have an earnest discussion about the manner in which your cases should be prosecuted.  Our statements to you for disbursements remain outstanding[.]").

22. Even more directly, my cover letter to the billing statement dated December 8, 2010, a copy of which is included within Exhibit C, states:

> As the statement reflects a substantial and long overdue, outstanding balance, we must insist on prompt payment. If full payment is not received within ten business days, we will have no choice, but to move for leave to withdraw as your counsel in the *Wolk* action and to commence collection efforts. We sincerely hope that such action will not become necessary.

23. Finally, my cover letter to the billing statement dated February 14, 2011, a copy of which is included within Exhibit C, states, "Despite our numerous requests for payment of our outstanding invoices . . ., you have not satisfied them. Accordingly, we intend to move immediately for leave to withdraw as your counsel in the *Wolk* action and to commence collection efforts."

24. In response to my February 14, 2011 correspondence, Sharbat replied by email, dated February 15, 2011, from his ssharbat@yahoo.com email address as follows:

> **Can we please meet** ? I need to speak to you privately not over the phone - money is not the issue - I was hospitalized and need to tell you what is going on - please don't sue me or hurt me this is one of the major reasons my health was so poor and having nightmares for months - **I will try to come [to your office] next week** - you can please give me dates-

See Sharbat's February 15, 2011 email (emphasis added), a copy of which is attached as Exhibit F.

25. In response to Sharbat's February 15, 2011 email, I responded by email that same day by stating, "Solomon, I can meet with you in our offices on March 1 or March

9

2. Please let me know if either date is good for you." A copy of my email is attached as Exhibit G.

26. Despite all my efforts and communications with Sharbat, he continually failed and refused to pay the outstanding invoices. Under such circumstances, The Nimkoff Firm had utterly no prospect that any disbursements that it would incur in connection with this action would be reimbursed.

27. Accordingly, in accordance with Rule 1.16(c)(5) of the Rules of Professional Conduct (22 NYCRR § 1200.0 *et seq.*), which entitles an attorney to leave to withdraw from representing a client, where, as here, the client "[d]eliberately disregards an agreement or obligation to the lawyer as to expenses or fees" (Rules of Professional Conduct (22 NYCRR 1200.0 *et. seq.*) Rule 1.16 (c) (5)), The Nimkoff Firm applied to this Court, by order to show cause dated February 16, 2011, for an order (i) granting The Nimkoff Firm leave to withdraw as counsel to the Sharbat Plaintiffs in this action and (ii) scheduling a hearing to determine The Nimkoff Firm's fee in *quantum meruit* for its representation of the Sharbat Plaintiffs. Copies of the February 16, 2011 order to show cause and my supporting affirmation (with exhibits) dated February 15, 2011 are attached, collectively, as Exhibit 5 (Document # 45-9) to the Sharbat Plaintiffs' papers in support of their application.

28. This Court (Hon. Paul G. Feinman) signed the February 16, 2011 order to show cause at the court conference in this action held during the afternoon of Wednesday,

February 16, 2011 and, in doing so, stated, among other things:

> LET service of copies of this order to show cause, together with the papers upon which it was based, by personal service as defined in the CPLR [to] (a) Plaintiffs at 67-34 Kessel Street, Forest Hills, NY 11375 (b) Edmond Wolk, attorney for Defendants, at 570 Lexington Avenue, 16th Floor, New York, New York 10022 , *before* [Friday], February 18, 2011, be deemed good and sufficient service.[4]

Sharbat Plaintiffs Ex. 5 at 2 (emphasis added).

29. In compliance with the service provision of this Court's February 16, 2011 order to show cause, The Nimkoff Firm, on the very day that that order was signed (February 16, 2011) dispatched one its attorneys, Matthew Dreyer ("Mr. Dreyer"), to travel to 67-34 Kessel Street, Forest Hills, New York to deliver the order and the papers upon which it was based. Mr. Dreyer's affirmation dated February 17, 2011 ("Dreyer Aff."), attesting to the circumstances of his efforts to deliver those papers that day, and the next day (Thursday, February 17, 2011), to the Sharbat Plaintiffs is attached as Exhibit H. In his affirmation, Mr. Dreyer stated, "under penalty of perjury," as follows:

1. I am over the age of 18 years and not a party to this action.

2. On February 16, 2011, I arrived at the residence of plaintiff Solomon Sharbat at 67-34 Kessel Street, Forest Hills, NY 11375 at approximately 5:01 PM

---

[4] As the February 16, 2011 order to show cause , which was signed during the afternoon of February 16, 2011, directed that service be accomplished at *"before* [Friday], February 18, 2011," Sharbat's contention that the Nimkoff Firm should have sought to serve him at 67-34 Kessel Street, Forest Hills, New York "on a weekend" (*see* the Sharbat Plaintiffs' memorandum of law dated May 2, 2012 at 16) is, obviously, misguided.

11

with a copy of this Court's order to show cause dated February 16, 2011 (the "Order") and the supporting affirmation and exhibits on which the Order was based (collectively, the "Papers"), in order to serve them upon plaintiffs in accordance with the Order, requiring "personal service as defined in the CPLR" prior to February 18, 2011. I repeatedly rang the doorbell and knocked on the door using both my hand and the knocker, but there was no reply from within. I noted that one light was on in the house.

3. On February 17, 2011. I arrived again at the residence of plaintiff Solomon Sharbat at 67-34 Kessel Street, Forest Hills, NY 11375 at approximately 10:50 AM with a copy of the Papers, in order to serve them upon plaintiffs in accordance with the Order. I repeatedly rang the doorbell and knocked on the door using both my hand and the knocker, but there was no reply from within. There were no lights on within the house, but it appeared otherwise unchanged.

4. On February 17, 2011, I arrived once again at the residence of plaintiff Solomon Sharbat at 67-34 Kessel Street, Forest Hills, New York 11375 at approximately 5:45 PM with a copy of the Papers, in order to serve them upon plaintiffs in accordance with the Order. I repeatedly rang the doorbell and knocked on the door using both my hand and the knocker, but there was no reply from within. There was again a light or lights on in the house and one item of mail which had been in the mail slot in the door was no longer there.

5. On February 17, 2011, at approximately 5:50 PM, having diligently attempted to serve the Papers in accordance with CPLR 308(1) and CPLR 308(2), I affixed copies of the Papers to the door in accordance with CPLR 308(4).

6. On February 17, 2011, at approximately 9:50 PM , I mailed copies of the Papers to plaintiff Solomon Sharbat at 67-34 Kessel Street, his known residence, in an envelope bearing the legend "personal and confidential" and not indicating on the outside, by return address or otherwise, that the communication is from an attorney or concerns an action against plaintiffs. To mail the Papers, I deposited them with the proper postage in a mailbox under the exclusive care and custody of the United States Postal Service within the State of New York.

12

7. On February 17, 2011 at 11:01 PM, as part of my further diligence in serving the Papers before February 18, 2011, I also sent an e-mail to Solomon Sharbat at his e-mail address, ssharbat@yahoo.com, attaching a full set of the Papers in .pdf format.

Ex. H at 1-3. Thus, not only did The Nimkoff Firm do everything it could do to deliver the February 16, 2011 order to show cause and the papers upon which it was based to the Sharbat Plaintiffs at 67-34 Kessel Street, Forest Hills, New York *before* February 18, 2011, it also emailed them to Sharbat at the email address (ssharbat@yahoo.com) at which The Nimkoff Firm regularly communicated with Sharbat. A copy of that email dated February 17, 2011 at 11:01 p.m. is attached as Exhibit I.

30. Then, within three days after The Nimkoff Firm delivered, mailed and emailed the Court's order to show cause and the papers on which they were based, I received an email from Sharbat dated February 20, 2011, demanding that I send to him and to his counsel, David Ferber and Scott Fenstermaker "all [his] files by email." A copy of Sharbat's February 20, 2011 email is attached as Exhibit J.

31. This Court (Hon. Paul G. Feinman) then granted The Nimkoff Firm's application for leave to withdraw and for a hearing to determine The Nimkoff Firm's fee in *quantum meruit* for its representation of the Sharbat Plaintiffs in this action. Indeed, through two orders dated March 9, 2011, this Court granted both components of The Nimkoff Firm's application (*i.e.*, to be relieved as the Sharbat Plaintiffs' counsel and for a

hearing to determine The Nimkoff Firm's fee in *quantum meruit* for its representation of

the Sharbat Plaintiffs).

    32.  The first March 9, 2011 order, addressing that component of The Nimkoff

Firm's application seeking leave to withdraw as the Sharbat Plaintiffs' counsel in this

action, provided in relevant part:

> ORDERED that this motion by Ronald A. Nimkoff, Esq. & The Nimkoff
> Firm to be relieved as attorneys for Plaintiff (s) Sharbat & Qualified in the herein
> action is granted upon the filing of proof of said attorney (s) having served, within
> 30 days of today, a copy of this order with notice of entry upon the former client at
> former client's last known address, which is 67-34 Kessel Street, Forest Hills, NY
> 11375 & any registered address for service of the LLC by regular <u>and</u> certified
> mail, return receipt requested, and upon the attorneys for all other parties
> appearing herein by regular mail. It is further

> ORDERED that said attorney(s) serve upon the former client,
> together with the abovementioned copy of this order with notice entry upon
> the former client, a notice directing the former client(s) to appoint a substitute
> attorney within 30 days from the date of mailing the notice; proof of service to be
> filed with the Trial Support Office (Room 158, 60 Centre Street).

A copy of this Court's first order dated March 9, 2011 is attached as Exhibit K.

    33.  The second March 9, 2011 order, addressing that component of The Nimkoff

Firm's application seeking a hearing to determine The Nimkoff Firm's fee in *quantum*

*meruit* for its representation of the Sharbat Plaintiffs, provided:

> [I]t is ordered that the branch of the [Nimkoff Firm's] motion
> which seeks a hearing to determine The Nimkoff Firm's fee in
> <u>quantum</u> <u>meruit</u> is referred to a special referee to hear and

14

determine.

A copy of this Court's second order dated March 9, 2011 is attached as Exhibit L.

34.  In strict compliance with the requirements of this Court's first order dated March 9, 2011 (Ex. K), The Nimkoff Firm, on March 31, 2011, "fil[ed] proof of . . . having served [on March 21, 2011], within 30 days of [March 9, 2011], a copy of this order with notice of entry upon the former client at former client's last known address, which is 67-34 Kessel Street, Forest Hills, NY 11375 [and] any registered address for service of the LLC by regular and certified mail, return receipt requested, and upon the attorneys for all other parties appearing herein by regular mail."  On March 21, 2011, The Nimkoff Firm also "serve[d] upon the former client . . . a notice directing the former client(s) to appoint a substitute attorney within 30 days from the date of mailing the notice."  On March 31, 2011, The Nimkoff Firm filed "proof of [such] service . . . with the Trial Support Office (Room 158, 60 Centre Street)."  Copies of the documents referenced above that The Nimkoff Firm served on March 21, 2011, and filed with the Trial Support Office on March 31, 2011, are attached, collectively, together with Mr. Dreyer's affirmation of the service of those documents, as Exhibit M.

35.  On March 22, 2011, the very next day after the documents referenced in ¶ 34 above were served, I received a telephone call from Scott Fenstermaker, Esq., who advised that he was calling on Sharbat's behalf.  Correspondence between Mr. Fenstermaker and me concerning that telephone conversation, among other things, are

15

attached, collectively, as Exhibit N.

36.  Thereafter, I was contacted by another lawyer for Sharbat, Scott Stone of JSBarkats, PLLC, regarding the legal fees that The Nimkoff Firm sought in connection with this action. A copy of an email from Mr. Stone dated April 14, 2012 is attached as Exhibit O.

37.  The hearing on The Nimkoff Firm's entitlement to fees in *quantum meruit* was then scheduled for May 17, 2011 and, on that day, it was assigned to Special Referee Lancelot B. Hewitt to determine.  However, Sharbat did not appear that day, but his counsel, Scott Stone, who did appear on the Sharbat Plaintiffs' behalf, represented that "he [*i.e.*, Sharbat] would like to attend the hearing."   Accordingly, the hearing was adjourned until June 6, 2011.  A copy of the transcript of the proceedings before Special Referee Hewitt on May 17, 2011 is attached as Exhibit P.

38.  The hearing then resumed on June 6, 2011, and again, Scott Stone appeared on behalf of the Sharbat Plaintiffs but, once again, Sharbat failed to appear.  As reflected by Special Referee Hewitt's decision and order dated September 21, 2011 (the "September 2011 Order," a copy of which is attached as Ex. Q), Sharbat appeared through his counsel Scott Stone of JSBarkats, PLLC (*id.* at 1) and was given every opportunity to appear in person.

39.  At the hearing on June 6, 2011, The Nimkoff Firm called one witness, me, its founding member. *See id.* at 4.  In connection with my testimony, which was subject to

16

the formal application of the applicable Rules of Evidence, I introduced "voluminous document[ary] evidence" (*id.* at 8; see also *id.* at 2 footnotes 1-4) and was subject to an extensive cross-examination by Sharbat's counsel, Scott Stone of JSBarkats, PLLC. After my testimony concluded, Sharbat had the opportunity to call witnesses, but declined to do so. *Id.*

40.  Then, Special Referee Hewitt issued his September 2011 Order (Ex. Q) which determined The Nimkoff Firm's entitlement to fees in *quantum meruit* by stating:

> Upon consideration of all the testimony presented, the considered credibility to be afforded the witness, and review of all the exhibits admitted into evidence, I find that the Nimkoff Law Firm is entitled to fee in *quantum meruit* in the amount of $336,784.22.

> ORDERED that the Clerk of the Court is directed to enter judgment in favor of movant The Nimkoff Law Firm, and against plaintiffs Solomon Sharbat and Qualified Settlement Management, LLC, jointly and severally, in the amount of $336,784.22, and it is further;

> ORDERED that the interest on the judgment shall be calculated at the statutory rate, together with costs and disbursements, to be taxed by the Clerk upon submission o[f] an appropriate bill of costs.

> The foregoing constituents the decision and order of the court.

Ex. Q at 6-7.

41.  In accordance with the Special Referee Hewitt's September 2011 Order, judgment was entered with the Clerk of the Court on October 4, 2011 (the "Judgment"). A copy of the Judgment is attached as Exhibit R.

17

As the Presiding Supreme Court Justice's Order of
Reference to the Referee Provided That the Referee
Was "To Hear and Determine," and *Not* "To Hear
and Report," the Sharbat Plaintiffs' Application Is
Not Properly Before the Presiding Justice And, If
They Are to Garner the Relief They Seek, the Sharbat
<u>Plaintiffs Must Receive it from the Referee or the Appellate Division</u>

42. As set forth in greater detail in The Nimkoff Firm's Brief at Point I, the

presiding Supreme Court Justice in this action (Hon. Paul G. Feinman) does not have the

authority to grant to the Sharbat Plaintiffs the relief that they seek. Indeed, where, as

here, the order of reference to the referee is to "hear and determine," (*see* Ex. L) and not

"to hear and report," Special Referee Hewitt "stands in the shoes" of Justice Feinman and

only he, or the Appellate Division through an appeal, are authorized to provide the

Sharbat Plaintiffs with the relief they seek. *See* The Nimkoff Firm's Brief at Point I.

As this Court, the Supreme Court of the State
of New York, Is a Court of General Jurisdiction,
the Sharbat Plaintiffs' Argument That it Does
Not Have Subject Matter Jurisdiction to Determine
and to Award Attorneys' Fees Based on *Quantum*
<u>*Meruit* Could Not Be More Frivolous</u>

43. As set forth in The Nimkoff Firm's Brief at Point II, this Court, the Supreme

Court of the State of New York, is a court of general jurisdiction. Accordingly, the

Sharbat Plaintiffs' argument that it does not have subject matter jurisdiction to determine

18

and to award attorneys' fees to The Nimkoff Firm based on *quantum meruit* could not be more frivolous.  *See* The Nimkoff Firm's Brief at Point II.

The Sharbat Plaintiffs Bastardize the Appellate
Division's Dicta in *Schneider, Kleinick* in a
Misguided Effort to Muster Some Type of Argument
That The Nimkoff  Firm's Claim for Attorneys' Fees
in *Quantum Meruit* Could Not Be Determined under
the Caption of this Action, but Needed to Be
Determined under the Caption of a Wholly Separate Action

44.  As explained in The Nimkoff Firm's Brief at Point III, there is simply no prohibition for a court to refer to a referee to "hear and determine" an attorney's entitlement to fees for representing a client in connection with an action before that court.

*See* The Nimkoff Firm's Brief at Point III.

As it Was They Who Commenced this Action
in this Court, it Is Patently Frivolous for the
Sharbat Plaintiffs to Claim That this Court
Does Not Have Personal Jurisdiction over Them

45.  As discussed in The Nimkoff Firm's Brief at Point IV, because it was the Sharbat Plaintiffs who commenced this action in this court, it is patently frivolous for them to claim that this Court does not have personal jurisdiction over them.  Indeed, a plaintiff submits to a court's personal jurisdiction by commencing an action there.   It is simply ridiculous for the Sharbat Plaintiffs to argue otherwise.

19

Because in Another Action, Sharbat, to Get
an Order of Attachment Against Him Vacated,
Recently Stated under Oath That He Is a New
York Domiciliary Residing at 67-34 Kessel
Street, Queens, New York, the Doctrine of
Judicial Estoppel Precludes Sharbat's Contention
Here That 67-34 Kessel Street Is Not His
<u>Residence at Which He Is Subject to Service of Process</u>

46.  In the *Hartstein* Action, a recent action in the United States District Court for the Southern District of New York in which my firm represented Sharbat and several of his other entities, Sharbat, in order to get an attachment against him vacated, stated under oath, in words directly in contrast to those to which he affirms under oath here, that, among other things, "I am now and have always been a resident and domiciliary of the State of New York and I do not plan on re-locating to another state much less another country.  My home is in Queens (67-34 Kessel Street, Forest Hills) where I was born and raised. . . .  As stated, I reside at 67-34 Kessel Street in Forest Hills.  I have resided at that address for 35 years."  *See* the affidavit of Solomon Sharbat sworn to on December 15, 2009 in support of his application in the *Hartstein* Action to, among other things, vacate the order of attachment that was entered against him ("Sharbat's Aff. in *Hartstein*"), a copy of which is attached (with its voluminous exhibits) as Exhibit S.

47.  Michael Hartstein commenced the *Harstein* Action against Sharbat and a number of his entities in this Court before the Honorable Richard B. Lowe III.  At the

time that the the *Harstein* Action was commenced, Mr. Hartstein secured from this Court

(Hon. Richard B. Lowe III) an *ex parte* order of attachment "restrain[ing] and

prohibit[ing]" Sharbat, his co-defendant entities "and all other persons and garnishees . . .

from transferring or paying any assets of the defendants [*i.e.*, Sharbat and his co-

defendant entities] or any personal or real property in which the defendants have an

interest, or any debt owed to the defendants to the extent of $400,000 . . . ." *See* this

Court's (Hon. Richard B. Lowe III) attachment order, which is contained within an order

to show cause dated November 12, 2009, a copy of which is attached as Exhibit T.

48.  Pursuant to a notice of removal dated November 24, 2009, a copy of which is

attached (without exhibits) as Exhibit U, Sharbat and his co-defendant entities removed

the *Harstein* Action to the United States District Court for the Southern District of New

York. The action was assigned to U.S. District Judge Richard M. Berman.

49.  On behalf of Sharbat and his co-defendant entities, I then forwarded to Judge

Berman a pre-motion letter dated December 2, 2009, as required by Rule 37.2 of the

Local Civil Rules for the Southern and Eastern Districts of New York and paragraph 2(A)

of Judge Berman's Individual Practices.  In that letter, a copy of which is attached

(without exhibits) as Exhibit V, I truthfully represented to Judge Berman, among other

things, that "Mr. Sharbat is a United States citizen, lives in New York at 67-34 Kessel

Street, Forest Hills and **I have met with him in person in my New York office on a half**

**dozen or so occasions since the time that this action was commenced . . . . Indeed,**

21

**Mr. Sharbat is in New York and is fully prepared to appear before this Court at the time of the pre-motion conference."[5]** *See* Ex. V (emphasis in original).

50. Thereafter, Sharbat and his co-defendant entities moved for, among other things, an order vacating the order of attachment that had been entered against him. A copy of the notice of motion dated December 16, 2009, seeking such relief, is attached as Exhibit W. In support of their motion, Sharbat and his co-defendant entities also submitted to the federal court a supporting memorandum of law, a copy of which is attached as Exhibit X, and Sharbat's Aff. in *Hartstein* (with voluminous exhibits) (Ex. S).

51. In Sharbat's Aff. in *Hartstein*, Sharbat stated under oath, among other things, as follows:

> 2. I have reviewed the *ex parte* order of attachment, a copy of which is attached as Exhibit A. I have also reviewed the papers that Hartstein submitted in support of his application for the *ex parte* order of attachment, consisting of his affidavit, sworn to November 9, 2009 ( "Hartstein Aff."), a copy of which is attached (with exhibits) as Exhibit B and the affirmation of his lawyer (and formerly my lawyer (see ¶¶ 19-25 *infra*), E. David Smith, dated November 6, 2009, a copy of which is attached as Exhibit C. Accordingly, I am aware that the *ex parte* order of attachment is predicated on Hartstein's representation that I moved to Israel and that I "do not intend to return to the United States" *See* Hartstein Aff. (Ex. B hereto) at ¶ 6 and the *ex parte* order of attachment (Ex. A hereto) at 2, which states that it is predicated on "it appearing that the defendant Solomon Sharbat has fled the jurisdiction and does not intend to return to the United States."
>
> 3. However, contrary to what Hartstein represented to the state court on an *ex parte* basis and as explained in further detail below, while I recently visited

---

[5] Sharbat did, in fact, attend, in person, the pre-motion conference.

22

Israel and family I have there, I never intended to stay in Israel and I returned home to New York more than one month ago. Simply stated, I am now and have always been a resident and domiciliary of the State of New York and I do not plan on re-locating to another state much less another country. My home is in Queens (67-34 Kessel Street, Forest Hills) where I was born and raised. I attended Queens College in the State of New York. I have had offices in midtown Manhattan for years from which I operate all my businesses and companies. In fact, just this past August, I signed a lease on behalf of my company, Solomon Capital Advisors LLC, to rent office space at 654 Madison Avenue through July 2011. A copy of that lease is attached as Exhibit D. I have been in that space for more than five years. My company, Solomon Capital, LLC [footnote-- I am the owner and President of Solomon Capital LLC.] a New York limited liability company (and named Defendant) also operates out of, and maintains its address at, 654 Madison Avenue.

4.   Thus, any notion that I have fled the jurisdiction or plan to do so is preposterous as I am a native New Yorker with both roots and future plans here. Nevertheless, based upon the unsubstantiated allegation that "I have fled the jurisdiction" hundreds of thousands of dollars belonging to Defendants have been restrained, paralyzing both me and my businesses financially and otherwise. In fact, Hartstein has actually restrained approximately $1 million of Defendants' money and securities although he is not even seeking half of that amount through this action.

5.   As stated, I reside at 67-34 Kessel Street in Forest Hills. I have resided at that address for 35 years.[6] While Hartstein claims that I simply picked up and left in October 2009 (see Hartstein Aff.), all sorts of documentation shows otherwise. For instance, my telephone bills, credit card bills and bank statements for the months October, November and December 2009 were all delivered to my home in Forest Hills and were not forwarded elsewhere as I never changed or sought to change my address. Copies of certain of my phone bills, credit card bills and bank statements for these months that bear my Forest Hills address are attached collectively as Exhibit E. A copy of my New York State's driver's license setting forth my Forest Hills address is also attached as Exhibit F. I also own two

---

[6] Curiously, assuming that perjury is a curiosity, Sharbat states under oath in the Sharbat Aff. at ¶ 9 that " The Kessel Street house is owned by my parents, and I temporarily lived there for several years . . .," while in Sharbat's Aff. in *Hartstein* (Ex. S), Sharbat stated under oath that "I reside at 67-34 Kessel Street in Forest Hills [and] I have resided at that address for 35 years."

automobiles that are insured and maintained in the State of New York.  Copies of the insurance policies for these vehicles are attached as Exhibit G.

6.  Further, my business cards and the letterhead for Solomon Capital LLC contain the Madison Avenue office address, my only office address and Solomon Capital LLC's only office address.  *See* copies of my business card and Solomon Capital LLC's letterhead attached collectively as Exhibit H.  Also, Solomon Capital LLC was receiving its mail at its Madison Avenue address during October 2009 through December 2009 -- the months that, according to Hartstein, I fled and was "shutting down shop in New York."  Copies of certain of Solomon Capital LLC's mail and bills for the aforementioned months, bearing its New York address are attached as Exhibit I.

7.  Moreover, I am not an Israeli citizen and I have never taken any steps to become a citizen of Israel or any other country.  I am a citizen of the United States and do not have, and have never had, dual citizenship in any other country.  I have never leased office space in Israel or any other country (or state, for that matter) and I do not own a home in Israel and have never lived anywhere outside New York City.  I maintain a United States passport and I do not have a passport from Israel or any other country aside from the United States.

Ex. S at ¶¶ 2-7.

52.  Based on the sworn statements set forth in Sharbat's Aff. in *Hartstein*, the court granted Sharbat's motion and vacated the attachment entered against him.  *See* the *Hartstein* court's order dated December 28, 2009, a copy of which is attached as Exhibit Y.

53.  Here, in stark contrast to what was sworn in Sharbat's Aff. in *Hartstein*, Sharbat states under oath:

8.  In point of fact, as Attorney Nimkopf [sic] well knew for some time, having represented me several times over the past ten years and having been so

24

advised by me, that I had moved to, and have been resided in Tel Aviv, Israel for at least two years, with the intent to permanently stay in Israel.[7] Prior to my move to Israel, I had been working in the finance and investment industries for over 15 years, in my capacity as a licensed broker, doing investment banking and raising capital. All that came to an end when I moved to Israel, and I no longer do any business in the United States or have any offices here. Not surprisingly, all of our communications throughout this time have been through e-mail.

9. The Court should note that since my move, I have become an Israeli citizen, have not visited the United States and have not stepped foot in the Kessel St. house at any time. The Kessel Street house is owned by my parents, and I temporarily lived there for several years, after giving up my own apartment in Manhattan, due to unexpected delays in the completion of the renovation of a new

---

[7] Not only did Sharbat never inform me in any way of his supposed move to Israel, he has advised me of just the opposite. *See* Sharbat's Aff. in *Hartstein* (Ex. S at ¶¶ 3 and 5)

("Simply stated, I am now and have always been a resident and domiciliary of the State of New York and I do not plan on re-locating to another state much less another country.  My home is in Queens (67-34 Kessel Street, Forest Hills) where I was born and raised . . . .  I reside at 67-34 Kessel Street in Forest Hills [and] I have resided at that address for 35 years."  *Compare* the Sharbat Aff. at ¶ 9 where Sharbat now conveniently states under oath only that " The Kessel Street house is owned by [his] parents, and [he] temporarily lived there for several years . . . ."

Moreover, on the very day before the February 16, 2011 order to show cause was signed (and first delivered to Sharbat at his Queens address), Sharbat emailed me with a request to meet me in New York, where I maintained my one, and only, office. He stated:

> **Can we please meet ?** I need to speak to you privately not over the phone - money is not the issue - I was hospitalized and need to tell you what is going on - please don't sue me or hurt me this is one of the major reasons my health was so poor and having nightmares for months - **I will try to come [to your office] next week** - you can please give me dates.

*See,* Sharbat's email to me dated February 15, 2012 (Ex. F).  Sharbat made no mention of having to fly in from Israel to meet with me in person, as he requested.  And, in my response, I made no mention of any understanding that he needed to fly in from Israel to meet with me.  I stated:

> Solomon, I can meet with you in our [Manhattan] offices on March 1 or March 2. Please let me know if either date is good for you.

*See,* my email to Sharbat dated February 15, 2012 (Ex. G).

25

home in Israel, which took longer than projected.

10.   My parents are both over retirement age, and they too have also

relocated to Israel permanently to spent [sic] their retirement years. The house has been "on sale" and listed with several real estate brokers, the real estate market ever since, but has not yet been sold only due to a poor sellers' market. Neither I, nor my parents, have any belongings we desire to keep at the Kessel St. house, and have no working telephone number there. They, too, have not been there once since their permanent relocation to Israel.

11.   Because we left suddenly upon learning of the long awaited

completion of construction, I had forgotten to notify the post office of our move. We get very little important mail there because everyone important has been notified, and almost all the mail received there could be classified as "junk" mail. In any event, our mail is reviewed and picked up by a friend who lives nearby, Michael.Michel, every one to several months based on his availability. That is how I eventually learned of the existence of Attorney Nimkopf's [sic] fee activity in this case.[8] Because Mr. Michelle was in California for an extended period of time starting in January 2011, I did not receive any mail for several months.

12.   I am advised by counsel that even assuming the <u>mailing</u> aspect of the

nail and mail method of service under CPLR § 308(4) had been properly effectuated by Mr. Dreyer to my "last known residence" at 67-34 Kessel Street, Forest Hills, NY 11375, the <u>nailing</u> part was not properly done at that last address because the statue requires that such nailing be done at my "dwelling place" which it clearly was not. Therefore, no "personal service as defined in the CPLR," was ever made upon me pursuant to CPLR § 308, as the method of service specifically directed by the order to show cause dated February 16, 2011.

_____

[8]  What Sharbat means when he says that he "eventually learned of the existence of Attorney Nimkopf's [sic] fee activity in this case," I do not know.  But, while Sharbat apparently claims that he learned of such "fee activity" through the efforts of his friend, Michael.Michel, he conveniently forgets that the February 16, 2011 order to show cause and the papers on which it was based was emailed to him on February 17, 2011 (*see* Ex. I).  He also seems to forget that, within three days after receiving those papers, he emailed me, on February 20, 2011, with his demand that I send to him and to his counsel, David Ferber and Scott Fenstermaker, "all [his] files by email."  *See* Ex. J.

26

Sharbat Aff. at ¶¶ 8-12.

54.   Given the grave disparity in Sharbat's sworn statements, there can be no question that Sharbat is "playing fast and loose with the courts" by claiming a New York presence when it benefits him to do so and, yet, claim no New York presence when he believes that is what is in his best interest.  He should be judicially estopped from doing so.

In Any Event, by Appearing Through Counsel at the Hearing
Before Special Referee Hewitt and Contesting the Issue of the
Nimkoff Firm's *Quantum Meruit* Entitlement to Fees on the
Merits, the Sharbat Plaintiffs Have Waived Any Defense Based
<u>on this Court's Supposed Lack of Personal Jurisdiction over Them</u>

55.   Given that it was the Sharbat Plaintiffs who commenced this action and submitted to this Court's personal jurisdiction by doing so (*see* The Nimkoff Firm's Brief at Point IV), it may seem silly for me to still be talking about their supposition that the Judgment should be vacated because this Court lacks personal jurisdiction over them.  But, their contention is so outrageous that I think it warrants comment.   Indeed, the Sharbat Plaintiffs claim that they can appear through their counsel at the hearing[9] before Special Referee Hewitt, make substantive arguments on the merits, object to the introduction of evidence, cross-examine the witness called, have the opportunity to call

---

[9]   As stated in Special Referee Hewitt's September 2011 Order (Ex. Q) at 1, Scott Stone, Esq. of JSBarkats, PLLC appeared at the hearing before him on behalf of the Sharbat Plaintiffs.

27

witnesses and to offer evidence and then await Special Referee Hewitt's determination without waiving any defense based on personal jurisdiction. That way, they obviously contend, if Special Referee Hewitt's determination were favorable to them, they could rely on it, and if it were not favorable to them (as they apparently believe it was not), they can claim that the determination is unenforceable because the Court lacked personal jurisdiction over them. Such a strategy, if it had any support in law, would seem like a pretty good deal for them. But, of course, as set forth in The Nimkoff Firm's Brief at Point VI, even if they had any viable defense based on this Court's supposed lack of personal jurisdiction over them (which they most certainly did not), the Sharbat Plaintiffs waived any such defense by defending on the merits The Nimkoff Firm's claim for fees in *quantum meruit*.[10]

---

[10] Moreover, the Sharbat Plaintiffs never asserted any personal jurisdiction defense or issue before Special Referee Hewitt, and, in fact, never even mentioned anything, in any way, relating to personal jurisdiction. While, on information and belief, no transcript of the proceedings before Special Referee Hewitt on June 6, 2011 was prepared because, as stated in Special Referee Hewitt's September 2011 Order (Ex. Q), "[t]he filing of the transcript was waived by the parties, pursuant to CPLR§4230[b]," a transcript of the proceedings before Special Referee Hewitt on May 17, 2011 was prepared. *See* Ex. P. As can be seen from that transcript, not only did the Sharbat Plaintiffs' counsel not assert any defense based on a supposed lack of personal jurisdiction (or even mention anything about jurisdiction), he affirmatively stated that Sharbat "would like to attend the hearing." *Id.* at 3.

WHEREFORE, for the foregoing reasons and the reasons set forth in The Nimkoff

Firm's Brief, I respectfully request that this Court deny the Sharbat Plaintiffs' application

in all respects.

Ronald A. Nimkoff

Sworn to before me
May 30, 2012

Notary Public

LEJO V ZACHARIA
Notary Public - State of New York
NO. 012A6236094
Qualified in Nassau County
My Commission Expires ___2/22/___

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                              :

SOLOMON SHARBAT AND            :     Case No. _10 C U 6955_
   SOLOMON CAPITAL, LLC,       :

                  Plaintiffs,     :     **COMPLAINT**
                              :

         -against-           :

MARCUS S. BUTLER and          :     **JURY TRIAL DEMANDED**
   MSB GROUP INCORPORATED,   :
                              :

             Defendants.     :
                              :
-----------------------------------------------------------------X

      Plaintiffs, SOLOMON SHARBAT and SOLOMON CAPITAL LLC, as and for their

Complaint, respectfully allege:

**JURISDICTION AND VENUE**

      1.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332 because there is complete diversity among the parties and the amount in controversy

exceeds $75,000.

      2.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial

part of the events giving rise to the claims in this lawsuit occurred in the Southern District of

New York.

**PARTIES**

      3.  Plaintiff SOLOMON SHARBAT ("SHARBAT") is an individual residing in New

York State.

      4.  Plaintiff SOLOMON CAPITAL, LLC ("SOLOMON CAPITAL") is a limited

liability company formed under the laws of the state of New York.

1

5. Plaintiff SOLOMON CAPITAL's principal place of business is New York, New York.

6. Upon information and belief, defendant MARCUS S. BUTLER ("BUTLER") is an individual residing in the Town of Teaneck, State of New Jersey

7. Upon information and belief, defendant MSB GROUP INCORPORATED ("MSB GROUP") is a corporation organized under the laws of the state of New Jersey.

8. Upon information and belief, the principal place of business of Defendant MSB GROUP is Teaneck, New Jersey.

9. Defendants both actively and regularly solicit business in New York, New York.

10. Defendants both actively solicited the business of Plaintiffs SHARBAT and SOLOMON CAPITAL that is the subject of this Complaint, in New York, New York.

11. Upon information and belief, Defendant BUTLER is the sole owner of Defendant MSB GROUP.

12. In his capacity as owner of Defendant MSB GROUP, Defendant BUTLER solicited Plaintiffs' business in the Southern District of New York, including the business that is the subject of this Complaint.

13. On or about August 25, 2009, Plaintiffs and Defendants entered into an agreement (the "Agreement") for the purchase of shares of stock of SpongeTech Delivery Systems, Inc. ("SpongeTech") and Vanity Events Holding, Inc. ("Vanity") valued at $600,000.00 (the "Shares").

14. As part of the Agreement, Plaintiffs agreed to advance $600,000.00 to Defendants for the purchase of the Shares from a third party.

2

15. In return, Defendants agreed to deliver the Shares to Plaintiffs, warranted that the Shares were worth $600,000.00 and agreed to guarantee that Plaintiffs would receive a minimum of $600,000.00 upon the resale of the Shares. If Plaintiffs received less than $600,000.00 upon the resale of the Shares, Defendants agreed to pay to Plaintiffs an amount necessary to make Plaintiffs whole to the extent of their $600,000.00 investment in the Shares.

16. As a further provision of the Agreement, Plaintiffs and Defendants agreed to share any profits from the resale of the Shares on an even 50/50 basis.

17. Pursuant to the Agreement, Plaintiffs, or their agents, paid Defendants $600,000.00.

18. Plaintiffs received shares of SpongeTech and Vanity stock with a fair market value of approximately $200,000.00. Plaintiffs did not receive the additional $400,000.00 worth of SpongeTech and Vanity stock they had bargained for.

19. Plaintiffs timely demanded payment on Defendants' guarantee to the extent of the $400,000.00 difference between the money Plaintiffs and their agents paid and the additional $200,000.00 worth of SpongeTech and Vanity stock Defendants provided to Plaintiffs.

20. Defendants have not satisfied their guarantee to Plaintiffs, notwithstanding Plaintiffs' timely demand to Defendants that they do so.

21. Upon information and belief, Defendant BUTLER comingled his personal funds with those of Defendant MSB GROUP throughout the period in question.

22. Upon information and belief, Defendant BUTLER utilizes Defendant MSB GROUP as his alter ego to conduct his personal business in the corporate form and used his domination of MSB GROUP to harm Plaintiffs.

3

## AS AND FOR A FIRST CAUSE OF ACTION FOR BREACH
## OF CONTRACT AGAINST BOTH DEFENDANTS

23. Plaintiffs repeat, reiterate and reallege the allegations set forth in paragraphs 1 through 22 of the within Complaint as if set forth fully herein.

24. On or about August 25, 2009, Plaintiffs and Defendants entered into the Agreement.

25. Pursuant to the Agreement, Plaintiffs agreed to advance to Defendants $600,000.00 for Defendants to purchase from a third party $600,000.00 worth of SpongeTech and Vanity stock.

26. Defendants, in turn, agreed to deliver $600,000.00 worth of stock to Plaintiffs.

27. Plaintiffs performed under the Agreement by advancing or causing their agents to advance to Defendants $600,000.00.

28. Defendants delivered $200,000.00 worth of SpongeTech and Vanity stock to Plaintiffs.

29. Plaintiffs demanded that Defendants deliver an additional $400,000.00 worth of SpongeTech and Vanity stock or its cash equivalent, or its cash equivalent, to Plaintiffs.

30. By failing to deliver the additional $400,000.00 worth of SpongeTech and Vanity stock or its cash equivalent, Defendants breached the Agreement.

31. As a result of Defendants' breach of contract, Plaintiffs were injured.

32. By reason of the foregoing, Plaintiffs have been damaged in the amount of at least $400,000.00 and in such further amounts as may be proven at trial.  Plaintiffs therefore pray for damages in the amount of no less than $400,000.00 for the Defendants' breach of contract.

4

## AS AND FOR A SECOND CAUSE OF ACTION FOR
## BREACH OF CONTRACT AGAINST BOTH DEFENDANTS

33. Plaintiffs repeat, reiterate and reallege the allegations set forth in paragraphs 1 through 32 of the within Complaint as if set forth fully herein.

34. Plaintiffs advanced to Defendants $600,000.00 in or about August and September of 2009.

35. On or about August 25, 2009, Defendants agreed in writing, for valuable consideration, and as special inducement to Plaintiffs to pay $600,000.00, to repay the full principal amount of Plaintiffs' $600,000.00 investment in the Shares. A copy of Defendants' written guarantee agreement is attached as Exhibit A.

36. Pursuant to this written guarantee agreement, Defendants guaranteed the return of Plaintiffs' $600,000.00 investment in the Shares.

37. Plaintiffs performed under the written guarantee agreement.

38. Defendants returned, in total, $200,000.00 to Plaintiffs.

39. Plaintiffs demanded that Defendants satisfy their guarantee to Plaintiffs in the amount of $400,000.00.

40. Defendants have not performed their guarantee.

41. Plaintiffs suffered loss in the amount of $400,000.00 as a result of Defendants' refusal to honor their guarantee of Plaintiffs' $600,000.00 investment in the Shares.

42. Plaintiffs seek damages in the amount of $400,000.00 as a result of Defendants' refusal to honor their obligation to satisfy their guarantee of Plaintiffs' $600,000.00 investment in the Shares.

5

43. Plaintiffs pray for damages in the amount of no less than $400,000.00 for the Defendants' breach of their guarantee agreement.

## AS AND FOR A THIRD CAUSE OF ACTION FOR UNJUST ENRICHMENT AGAINST BOTH DEFENDANTS

44. Plaintiffs repeat, reiterate and reallege the allegations set forth in paragraphs 1 through 43 of the within complaint as if set forth fully herein.

45. Defendants agreed to sell $600,000.00 worth of SpongeTech and Vanity stock to Plaintiffs.

46. Plaintiffs agreed to pay $600,000.00 for the $600,000.00 worth of SpongeTech and Vanity stock.

47. Plaintiffs or their agents gave Defendants $600,000.00 pursuant to the agreement mentioned in paragraphs 45 and 46.

48. Defendants gave Plaintiffs and their agents $200,000.00 worth of SpongeTech and Vanity stock pursuant to the agreement mentioned in paragraphs 45 and 46.

49. Plaintiffs demanded an additional $400,000.00 worth of SpongeTech and Vanity stock.

50. Defendants did not deliver any additional SpongeTech and Vanity stock to Plaintiffs.

51. As a result of these transactions, Defendants were unjustly enriched in the amount of $400,000.00.

52. It would be against equity and good conscience to permit Defendants to keep Plaintiff's $400,000.00 without compensating Plaintiffs.

6

53. Plaintiffs pray for damages in the amount of no less than $400,000.00 from Defendants as a result of Defendants' having been unjustly enriched as described above.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR CONVERSTION AGAINST BOTH DEFENDANTS

54. Plaintiffs repeat, reiterate and reallege the allegations set forth in paragraphs 1 through 53 of the within complaint as if set forth fully herein.

55.  Plaintiffs paid Defendants $600,000.00.

56. Defendants gave Plaintiffs $200,000.00 worth of securities.

57. Defendants never returned the $400,000.00 difference between what Plaintiffs paid them and the value of the property Defendants gave to Plaintiffs.

58. Plaintiffs demanded the return of the $400,000.00 difference between the value of the property Plaintiffs paid to Defendants and the $200,000.00 value of the property Defendants gave to Plaintiffs.

59. Defendants refused to return the $400,000.00 difference between the value of the property Plaintiffs gave Defendants and the value of the property Defendants gave Plaintiffs.

60. Because of the Defendants' wrongful conversion of Plaintiffs' property, Plaintiffs suffered damages in the amount of $400,000.00.

61. Plaintiffs pray for no less than $400,000.00 in damages from Defendants as a result of Defendants' wrongful conversion of Plaintiffs assets.

## AS AND FOR A FIFTH CAUSE OF ACTION TO PIERCE THE CORPORATE VEIL AGAINST DEFENDANT BUTLER

62. Plaintiffs repeat, reiterate and reallege the allegations set forth in paragraphs 1 through 61 of the within complaint as if set forth fully herein.

7

63. Defendant BUTLER engaged in a scheme or plan to defraud Plaintiffs out of $400,000.00 by promising to sell SpongeTech and Vanity stock, which he never intended to deliver.

64. Upon information and belief, as part of this scheme or plan, Defendant BUTLER used his corporation, Defendant MSB GROUP, to serve as a conduit for the sale of SpongeTech and Vanity stock.

65. Upon information and belief, Defendant BUTLER used Defendant MSB GROUP as his alter ego.

66. Upon information and belief, Defendant BUTLER comingled his personal funds with those of Defendant MSB GROUP.

67. Defendant Butler used his domination and control of Defendant MSB to commit a fraud or wrong against Plaintiffs.

68. As a result of the foregoing, Plaintiffs were injured by Defendant BUTLER's misuse of the corporate form in the amount of $400,000.00.

69. Plaintiffs pray for damages in the amount of no less than $400,000.00 as a result of Defendant BUTLER's misuse of the corporate form.

WHEREFORE, Plaintiffs demand judgment as follows:

Damages sustained as a result of Defendants' unlawful actions, together with interest thereon, in an amount to be proven at trial, but, in any event, in an amount no less than $400,000.00;

Reasonable costs, including attorneys' fees;

Such other relief as the Court may deem equitable, just and proper.

8

Dated:   New York, New York
         August 29, 2010

Yours, etc.

_Scott L. Fenstermaker_

Scott L. Fenstermaker, Esq.

THE LAW OFFICES OF
  SCOTT L. FENSTERMAKER, P.C.
100 Park Avenue, 16th Floor
New York, New York 10017
(212) 302-0201 (o)
(917) 817-9001 (c)
(212) 302-0327 (f)

Defendant's address:

Marcus S. Butler
801 Downing Street
Teaneck, New Jersey 07666

MSB Group, Incorporated
801 Downing Street
Teaneck, New Jersey 07666

9

# EXHIBIT A

**Scott Fenstermaker**

**From:** Solomon Sharbat [ssharbat@yahoo.com]
**Sent:** Thursday, May 13, 2010 4:28 PM
**To:** scott fenstermaker
**Subject:** Fw: Update investment

----- Forwarded Message -----
**From:** Marcus S. Butler <marcusbutler07@gmail.com>
**To:** Sol Sharbat <ssharbat@yahoo.com>
**Sent:** Tue, August 25, 2009 3:59:18 PM
**Subject:** Update investment

Solomon;

You are to receive the 550k once the stock is sold - and you will receive an additional 50k to cover part of your loss of getting the money today from Michael.

Please e-mail me the fed ref # asap so I could confirm it with my bank.

Marcus S. Butler
201.220.0031

Sent via BlackBerry by AT&T

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOLOMON SHARBAT AND
SOLOMON CAPITAL, LLC,

Plaintiffs,

-AGAINST-

MARCUS S. BUTLER AND
MSB GROUP INCORPORATED,

Defendants.

Case Number

**COMPLAINT**

The Law Offices of Scott L. Fenstermaker, P.C.
Attorney for the Plaintiffs

Office and Post Office Address
100 Park Avenue, 16th Floor
New York, New York 10017
(212) 302-0201 (Phone)
(917) 817-9001 (Cell)
(212) 302-0327 (Facsimile)

**Exhibit E**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

SOLOMON SHARBAT,
   SOLOMON CAPITAL, LLC,
   SOLOMON CAPITAL 401(k) TRUST,
   SOLOMON SHARBAT, as Trustee of the
   SOLOMON CAPITAL 401(k) TRUST,

                    Plaintiffs,

       -against-

MARCUS S. BUTLER and
   MSB GROUP INCORPORATED,

                  Defendants.

------------------------------------------------------------------X

Case No. 10 CV 6455 (SAS)

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiffs, SOLOMON SHARBAT, SOLOMON CAPITAL LLC, SOLOMON

CAPITAL 401(k) TRUST, and SOLOMON SHARBAT, as Trustee of the Solomon Capital

401(k) TRUST, as and for their Amended Complaint, respectfully allege:

### JURISDICTION AND VENUE

      1.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332 because there is complete diversity among the parties and the amount in controversy

exceeds $75,000.

      2.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial

part of the events giving rise to the claims in this lawsuit occurred in the Southern District of

New York.

1

**PARTIES**

3.   Plaintiff SOLOMON SHARBAT ("SHARBAT") is an individual residing in New York State.

4.   Plaintiff SOLOMON CAPITAL, LLC ("SOLOMON CAPITAL") is a limited liability company formed under the laws of the state of New York.

5.   Plaintiff SOLOMON CAPITAL 401(k) TRUST is a qualified retirement trust organized under the laws of the State of New York.  SHARBAT serves as the trustee of the trust.

6.   Plaintiff SOLOMON CAPITAL's principal place of business is New York, New York.

7.   Plaintiff SOLOMON CAPITAL 401(k) TRUST's principal place of business is New York, New York.

8.   Upon information and belief, defendant MARCUS S. BUTLER ("BUTLER") is an individual residing in the Town of Teaneck, State of New Jersey

9.   Upon information and belief, defendant MSB GROUP INCORPORATED ("MSB GROUP") is a corporation organized under the laws of the state of New Jersey.

10.  Upon information and belief, the principal place of business of Defendant MSB GROUP is Teaneck, New Jersey.

11.  Defendants both actively and regularly solicit business in New York, New York.

12.  Defendants both actively solicited the business of Plaintiffs SHARBAT, SOLOMON CAPITAL, and SOLOMON CAPITAL 401(k) TRUST, that is the subject of this Amended Complaint, in New York, New York.

13.  Upon information and belief, Defendant BUTLER is the sole owner of Defendant MSB GROUP.

2

14. In his capacity as owner of Defendant MSB GROUP, Defendant BUTLER solicited Plaintiffs' business in the Southern District of New York, including the business that is the subject of this Amended Complaint.

15. On or about August 25, 2009, Plaintiffs and Defendants entered into an agreement (the "Agreement") for the purchase of shares of stock of SpongeTech Delivery Systems, Inc. ("SpongeTech") and Vanity Events Holding, Inc. ("Vanity") valued at $600,000.00 (the "Shares").

16. As part of the Agreement, Plaintiffs agreed to advance $600,000.00 to Defendants for the purchase of the Shares from a third party.

17. In return, Defendants agreed to deliver the Shares to Plaintiffs, warranted that the Shares were worth $600,000.00 and agreed to guarantee that Plaintiffs would receive a minimum of $600,000.00 upon the resale of the Shares. If Plaintiffs received less than $600,000.00 upon the resale of the Shares, Defendants agreed to pay to Plaintiffs an amount necessary to make Plaintiffs whole to the extent of their $600,000.00 investment in the Shares.

18. As a further provision of the Agreement, Plaintiffs and Defendants agreed to share any profits from the resale of the Shares on an even 50/50 basis.

19. Pursuant to the Agreement, Plaintiffs, or their agents, paid Defendants $600,000.00.

20. Plaintiffs agreed to pay a third party, Michael Hartstein ("Hartstein"), $60,000.00 to act as Plaintiffs' agent by advancing monies necessary to partially fund Plaintiffs' purchase of $600,000.00 worth of SpongeTech and Vanity stock from Defendants.

21. As Plaintiffs' agent, Hartstein partially funded Plaintiffs' $600,000.00 payment obligation under the Agreement.

3

22. Plaintiffs repaid Hartstein in full for the portion of the $600,000.00 payment that Hartstein advanced.

23. Hartstein's agency fee attributable to his partial funding of Plaintiffs' $600,000.00 payment obligation pursuant to the Agreement was $60,000.00.

24. Defendants agreed to pay Hartstein's $60,000.00 agency fee on behalf of Plaintiffs in order to induce Plaintiffs to provide $600,000.00 to purchase the Shares from the third party.

25. Defendants never paid Hartstein's $60,000.00 agency fee.

26. Plaintiffs paid Hartstein's $60,000.00 agency fee, notwithstanding Defendants' agreement to pay Hartstein's $60,000.00 agency fee on Plaintiffs' behalf.

27. Plaintiffs made a timely demand that Defendants pay Hartstein's $60,000.00 agency fee as agreed upon.

28. Plaintiffs received shares of SpongeTech and Vanity stock with a fair market value of approximately $200,000.00.  Plaintiffs did not receive the additional $400,000.00 worth of SpongeTech and Vanity stock they had bargained for.

29. Plaintiffs timely demanded payment on Defendants' guarantee to the extent of the $400,000.00 difference between the money Plaintiffs and their agents paid and the additional $200,000.00 worth of SpongeTech and Vanity stock Defendants provided to Plaintiffs.

30. Defendants have not satisfied their guarantee to Plaintiffs, notwithstanding Plaintiffs' timely demand to Defendants that they do so.

31. Upon information and belief, Defendant BUTLER comingled his personal funds with those of Defendant MSB GROUP throughout the period in question.

4

32. Upon information and belief, Defendant BUTLER utilizes Defendant MSB GROUP as his alter ego to conduct his personal business in the corporate form and used his domination of MSB GROUP to harm Plaintiffs.

## AS AND FOR A FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT AGAINST BOTH DEFENDANTS

33. Plaintiffs repeat, reiterate and reallege the allegations set forth in paragraphs 1 through 32 of the within Amended Complaint as if set forth fully herein.

34. On or about August 25, 2009, Plaintiffs and Defendants entered into the Agreement.

35. Pursuant to the Agreement, Plaintiffs agreed to advance to Defendants $600,000.00 for Defendants to purchase from a third party $600,000.00 worth of SpongeTech and Vanity stock.

36. Defendants, in turn, agreed to deliver $600,000.00 worth of stock to Plaintiffs.

37. Plaintiffs performed under the Agreement by advancing or causing their agents to advance to Defendants $600,000.00.

38. Defendants delivered $200,000.00 worth of SpongeTech and Vanity stock to Plaintiffs.

39. Plaintiffs demanded that Defendants deliver an additional $400,000.00 worth of SpongeTech and Vanity stock or its cash equivalent, to Plaintiffs.

40. By failing to deliver the additional $400,000.00 worth of SpongeTech and Vanity stock or its cash equivalent, Defendants breached the Agreement.

41. As a result of Defendants' breach of contract, Plaintiffs were injured.

5

42. By reason of the foregoing, Plaintiffs have been damaged in the amount of at least $400,000.00 and in such further amounts as may be proven at trial. Plaintiffs therefore pray for damages in the amount of no less than $400,000.00 for the Defendants' breach of contract.

## AS AND FOR A SECOND CAUSE OF ACTION FOR
## BREACH OF CONTRACT AGAINST BOTH DEFENDANTS

43. Plaintiffs repeat, reiterate and reallege the allegations set forth in paragraphs 1 through 42 of the within Amended Complaint as if set forth fully herein.

44. Plaintiffs advanced to Defendants $600,000.00 in or about August and September of 2009.

45. On or about August 25, 2009, Defendants agreed in writing, for valuable consideration, and as special inducement to Plaintiffs to pay $600,000.00, to repay the full principal amount of Plaintiffs' $600,000.00 investment in the Shares. A copy of Defendants' written guarantee agreement is attached as Exhibit A.

46. Pursuant to this written guarantee agreement, Defendants guaranteed the return of Plaintiffs' $600,000.00 investment in the Shares.

47. Plaintiffs performed under the written guarantee agreement.

48. Defendants returned, in total, $200,000.00 to Plaintiffs.

49. Plaintiffs demanded that Defendants satisfy their guarantee to Plaintiffs in the amount of $400,000.00.

50. Defendants have not performed their guarantee.

51. Plaintiffs suffered loss in the amount of $400,000.00 as a result of Defendants' refusal to honor their guarantee of Plaintiffs' $600,000.00 investment in the Shares.

6

52. Plaintiffs seek damages in the amount of $400,000.00 as a result of Defendants' refusal to honor their obligation to satisfy their guarantee of Plaintiffs' $600,000.00 investment in the Shares.

53. Plaintiffs pray for damages in the amount of no less than $400,000.00 for the Defendants' breach of their guarantee agreement.

## AS AND FOR A THIRD CAUSE OF ACTION FOR BREACH OF CONTRACT AGAINST BOTH DEFENDANTS

54. Plaintiffs repeat, reiterate and reallege the allegations set forth in paragraphs 1 through 53 of the within Amended Complaint as if set forth fully herein.

55. Plaintiffs agreed to pay Michael Hartstein $60,000.00 to serve as their agent by advancing monies to Defendants on Plaintiffs' behalf as consideration for Plaintiffs' purchase of $600,000.00 worth of SpongeTech and Vanity stocks.

56. Defendants agreed to pay Mr. Hartstein's $60,000.00 agency fee on Plaintiffs' behalf to induce Plaintiffs to enter into the Agreement.

57. Defendants never paid Mr. Hartstein's $60,000.00 agency fee, as promised.

58. Plaintiffs paid Mr. Hartstein's $60,000.00 agency fee.

59. Plaintiffs made a timely demand that Defendants pay Mr. Hartstein's $60,000.00 agency fee.

60. Plaintiffs suffered loss in the amount of $60,000.00 as a result of Defendants' refusal to honor their promise to pay Mr. Hartstein's $60,000.00 agency fee.

61. Plaintiffs seek damages in the amount of $60,000.00 as a result of Defendants' refusal to honor their obligation to pay Mr. Hartstein's $60,000.00 agency fee.

7

62. Plaintiffs pray for damages in the amount of no less than $60,000.00 for the Defendants' breach of their agreement to pay Mr. Hartstein's $60,000.00 agency fee.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR
## UNJUST ENRICHMENT AGAINST BOTH DEFENDANTS

63. Plaintiffs repeat, reiterate and reallege the allegations set forth in paragraphs 1 through 62 of the within Amended Complaint as if set forth fully herein.

64. Defendants agreed to sell $600,000.00 worth of SpongeTech and Vanity stock to Plaintiffs.

65. Plaintiffs agreed to pay $600,000.00 for the $600,000.00 worth of SpongeTech and Vanity stock.

66. Plaintiffs or their agents gave Defendants $600,000.00 pursuant to the Agreement.

67. Defendants gave Plaintiffs and their agents $200,000.00 worth of SpongeTech and Vanity stock pursuant to the Agreement.

68. Plaintiffs demanded an additional $400,000.00 worth of SpongeTech and Vanity stock.

69. Defendants did not deliver any additional SpongeTech and Vanity stock to Plaintiffs.

70. As a result of these transactions, Defendants were unjustly enriched in the amount of $400,000.00.

71. It would be against equity and good conscience to permit Defendants to keep Plaintiff's $400,000.00 without compensating Plaintiffs.

72. Plaintiffs pray for damages in the amount of no less than $400,000.00 from Defendants as a result of Defendants' having been unjustly enriched as described above.

8

## AS AND FOR A FIFTH CAUSE OF ACTION FOR
## CONVERSTION AGAINST BOTH DEFENDANTS

73. Plaintiffs repeat, reiterate and reallege the allegations set forth in paragraphs 1 through 72 of the within Amended Complaint as if set forth fully herein.

74.  Plaintiffs paid Defendants $600,000.00.

75. Defendants gave Plaintiffs $200,000.00 worth of securities.

76. Defendants never returned the $400,000.00 difference between what Plaintiffs paid them and the value of the property Defendants gave to Plaintiffs.

77. Plaintiffs demanded the return of the $400,000.00 difference between the value of the property Plaintiffs paid to Defendants and the $200,000.00 value of the property Defendants gave to Plaintiffs.

78. Defendants refused to return the $400,000.00 difference between the value of the property Plaintiffs gave Defendants and the value of the property Defendants gave Plaintiffs.

79. Because of the Defendants' wrongful conversion of Plaintiffs' property, Plaintiffs suffered damages in the amount of $400,000.00.

80. Plaintiffs pray for no less than $400,000.00 in damages from Defendants as a result of Defendants' wrongful conversion of Plaintiffs assets.

## AS AND FOR A SIXTH CAUSE OF ACTION TO PIERCE THE
## CORPORATE VEIL AGAINST DEFENDANT BUTLER

81. Plaintiffs repeat, reiterate and reallege the allegations set forth in paragraphs 1 through 80 of the within Amended Complaint as if set forth fully herein.

9

82. Defendant BUTLER engaged in a scheme or plan to defraud Plaintiffs out of $400,000.00 by promising to sell SpongeTech and Vanity stock, which he never intended to deliver.

83. Upon information and belief, as part of this scheme or plan, Defendant BUTLER used his corporation, Defendant MSB GROUP, to serve as a conduit for the sale of SpongeTech and Vanity stock.

84. Upon information and belief, Defendant BUTLER used Defendant MSB GROUP as his alter ego.

85. Upon information and belief, Defendant BUTLER comingled his personal funds with those of Defendant MSB GROUP.

86. Defendant Butler used his domination and control of Defendant MSB GROUP to commit a fraud or wrong against Plaintiffs.

87. As a result of the foregoing, Plaintiffs were injured by Defendant BUTLER's misuse of the corporate form in the amount of $400,000.00.

88. Plaintiffs pray for damages in the amount of no less than $400,000.00 as a result of Defendant BUTLER's misuse of the corporate form.

WHEREFORE, Plaintiffs demand judgment as follows:

Damages sustained as a result of Defendants' unlawful actions, together with interest thereon, in an amount to be proven at trial, but, in any event, in an amount no less than $460,000.00;

Reasonable costs, including attorneys' fees;

Such other relief as the Court may deem equitable, just and proper.

10

Dated:    New York, New York
          September 15, 2010

                                        Yours, etc.


                                        _____
                                        Scott L. Fenstermaker, Esq.

                                        THE LAW OFFICES OF
                                           SCOTT L. FENSTERMAKER, P.C.
                                        *Attorneys for Plaintiffs*
                                        100 Park Avenue, 16th Floor
                                        New York, New York 10017
                                        (212) 302-0201 (o)
                                        (917) 817-9001 (c)
                                        (212) 302-0327 (f)


Defendant's address:

Marcus S. Butler
801 Downing Street
Teaneck, New Jersey 07666

MSB Group, Incorporated
801 Downing Street
Teaneck, New Jersey 07666

11

# EXHIBIT A

**Scott Fenstermaker**

| | |
|---|---|
| **From:** | Solomon Sharbat [ssharbat@yahoo.com] |
| **Sent:** | Thursday, May 13, 2010 4:28 PM |
| **To:** | scott fenstermaker |
| **Subject:** | Fw: Update investment |

----- Forwarded Message ----
**From:** Marcus S. Butler <marcusbutler07@gmail.com>
**To:** Sol Sharbat <ssharbat@yahoo.com>
**Sent:** Tue, August 25, 2009 3:59:18 PM
**Subject:** Update investment

Solomon;

You are to receive the 550k once the stock is sold - and you will receive an additional 50k to cover part of your loss of getting the money today from Michael.

Please e-mail me the fed ref # asap so I could confirm it with my bank.

Marcus S. Butler
201.220.0031

Sent via BlackBerry by AT&T

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case Number 10 CV 6455 (SAS)

SOLOMON SHARBAT,
SOLOMON CAPITAL, LLC,
SOLOMON CAPITAL 401(k) TRUST,
SOLOMON SHARBAT, as Trustee of the
SOLOMON CAPITAL 401(k) TRUST,

Plaintiffs,

-AGAINST-

MARCUS S. BUTLER AND
MSB GROUP INCORPORATED,

Defendants.

**AMENDED COMPLAINT**

The Law Offices of Scott L. Fenstermaker, P.C.
Attorney for the Plaintiffs

Office and Post Office Address
100 Park Avenue, 16th Floor
New York, New York 10017
(212) 302-0201 (Phone)
(917) 817-9001 (Cell)
(212) 302-0327 (Facsimile)